

### IN THE UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF ILLINOIS

Zafar Sheikh )
)
)
*vs.* )
)
John Wheeler )
Raj Badri )
Countryside Bank )
Jeffery Nitti )
Windsor Advantage )
Appraisal Research Counselors )
Cary A. Lannin )
Appraisal Research Counselors )
Nancy Townsend )
Burke Costanza & Cranberry )
Hasan Musleh )
Nidal Musleh )
)
*Defendants* )

**FILED**

JUL 24 2018

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

1:18-cv-05037
Judge Gary Feinerman
Magistrate Judge Jeffrey Cole

### COMPLAINT FOR RACKETEERING & VIOLATIONS OF RICO ACT, FRAUD, ENGAGING IN ACTS OF PREDATORY LENDING, LOAN SHARKING & VIOLATIONS OF SBA CODES & PROCEDURES, FILING VEXATIOUS LAWSUIT TO HARASS AND TO DEFAME, TORTIOUS INTERFERENCE & OBSTRUCTING INTERSTATE COMMERCE

NOW COMES the Plaintiff Zafar Sheikh, acting pro se and files this complaint

against the Defendants named above for Racketeering & violations of Rico act,

Constructive fraud, breach of contract, engaging in acts of predatory lending, loan

sharking, violations of SBA (Small business administration) FDIC and treasury

regulations, codes and operating procedures, filing of vexatious lawsuits for the purpose

of harassing, blackmailing and defaming, printing libelous statements to defame and non-payment of rents and inventory. In support whereof the Plaintiff hereby states as follows:

## JURISDICTION & VENUE

1- This Court has original jurisdiction under 28 U.S.C. § 1331 as the Jurisdiction is conferred upon this Court by Civil Rico Statutes 18 U.S.C. §§ 1961-1968 which expressly authorize civil remedies in the U.S. District Courts.

The Court also has supplemental Jurisdiction under 28 U.S. Code § 1367 which provides that in any civil action in which the district courts have original jurisdiction, the District Courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. Such supplemental jurisdiction includes claims that involve the joinder or intervention of additional parties. The matter in controversy exceeds the sum of $75,000 exclusive of interest and costs.

## PARTIES

2- Plaintiff Zafar Sheikh is a resident of the City of Chicago, Illinois.

3- Defendant John Wheeler is an officer of the Countryside bank and is resident of the State of Illinois.

4- Raj Badri at all times relevant was an officer of the Countryside bank, and on information and belief is a resident of the County of Cook, State of Illinois.

5- Countryside bank is a small bank with one or two branches in Chicago Suburbs, and is based in the village of Countryside, Cook County, Illinois.

6- Jeffery Nitti, on information and belief, is a resident of the City of Chicago and is gainfully employed by Windsor Advantage.

7-    Windsor Advantage, on information and belief is a Delaware Corporation and is engaged in providing varied debt collection services to banks and other institutions.

8-    Cary Lannin is an appraiser who is certified to conduct appraisers in the State of Illinois.

9-    'Appraisal Research Counselors' is a company which is registered in Illinois and its primary functions include appraising properties for banks and other institutions for the purpose of bank loans and refinancing.

10-    Nancy Townsend is a debt collection attorney, and on information and belief is a resident of either Merrillville or its surrounding suburbs in Lake County, Indiana.

11-    Burke Costanza & Carberry is a law firm which is based in Merrillville, Indiana and employs Nancy Townsend.

12-    Hasan Musleh is a resident of Lake County, State of Indiana.

13-    Nidal Musleh is a resident of Skokie, Illinois.

14-    Plaintiff is informed and believe and thereupon allege that the defendants entered into a conspiracy to where they fraudulently and wrongfully evaluated, appraised and underwrote the bank loan which was predatory in nature and the purpose of that was not legitimate financing but rather engaging in the acts of loan sharking. The value of the business and property that was apparently financed was woefully inflated and exaggerated by the Defendants and their hand picked appraisal company, enabling them to reap exorbitant profits at superficially high monthly payments, which were unsustainable and which lead to the business' ultimate demise. Further these Defendants acted jointly, conspired together among themselves and with each other in order for the Plaintiffs to be induced and nudged towards entering into an SBA loan, and the purchase

of the business and property as described fully in this complaint, such that they had a community of interest in this undertaking and agreed to share in the economic benefits and proceeds derived from such scheme and conspiracy to defraud. That these defendants made commitments and representations with the Plaintiff regarding the transfer of loans, which they reneged on and in the process defrauded them. These Defendants acted in a cabal and engaged in the acts of Racketeering in express violations of the Rico act, 18 U.S.C. § 1961-1968.

15-    The Defendants acted in collusion with each other so therefore each defendant is responsible for the acts and omissions of each of the other defendants. The Defendants demonstrated their malice by filing a bogus and fictitious lawsuit against Plaintiffs alleging falsely that the Plaintiffs are guilty of theft and fraud. This lawsuit was vexatious and its only purpose was to harass, intimidate, blackmail and defame the Plaintiff. After publicizing this lawsuit on internet and defaming the Plaintiff, the Defendants knowing their falsehoods were all made up, conveniently and suddenly withdrew their allegations and asked the Court that they want to withdraw those charges filed against the Plaintiff and dismiss them from the Court proceedings.

16-    Defendants schemed among themselves and interfered in the business dealings and contractual relationships of the Plaintiff and played the role of spoilers in having a legally and contractually binding lease implemented, that the Plaintiff had entered into with the Lessee/s Nidal and Hasan Musleh. Those Lessees who are also Defendants in this lawsuit either because of intimidation and blackmail, or at their own volition, decided to renege on the terms and conditions of the lease and refused to pay for the inventory and the rents due under that lease.

17-     Plaintiff is informed and believe, and on that basis allege, that all the acts and
omissions alleged against these Defendants described in this Complaint are implicated to
have been done by any defendant or defendants, were duly performed by, and attributable
to all defendants, each acting as agent, as owner, as employee, adviser or counselor, alter
ego and/or under the direction and control of the others, and that said acts and omissions
were within the scope of said agency, employment, alter ego, direction, and/or control.
Whenever and wherever reference is made in this complaint to any acts of defendants,
such allegations and references shall also be deemed to mean the acts of each defendant,
acting individually, jointly or severally.

## BRIEF  FACTUAL  BACKGROUND

18-     In the summer of 2014 the Plaintiff in this case, namely Zafar Sheikh, along with
a partner, Bashir Chaudry had been looking for a business opportunity, were solicited by
the owners of the Central Market, (meat/Supermarket) who offered to sell them the
business along with the property located at 3232 Central Avenue, in Lake Station,
Indiana.

19-     A contract between the Sellers by one Naser Musleh / Feras Musleh and the
buyers, Sheikh and Chaudry, was prepared, signed and sealed and presented to the
Countryside bank for loan. (Exhibit A). The initial contact officer at the bank was Raj
Badri, who had known Bashir Chaudry for years. Badri took in the loan application and
forwarded that request of Sheikh and Chaudry to John Wheeler, President of the
Countryside bank. After few days, Badri notified the above named Plaintiff and Chaudry,
after the file was reviewed by president John Wheeler that the applicants credit score was
insufficient for the SBA loan. However John Wheeler did not reject the application, but

suggested that the Plaintiffs bring forward individual or individuals who have better and/or higher credit scores, which would make it possible for him to have the SBA (small business administration) approval and thus enable the bank to underwrite the loan.

20-    Having been enticed and induced by John Wheeler's suggestion, Plaintiff Zafar Sheikh asked his son, Sean Sheikh and Bashir Chaudry asked his sister in law, Bushra Naseer, if they could be the applicants for the bank loan as suggested by Badri and Wheeler. Both newly minted 'buyers' knew that they were not going to be involved in the operation and the supermarket for all practical purposes will be run and operated by the Plaintiff Sheikh and Chaudry. An inter-family agreement struck within each family of Sheikh and Chaudry provided that in case of adversity, the original buyers, Zafar Sheikh and Bashir Chaudry will remain liable and will assume all risk associated with the true performance of the loan. Countryside bank was notified of this, and both John Wheeler and Raj Badri approved this inter-family arrangement.

## 'NEW BUYERS' WERE INDUCED BY THE BANK, NEVER VISITED THE BANK, NOR TALKED TO ANY BANK OFFICIALS

21-    The applicants for the loan, who were put forward for the bank loan, at the suggestion, recommendation and inducement of President John Wheeler and vice president Raj Badri never visited the bank. President John Wheeler who concocted this scheme along with Raj Badri, his vice president for SBA loans, never even spoke to the 'new buyers' Sean Sheikh or Bushra Naseer. John Wheeler and Badri told the Plaintiffs that since they were dealing with the 'real buyers', they need not see either Sean Sheikh or Bushra Naseer or even need to talk to them.

22-    John Wheeler and Badri directed the Plaintiffs Zafar Sheikh and Bashir

Chaudry to ditch the earlier contract that they had presented to the bank, and have another contract prepared which would name Sean sheikh and Bushra Naseer as the 'buyers' and thus as being the applicants. Plaintiffs thus on the recommendation of Wheeler and Badri hired an attorney in Indiana, who was instructed as per the guidelines provided by these officials, as to how a contract should be prepared, and what exactly should the contract describe, to meet the bank's format. (Exhibit B). Wheeler and Badri even suggested how the loan application should be filled.

## 'NEW BUYERS' NEVER MET THE SELLERS NOR THEY EVER VISITED THE BUSINESS THEY WERE BUYING

23-    Sean Sheikh and Bushra Naseer never met the sellers of the business Mr. Musleh, the owner of the market who was selling the business. It was pointed out to Mr. Wheeler and Raj Badri of this situation, as SBA's rules and regulations explicitly prohibit loans to those individuals who act as intermediaries and do not run or operate the business themselves and who are qualified by SBA as 'absentees' or 'investor' in a venture, in which they are silent partners. But Wheeler and Badri told the defendants 'not to worry and let them take care of the SBA and their approvals'.

## BANK DESIGNATED BUYERS DIDN'T MAKE ANY DOWN PAYMENTS

24-    SBA regulations and bylaws specify that the individuals who purchase the business are required to make the down payments towards the purchase of the business. The bank designated buyers did not put any money down towards the purchase of the business. Instead the bank officials Wheeler and Raj Badri concocted another scheme and told the Defendants Chaudry and Sheikh that they will circumvent this requirement by preparing a 'gift' letter, which would satisfy the SBA requirements of making down

payments by the 'new buyers'. The format of the 'gift letter' briefed and suggested by Wheeler to the Plaintiffs as to how this letter is to be written, which stated that the down payment made towards the purchase of the business was a gift from the Plaintiff.

## SBA REQUIRES THAT INDIVIDUALS BUYING THE BUISNES MUST HAVE EXPERIENCE IN THAT BUSINESS

25- Another requirement of the SBA for approval of loans and their loan guaranty to be effective, is the requirement that the individuals who are purchasing the business are well qualified and experienced in running the kind of business that they intend to purchase. This requirement is to make sure that the buyers have the business acumen and experience in the business that they are purchasing, as the individuals with the proper experience take good care in managing and operating the new business and are likely to be successful in running that business and meeting their loan obligations. This relates directly to the risk factor that the SBA thinks a business could face, if it is acquired by people with no experience in a particular line of business. According to SBA's internal studies, the businesses that are run by inexperienced operators have a high likelihood of going under, which results in losses for the SBA as SBA writes the loan guaranty and legally is obligated to compensate the bank, in case of default.

26- The bank was told up front that the bank's designated buyers, Bushra Naseer and Sean Sheikh had zero experience in running a meat / supermarket. Additionally both of these 'bank designated' buyers were residing thousands of miles away from where the business was being purchased. Sean lived in New York City, about 1800 miles from Lake Station, Indiana, and the other 'buyer' Bushra Naseer had relocated to Pakistan with her family and lived in Pakistan, about 7000 miles away. The

Defendants are not aware as to how the Countryside bank circumvented this condition relating to the experience requirement of the buyers, and the additional requirement that the buyers MUST not be absentees and should run the business *in person and by themselves,* with adequate experience. On information and belief, one can say with reasonable certainty that the bank fabricated the resume of the 'bank designated buyers' and sent that to the SBA which most probably showed that the bank designated buyers had the necessary experience and know-how and were themselves going to run the business which was being purchased.

## BANK PRODUCED A DEFECTIVE AND INFLATED
## APPRAISAL, MERELY TO SELL THE LOAN

27-  The Plaintiff had access to an appraiser who could have done the property appraisal for less than $500. But Mr. Badri insisted that the bank would like to use its own appraiser. According to Badri the appraiser that the bank used had excellent experience in doing commercial appraisals, specially those relating to the meat and super-markets. Badri demanded $5,000 for this appraisal. Though this was a large sum of money, but Plaintiffs had no choice but to agree to pay this sum, **as the bank was in dominant position, controlled and directed the process and was calling all shots at that time.**

28-  The appraisers who were hired by the bank, "Appraisal Research Counselors" had been working for the Countryside bank for years. The appraisal that those appraisers produced for the Lake Station property exaggerated and inflated the value of the property, merely to qualify it for the SBA loan. The bank appraisers also failed to look at the refrigeration system of the supermarket, which practically started failing from the very

first day that the Defendants took control of the business. This refrigeration system's failure cost the defendants well in excess of $200,000 in the very first year, in equipment maintenance, which repeatedly broke down, and in replacement of the inventory which would spoil each time the refrigeration system broke down. (Exhibit C).

29-     The bank appointed appraisers whom Badri had touted as "expert in appraising commercial properties, specially meat/supermarkets" also failed to look at the condition of the roof, which was leaking from dozens of places, and after each rain, resulted in store being flooded from numerous places. Those roof repairs cost the Plaintiff thousands of dollars and also affected the business operations.

30-     The bank appraiser James Kutill who wrote the appraisal and the accompanying report, on information and belief, was not even licensed to practice in Indiana. SBA requires that the appraiser who does the appraisal MUST be licensed in the state where the property is located.

## BANK HAD PROMISED TO RE-FINANCE THE LOAN
## AFTER 90 DAYS OF ITS ORIGINAL CLOSING

31-     Sean Sheikh who had volunteered at the bank's urging to be the 'new owner' along with Bushra Naseer had serious reservations, as the loan being acquired was too big for his mental comfort, and his income, and so he had demanded, thru the Plaintiff, as he had never spoken to the bank officials himself, that he would like to be out as soon as possible from the shadow of this massive loan.

32-     John Wheeler and Badri gave their personal assurances to the Plaintiff and Chaudry that within 90 days of the closing of the SBA's original loan, they will re-finance that loan and transfer the loan to Bushra Naseer name. According to Wheeler, once the SBA approves the original loan, the re-financing of the same loan requires

hardly any further SBA input, and the bank after closings has much more leeway in refinancing and reconverting the loan.

33-    After 90 days, sometime in early September 2015, the Plaintiff called upon Mr. Wheeler and Badri, with whom the Plaintiffs had commitments that Sean's name will be taken out of the loan and that the loan will be transferred to Bushra Naseer's name. The bank had changed its tack by then, and to great surprise of the Plaintiffs, the bank started making new demands and asked for an additional $190,000 to transfer the loan to Ms. Naseer's name. Badri told the Plaintiffs, that since the loan is less than a year old, the bank will charge 5% of the total loan amount as penalty, plus 3% as a new bank guaranty and closing costs of approximately $20,000.

34-    This demand by Wheeler and Badri was an outright extortion and there was no way that the Plaintiffs, with all recurring problems with refrigeration system failures and stiff losses, could comply with this demand. Plaintiffs called the SBA and enquired about those transfer and switchover costs and fees that the bank was levying. SBA informed the Plaintiff that the bank is not allowed to charge any penalty or costs, as the transfer of loan from one owner to the second owner is not qualified as a new loan, but rather in house conversion, which should not entail any such penalties, reinsurance or exorbitant closing costs. Plaintiffs told Badri of what they were told by the SBA, but Badri refused to budge. Badri related that its not him, but John Wheeler who is demanding that those fees and penalties should be paid for the loan transfer, and Badri cannot render any help, as "he must listen to his boss" (Bank president John wheeler).

### BANK DIDN'T INVESTIGATE THE HIGH MEDICAL COSTS
### WHICH WERE MISREPRESENTED BY SELLER MUSLEH

35-    During the bank's due diligence process, Badri discovered that the tax returns

provided by the Seller Mr. Musleh, showed a substantial amount over $159,000 was being paid for the insurance expenditures of the super market. Mr. Badri notified the Plaintiffs that this is too high of an expenditure and leaves the Supermarket with not enough cash flow.

36    The matter was discussed with the Seller Mr. Feras Musleh, who sent an email back to Mr. Badri, notifying him that the bulk of that insurance cost was for the medical expenses of the unionized employees, and that cost had been shifted and had been transferred to the employees to pay themselves. (Exhibit D).

37    This assertion by the Seller Musleh came out to be totally fraudulent, as after taking over the supermarket, the Plaintiffs discovered that this cost was still payable by the supermarket and was not the responsibility of the employees.

38-    It can be said that this response from the seller Mr. Musleh may have been enticed by Mr. Badri, who most probably had advised Musleh to respond in this way, as this could pave the way for the bank to move ahead with the loan. Regardless of the Seller's response, Mr. Badri had an obligation to investigate Seller's claim, as it was a substantial sum of money, but regrettably Badri failed to make any further enquiries to substantiate Seller's claim. All Wheeler and Badri wanted was the loan to go thru, as any meaningful enquiry into this large insurance expenditure may have blocked this loan.

## REFRIGERATION FAILURES & EMPLOYEE MEDICAL PAYMENTS
## CREATED A SEVERE CASH SQUEEZE

39-    The continuous breakdown of the refrigeration system, the extensive roof leaks and dislocation it was causing the business in lost merchandise and repair costs, as well as the unexpected monthly payments of at least 6 to 7 thousand dollars in

employees medical health insurance put the business in financial stress. Despite the Plaintiff's untiring efforts to manage the situation, it all proved futile. The supermarket faced declining revenues and cash squeeze. On top of that, adding insult to injury, the wholesale supplier of the supermarket, Centrella Grocers, who was holding $160,000 in cash deposits against the Supermarket's account, filed for bankruptcy, thus retaining that cash deposit. (pending in Northern District of Illinois).

40- After loosing their supplier, Centrella Grocers, the Plaintiff had to scramble and look for another wholesale supplier. Another wholesaler, AWG (Associated wholesale grocers) was located and signed on to supply the grocery and other merchandise to the supermarket. But they too, as is customary in the trade, wanted a deposit, against which they would supply merchandise to the supermarket.

## AS PER SBA GUIDELINES & OPERATING PROCEDURES COUNTRYSIDE BANK WAS ADVISED OF THE SITUATION

42- As per the guidelines, Countryside bank was immediately contacted. Numerous meetings were held at the Countryside bank, in Countryside, Illinois with Mr. Raj Badri. He was apprised of the situation, specially in view of the defective refrigeration system and the bank's failure to properly investigate the representations of the seller's regarding the medical insurance of the union employees, which was an additional drain of almost $7,000 a month on the business. Badri was asked to see if bank could provide a break either in lowering of interest rate that it charged the business or reducing the principal for few months, till the business could find its footing. To the disappointment of the Plaintiff, Badri confided that the bank's hands were tied, as it had already sold the loan in the

13

secondary market and could not lower the interest or the principal. Nevertheless Badri

promised to talk to the bank president John wheeler and get his ideas as how to proceed.

43-     Bank was told that to merely stay in business, the refrigeration system needed to

be fixed as it was in disrepair and the cost of partly fixing those units was in excess of

fifty thousand dollars. Bank was also advised of the situation that was created by the

Centralla grocers sudden filing of bankruptcy and additional sums required towards

posting additional deposits with AWG.

## BANK ASKED TO EITHER SELL OR LEASE
## THE BUSINESS

44-     In the next few meetings held at the bank, Badri told the Plaintiff that he had

spoken to President John Wheeler, and he regrets that the bank can't do much to help

financially but advised that the Plaintiff should try to either sell or lease the business,

which would save the business as well as provide an opportunity to the Plaintiff and

Chaudry to stay current on their loan by forwarding the monthly rental amounts that they

receive to the bank towards their mortgage payments. (Exhibit E & E-1)

With the supermarket having no money to either pay the AWG deposit or to fix the

failing refrigeration system, it turned to the Plaintiff zafar sheikh, who advanced it the

needed amount of $105,000, so it could pay the AWG deposit as well as partially fix the

refrigeration system, so the store could keep itself in functional order and as per the

suggestions of John Wheeler could be either sold or leased to a third party. These sums

were disbursed despite the dire situation in hopes of keeping the store open, as a shuttered

store would not elicit anyone's interest in either buying or leasing the business.

45-     Plaintiff Sheikh deposited the sums required by the AWG grocers and also had

the refrigeration system partially repaired. After taking care of those issues, the Plaintiff

actively started looking for a prospect who could invest some money and acquire the business. Few business brokers were contacted and word was also spread out that the supermarket business was either for sale or lease. Centrella Grocers and later Affiliated wholesale grocers, who supplied the groceries to the other supermarkets were also courted to see if any one of their vendors may be interested in acquiring the business. There are handful of supermarkets in and around Lake Station, Indiana, who were also contacted. At least four people came forward. Badri had asked that he be kept in the loop of all such developments and he was kept abreast of all developments in this regard, sometime two three times daily.

## ONE PROSPECT WAS SELECTED, &
## AFTER NEGOTIATIONS LEASE WAS SIGNED

46- Out of four interested parties, one prospect who showed more promise and ability to take over the business and run it professionally was selected. Another consideration in choosing this party was their desire to purchase the property after getting their foot on the ground. This party had assured the Plaintiff that after a year or so of the lease, they intended to purchase the property as well. This interested party comprised of two cousins Hasan and Nidal Musleh. Hasan has a large warehouse and employs a good number of people with a large fleet of trucks who deliver dozens of grocers different items including cigarettes and general merchandise. Nidal had multiple liquor and meat stores in Chicago area, who had decided to sell those and move to Indiana to run this business. Badri and John wheeler were advised of the pending contract and lease. Nidal and Hasan had hired a local attorney who negotiated the lease with the Plaintiff. By this time bank had retained an additional consultant, Mr. Jeffrey Nitti, who was also in touch with the Plaintiff on a regular

15

basis, and encouraged the Plaintiff to actively pursue sale or lease so that the loan stays current and the store could remain open. From appearance at least it seemed that the bank wanted this deal to go forward. (Exhibit F)

47-    The Lessee's Hasan and Nidal had agreed to purchase the supermarket's inventory that the store possessed but demanded that since it would take them at least 60-90 days to open the store, they would buy only that inventory which had an expiration date of six months from their start of the operation. Under this term, all inventory that had less than 9 months expiry date had to be removed, donated or left at the store, without being counted for compensation. The Plaintiffs had no choice, and reluctantly agreed to this condition.

48-    All inventory that was expiring within the dates agreed with the Lessee's was separated. It is estimated that this short date inventory amounted to an amount well in excess of $150,000. Local churches were called, and most of this inventory was donated to them and to some other needy organizations. Some of the remaining inventory was left behind at the supermarket but was not counted towards inventory valuation as agreed with the Lessees.

49-    Finally a lease with Mr. Hasan Musleh was signed (Exhibit G) and as agreed with the Lessee, a date for closing was set, on which day an inventory company was invited, who did the inventory. Inventory which was up to date and which the Lessees had agreed to accept was about $130,000. (Exhibit H). After the inventory and some other formalities, on the 6th of December 2017 the business and the store was handed over to the Lessees. The Lessee gave a check for $20,000 which was to cover one month's

security and a month's rent in advance. The inventory was financed by the Plaintiff and was payable in 13 monthly installments of five thousand dollars each.

50-    Plaintiffs who had already notified Jeff Nitti, the newly retained bank consultant of the ongoing lease negotiations and the upcoming transaction, was sent a copy of the lease the same day, the closing took place. Nitti asked for, and was also provided the telephone and email information of the lessees. Nitti promised the Plaintiffs that he will make sure that everything works out smoothly. Plaintiff also advised Nitti that they had received one month's rent as deposit and one month's rent as advance payment towards the lease, and offered to send the money to Nitti. As per the mortgage Note, the assignment of rents clause provided that the Plaintiff will reimburse the bank all rental payments. Nitti advised the Plaintiff that he was not authorized to accept any funds, but will notify the bank and act as advised.

51-    To the surprise of the Plaintiff and Chaudry, the very next day, Nitti called Mr. Hasan Musleh, the Lessee and told him that he should not proceed with opening the store, unless the bank okays the deal. Nitti demanded that the Lessee fill out certain forms which included credit applications and information about his back ground as well as his experience in running retail operations. Lessee promptly provided all information that Nitti demanded. Both Nitti and Lessee met three four times to discuss as to how the store was going to be run and the name of whole sale suppliers and other information regarding the store's operation, which the Lessee promptly provided. Lessee realized that meeting Nitti's demands was essential to get the banks blessings, bent backwards to fulfill those demands and made available all that they were asked of.

17

52-    Nitti and Lessee got together few times at the supermarket in Lake Station and went thru and discussed different items of mutual interest. Lessee also brought up the condition of the supermarket's roof and Nitti assured him of bank's help. Thereafter Nitti called a roofing company, who visited the store after few days, met the lessee and submitted an estimate for roof repairs directly to Mr. Nitti.

       Nitti seemed to be satisfied with the Lessee, but the bank was still holding on giving a green light to the Lessee. According to Nitti, the green light *had* to be given by the bank before the lessee is allowed to proceed. Meantime the Lessees had started working towards starting their business. Lessee transferred gas and electric accounts to their company's name, making a deposit of over $30,000 to NIPSCO (Indiana electric utility company) and also started working with a wholesale grocer who promised to extend their expertise in re-stocking and jump starting the supermarket. Lessee installed a new security system and contracted with an alarm company to provide 24 hour security.

53-    The Plaintiff had also devised a solid plan to get up to date on their mortgage which by now was two months behind and the bank was owed about $30,000. Plaintiff was going to get paid for the inventory, plus their claim of $200,000 against the insurance company from which they had claimed the loss / spoilage of merchandise and breakdown of refrigeration equipment repairs, plus the monthly rents of $10,000 that they were going to receive from the Lessee would have brought the loan up to date. The total monthly mortgage payments to the bank amounted to $11,000 plus real estate taxes of around $2,000 would have easily been met by the rental income and the inventory payments of five thousand dollars a month from the Lessee.

54-    Meantime Nitti had been in touch with the Lessees, but had not given them a green light from the bank to proceed. The Lessees were very impatient and wanted this impasse resolved, and were constantly calling the Plaintiff and Chaudry to push Nitti to act. (Exhibit I).

Nitti represented that he was pushing the bank to okay the deal, but the bank was stalling, as the bank was more inclined to sell the property rather accept the lease. According to Nitti bank wanted their loan which was insured by the SBA to be paid by the SBA right away, rather wait for Lessee to start his operation and wait for him to either refinance the loan or purchase the supermarket.

55-    The Plaintiffs and the Lessees all waited patiently but the bank seemed reluctant to agree to okay the lease and was delaying the whole deal. After pushing Nitti, who was under pressure from the Plaintiff as well as the Lessees, Nitti was finally able to secure an agreement from the bank that all parties should get together at the bank in the bank's head office in Countryside, Illinois, on a certain day, which was the 9th of February 2018. It was expected that the bank will finally give its blessing and the Lessee after a three month wait could proceed and start stocking and starting the supermarket. It was a win-win situation for all parties, as the Plaintiff was told by the Lessees that they were going to invest upwards of $700,000 towards restarting the supermarket, and in a year's time, once they jump start the supermarket, they could either refinance the existing loan, or secure a new loan to purchase the property. Lessees were also apprehensive, and wanted an okay from the bank which they thought was necessary, as they did not want to invest a minimum of $600,000 to $700,000 towards starting the store, and later at the

19

bank's whim, could loose it all, if the bank decided not to honor the lease and to evict them.

56-    Just few hours prior to the meeting which was to be held at the bank in Countryside, Illinois, Jeff Nitti notified the Lessees as well as the Plaintiffs that the bank is not interested in having this meeting. (Exhibit J & K). Nitti also called the Plaintiff and told him that the bank is not going to honor the lease and that it will proceed to have the property foreclosed and sell it in the auction. This came as a big surprise to all, as an empty and vacant store which goes in public auction never invites investor interest and is sold for pennies on the dollar. Whereas a store with a functioning business, occupied by a reputable operator, well kept, clean, tidy and full of customer and vendor activity commands the market price. The Plaintiff strongly protested to Nitti and told him that the bank's decision is not only unfair and impulsive but could entail substantial losses to the bank, as the bank could never command a decent price at the sheriff sale or sheriff auction. Nitti countered by saying that **"the bank will suffer no loss, as it has comprehensive SBA loan guaranty and it will recoup all its money. The loss will be Plaintiff's alone, as SBA will come after them to be re-compensated for any losses that the SBA may suffer"**.

## BANK RENEGED ON THEIR AGREEMENT, TURNING A MANAGEABLE SITUATION INTO A TOTAL DISASTER

57-    Plaintiff and Chaudry had worked assiduously to save the business, as they kept the bank fully informed and sought their guidance and approvals on each matter from the day the business ran into financial troubles and throughout the lease process. The reason the business ran into trouble were circumstances beyond the Plaintiff's control. To start

with, the bank did a deceptive and inflated appraisal, appraised the property for twice the amount it was really worth, , did not do any proper and due diligence in investigating the medical insurance claims of the seller Mr. Musleh. Additionally the bank's so called 'expert commercial appraisers, who specialized in appraising supermarkets' did not even look at the refrigeration system of the supermarket and did not even bother to go on roof of the building for a 2.5 million dollar transaction. The continued failure of the refrigeration system, the dislocation caused by the multiple roof leaks, unexpected employee medical expenses and subsequent filing of bankruptcy by Centrella Grocers, all lead to the cash flow problems which resulted in this unfortunate situation.

58-    Despite all those omens, the Plaintiff and Chaudry worked hard to find a Lessee as recommended by the bank, signed the lease, inventoried the store, in hope of avoiding loan default, which was all within reach. But the bank was almost exclusively focused on cashing on the SBA loan guaranty, disregarding what may happen to the Plaintiff, or their imminent default, or to the Lessees. Bank's refusal to endorse the lease, without any valid or legitimate reason, also resulted in total loss of inventory, as all food inventory that sits in the store is date sensitive, has either expired or is about to expire. Bank's actions have resulted in over $300,000 in inventory losses, and the loss of the property's market value, which is as yet undetermined. It is estimated that because of the roof leaks from multiple locations, the supermarket which remains shuttered, may have sustained extensive water damage and could have mold and lichen growth within the building.

## COUNTRYSIDE FILES A LAWSUIT, AND THRU SURROAGATES ENGAGE IN HARRASSMENT, THREATS AND DEFAMATION

59-    Countryside bank not being satisfied with scuttling the lease, wanted to make

sure that the legally binding contract and lease entered into between the Plaintiff, Chaudry and the Lessees does not ever see light of the day. The implementation of lease would have frustrated the bank's desire to sell the supermarket, and claim two million dollars right away from the SBA. Whereas leasing of the supermarket would have netted merely 12-13 thousand dollars in mortgage or rents on a month to month basis.

Thus Countryside hired Burke Costanza and Carberry, (BCC) a firm which specializes in debt collection. It instructed BCC and enlisted BCC into their illegal scheme to device an intimidating plan and to sue the Plaintiff and Chaudry on false and bogus charges of fraud and theft. Nancy Townsend who filed the lawsuit, also named the Lessee's being involved in theft and fraud. The lawsuit did have a debilitating effect on the Lessees, who were told by Nitti that if they do not withdraw from the lease, they will have to spend thousands and thousands of dollars to defend this lawsuit, and since they haven't invested a lot of money into the venture and are somewhat in their preliminary stages of opening the supermarket, it will be best for them to withdraw from this lease.

60-    Nancy Townsend who works for Burke Costanza and Carberry and Jeff Nitti started a campaign of intimidation and blackmail. Their each action and communication started with a threat. They always implied that if you don't do this, we will do that, if you do this, we will do that, we will put you out of business, we will get judgments against you, which will ruin you, you have to do this, you have to do that, otherwise this will happen to you etc etc. These two individuals did and said things which were completely illegal. Sometime their threats and actions were couched in legalities, and

sometime their conduct was more brazen. Even the legal actions they threatened had an illegal purpose and intent.

61-    Not only that, in an effort to defame the Plaintiff, Townsend, Nitti and John Wheeler immediately downloaded and posted their false complaint alleging fraud and theft on Google thus making the concocted accusations of theft and fraud against the Plaintiff visible and accessible to millions of people not just in the United States, but all over the *world wide web*. In the very first response that this Plaintiff filed in the foreclosure action, Plaintiff pointed out that these were false and malicious accusations meant only to harass, intimidate and defame the Plaintiffs. Countryside bank, Nancy Townsend, John Wheeler and Jeff Nitti were well aware that the charges that they had brought against the Plaintiff in the lawsuit were all false. Regrettably all these individuals jointly and severally persisted in pushing these accusations.

62-    After fully defaming the Plaintiff and posting their bogus accusations of theft and fraud on the internet and having achieved their basic purpose, of disseminating and spreading the libelous accusations, Countryside bank, John Wheeler and Townsend decided to withdraw all theft and fraud charges against the Plaintiff. In a Motion filed with the Superior court in Indiana, Townsend wrote, "we have discovered some new information and we have decided to withdraw all counts against Bashir and zafar sheikh". (Exhibit L).

But the damage that Countryside bank, John Wheeler, Jeff Nitti and Townsend anticipated and intended had been done. The Plaintiff has suffered loss of face, feel defamed and humiliated and have suffered mental anguish and physical stress. It was a vexatious prosecution and malicious abuse of legal process for the sole purpose of

defaming, humiliating and intimidating the Plaintiff and the Lessees. The purpose, the only purpose was to scuttle the lease and make Lessees withdraw from pursuing a legitimate business contract, which would have saved the business and the loan from going into default.

## WHEELER, TOWNSEND & NITTI  MAKE MOCKERY OF THE LEGAL PROCESS

63-     Acting jointly and scheming, all three Wheeler, Townsend and Nitti wanted to foreclose on the property in the lawsuit that they had filed in the superior court of the Lake County. All three wanted to act fast, so they could get a judgment against the property, sell it in auction and run to the SBA to claim two million dollars. For them speed was crucial and legal process had no meaning. There were multiple defendants in the lawsuit, which included the 'new buyers' Sean and Bushra Naseer, Central Market of Indiana inc, 3232 Central Avenue LLC, Plaintiff and Bashir. Lessee Hasan Musleh was also named for intimidation purpose.

64-     Bushra Naseer did not even live in the U.S. and had been out of the Country for years, and this fact was well known to John Wheeler, Nitti and Townsend. (Exhibit M: chain of emails between the Plaintiff, Attorney Townsend and bank officials). Despite this Nancy Townsend files affidavits in the Court that Ms. Naseer has been served.

65-     Sean Sheikh who resided in Texas, did not get served, but on the safe side, when the business started having financial problems, did retain a Chicago attorney, Mr. Robert Habib. Mr. Habib had been in constant touch with Townsend and had been negotiating the disposition of the lawsuit. There were proposals and counter proposals between Townsend and Mr. Habib. Despite this Townsend chose not to

serve any Court documents upon Mr. Habib and in an unbelievable act, going
behind his back, and without even bringing it up much less serving him paperwork
on the summary judgment that Townsend was planning to get, did file a motion for
summary judgment and obtained the judgment. Even after getting the judgment,
Townsend hid that fact from Sean's attorney Mr. Habib. (Exhibit N: emails
showing billings by Townsend to the bank about her contacts and letters to Habib).
Townsend completely hid those contacts, goes to Court and claims in her pleadings
that there has been no contact with Sean Sheikh, as his whereabouts are unknown,
and secures the judgment by deception.

66- Central Market of Indiana Inc, which was a signatory to the $1,800,000 loan was
also not served. The bank knew that the supermarket remains shut, as the Lessees
were prohibited from opening the store. Townsend , Wheeler and Jeff Nitti were
aware as well that the supermarket remains closed. Despite this Townsend sends the
service of court documents to the shuttered address. The court documents, which
were sent via U.S. mail went back to Townsend, they could not be delivered.
(Exhibit O). Despite this Townsend falsely claimed in her pleadings that Central
market of Indiana inc had been properly served, and obtains a judgment against it.

67-    Plaintiff Zafar Sheikh who managed the day to day affairs of the Supermarket
and was also the president of the Central market of Indiana Inc was not served
either. Countryside bank, Jeff Nitti and Townsend all knew that fact as Sheikh was
the only source of contact for the bank and Nitti. Despite this Townsend files
affidavits and pleadings in Court saying, "zafar sheikh has not been served, but
service on him is not necessary to obtain judgment". (Exhibit P).

**68-**      Aneeqa Sheikh, wife of Plaintiff zafar sheikh was the registered agent of the Central market of Indiana inc, and service to her was required under the Indiana law. Despite this Aneeqa Sheikh was never served. Her name is not even on the service list that Townsend filed in Court. (Exhibit Q). Despite this she claims in her pleadings that Aneeqa Sheikh has been served and deceptively secures almost two million dollars judgment against the corporation.

**69-**      Likewise Townsend did not serve Bushra Naseer, who is a member of the 3232 Central Market LLC, but likewise filed an affidavit in Court pleading that Ms. Naseer has been served. Townsend knew full well that Ms. Naseer is not even in the U.S. and resides permanently in Pakistan. (Exhibit M : emails from plaintiff).

## COUNT 1

### RACKETEERING: UNLAWFUL DEBT
### Against John Wheeler, Raj Badri and Countryside Bank

69-　Plaintiffs reallege by reference the allegations made in each of the paragraphs above and hereby incorporates them here as if fully set forth herein.

When the loan was turned down by Countryside bank for Sheikh and Chaudry, the bank, acting thru Wheeler and Badri had induced the Plaintiff and Chaudry to bring in some other buyer, with reasonably good credit, who could qualify for the SBA loan. Upon wheeler and Badri's inducement, the Plaintiff and Chaudry solicited their close relatives who volunteered to be the note holders, for a debt, which was really not theirs. Those individuals assumed the debt, which should have been carried by the Plaintiff and Chaudry. That debt, as per the SBA, FDIC and U.S. treasury guidelines was an illegal debt or if not outright illegal was definitely against their rules and regulations and as such qualifies as "an unlawful" debt. A debt which did not belong to the 'new buyers' induced

by the Wheeler and Badri. Additionally flipping the coin, that debt really belonged to the Plaintiff and Chaudry, a debt which they did not qualify to secure in the first place. Theoretically this debt qualifies as an 'unlawful debt'. 18 U.S.C. § 1962(c) prohibits a person from conducting the affairs of an enterprise through a pattern of racketeering, who thru that racketeering activity imposes an 'unlawful debt' on another individual and then tries to collect that unlawful debt. A debt which is unlawful cannot be collected thru a lawful or unlawful means as per 18 U.S.C. § 1962(c).

Here looking at the facts of this case, it is very clear that Countryside bank, acting thru Wheeler and Badri engaged in a pattern of racketeering activity to underwrite, approve and sanction a debt which was an unlawful debt, a debt which they are trying to collect now. Under 18 U.S.C. § 1962(b) a debt which is unlawful cannot be collected. Court should suppress the bank's motives and quash their efforts to collect "an lawful debt".

**COUNT 2**

**SUBSTANTIVE RACKETEERING**

**Against John Wheeler, Raj Badri, Nancy Townsend, Jeff Nitti, Cary Lannin**

65-    Plaintiff realleges by reference the allegations made in each of the paragraphs above, and hereby incorporates same as if fully set forth herein.

John Wheeler, Nancy Townsend, Jeffery Nitti and Cary Lannin, each were a "person" as that term is defined in 18 U.S.C. 1961 (3), and engaged in activities which affected the interstate commerce. John Wheeler, Jeffery Nitti, Nancy Townsend and Cary Lannin were associated in fact, and constituted an "enterprise" as that term is defined in 18 U.S.C. 1961 (4), an enterprise which was engaged in, and the activities of which affected, interstate commerce. This enterprise is referred for the purposes of this

complaint as "predatory lending enterprise". This predatory lending enterprise constituted

an ongoing organization whose members functioned as a continuing unit for a common

purpose of achieving the goals of the enterprise.

These defendants misrepresented, concealed, hid and caused to be misrepresented,

concealed and hidden, the purposes of and the acts done in furtherance of the 'Predatory

lending enterprise'.

The racketeering activity in which these members engaged in violation of

18 U.S.C. § 1962 (b) and (c) consisted, *inter alia*, of:

A: multiple acts of wire fraud in violation of 18 U.S.C. § 1343

B: engaging in interstate and/or foreign traveling in aid of racketeering enterprise

in violation of 18 U.S.C. § 1952

Specifically the defendants acting individually and in concert engaged in a

pattern of racketeering activity consisting of at least the following predicate acts:

**Predicate Act No. 1**

i: On or about the 10th of October 2014, John Wheeler recommended that the

Plaintiffs prepare a substitute agreement naming Sean Sheikh and Bushra Naseer

as the 'buyers'

ii: On or about the 6th of January 2015 Wheeler and Badri asked and or ordered

an appraisal report of the subject property in furtherance of their predatory

lending scheme, did knowingly transmit and cause to be transmitted, in interstate

and foreign commerce by means of wire communication, instructions to Cary

Lannin, all from Illinois, to conduct an inflated and fraudulent appraisal for the

property in the neighboring state of Indiana.

**Predicate Act No. 2:**

On or about the 6th of March 2015 asked and or instructed, for the purpose of executing and attempting to execute that aforementioned 'predatory lending enterprise', to individuals and or subordinates working directly under John Wheeler's supervision to have a "gift" letter prepared that would imply that the 'buyers' were getting the down payment required for the purchase of the Central supermarket was a 'gift' to the bank designated 'buyers' from the Plaintiff. These instructions were sent in by John Wheeler by means of wire communications, writings, signs and or signals as detailed in this complaint in violation of 18 U.S.C. § 1343, which prohibits devising or intending to devise any scheme or artifice to defraud.

**Predicate Act No. 3:**

Plaintiff believes and the underlying facts enumerated in this complaint conclusively demonstrate that John Wheeler knowingly and fraudulently in violation of 18 U.S.C. § 152 (a) and false claims act, informed the SBA (small business administration) that the Countryside bank had met the 'buyers' Sean Sheikh and Bushra Naseer, had interviewed them individually and personally and had asked them to submit and they had submitted the loan application for the $1,800,000.00 loan, all in an effort to promote and push for their 'predatory lending enterprise' scheme.

**Predicate Act No. 4:**

John wheeler and Badri made bogus and extortionate demands upon the Plaintiffs in violation of 18 U.S.C. § 1956 (a)(1), to pay an additional $190,000 in return for

re-financing and or transferring the SBA loan from the bank designated 'buyers' to either Chaudry and/or Naseer. John Wheeler and Badri made this predatory and extortionate demand in violation of the SBA rules and operating procedures, which do not add or impose any penalty for *in house* loan transfers from one partner, already approved by the SBA to the second partner, already approved by the SBA, within the same loan parameters and amounts.

That this extortionate demand violated U.S.C. § 1956(a)(1), which was for the purpose of executing and attempting to execute the aforementioned 'predatory lending enterprise' by knowingly transmitting and causing to be transmitted, in interstate and foreign commerce, by means of wire communications, the writings, signs and signals, as detailed elsewhere in this complaint.

**Predicate Act No. 5:**

John Wheeler and Raj Badri on or about the 7th of May 2017 traveled from Illinois to Indiana crossing the State lines to aid and abet in making fraudulent, false and untrue promises in violation of 18 U.S.C. § 1952 in furtherance of their racketeering scheme that if the Plaintiff spend additional sums and fix their refrigeration systems partly or fully, the Countryside bank will provide assistance towards the Plaintiffs efforts to either lease or sell the Central Market to third parties. A commitment that was fraudulent and deceptive, as Wheeler and Nitti scuttled the lease and blackmailed the Lessee to abandon the lease or else face irreparable and unspecified harm either to his person or to his finances.

**Predicate Act No. 6:**

John Wheeler and Jeff Nitti in violation of U.S.C. § 1962 made direct or overt threats to the Plaintiff that the lease that they have entered into must be abandoned by them or the bank will take unspecified measures and actions to hurt them or frame them, if that is what is required into abandoning the lease, so the Countryside bank could proceed and sell the property and recoup its investment by cashing in on the SBA's loan guaranty that was issued against the loan, and for which the Plaintiffs had paid over $60,000 as insurance fee to the SBA.

As a direct and proximate result of and by reason of the foregoing violations of 18 U.S.C. § 1962(b) and (c), the Plaintiffs have been injured in their business and property because they had been unable to refinance the loan from one partner to the other partner, as fully allowed by the SBA operating procedures, have not been able to convince the Lessees of the grocery/meat market to occupy the market and start their operations, despite the fact that the store had been leased. Wheeler and Nitti's acts have resulted in approximate loss of 1.9 million dollars to the Plaintiffs, plus an inventory of over $300,000 which mostly consists of dated merchandise.

As a consequence of this financial loss, the Plaintiffs seek reimbursement of 1.9 million dollars. Plaintiff also seeks triple damages as allowed by U.S.C. § 1962, and also seeks the reasonable attorney fees and costs of this lawsuit.

**Predicate Act No. 7:**

Countryside bank, acting thru Wheeler, Nitti and Townsend filed a vexatious and malicious lawsuit against the Plaintiff and Chaudry. The sole purpose of that lawsuit was malignant and malicious prosecution. Everything in that lawsuit was

fabricated by these defendants. Defendants also filed frivolous and false pleadings and affidavits in that lawsuit, alleging that the service to these Plaintiff and other related parties had been effectuated as being the owners and officers of the corporation that they represented. Defendants knew that Plaintiff Zafar Sheikh is the manager of the Supermarket, which was being foreclosed, zafar sheikh was also the president of the Central Market of Indiana inc, which had obtained 2 million dollar loan, zafar sheikh was the only point of reference and contact for the bank and Nitti for months, zafar sheikh was the individual who negotiated the lease with Mr. Musleh and signed it on corporation's behalf, a copy of which was promptly sent to the bank and Nitti. But in an effort to secure the two million dollar judgment, without due process, Defendants sought an urgent and immediate foreclosure order and wrote to the Judge in their certified pleadings, "zafar sheikh has not been served but it is not necessary to serve zafar sheikh, and the Court can grant judgment without him being served".

**Predicate Act No. 8:**

Townsend, Nitti and John wheeler knew that one of the 'new buyer' Bushra Naseer was out of the United States for years. Even the Plaintiff Sheikh had an interaction with the bank on this issue. In many emails directed to the bank as well as Jeff Nitti, copies of which were all provided to Townsend, Zafar Sheikh had brought up the subject of Ms. Naseer being abroad. Even in his first email, that he sent Townsend, Sheikh mentioned that Naseer was out of the U.S. for some time. (Exhibit M). Still Townsend filed affidavit in Court certifying that Ms. Naseer has been served. The only purpose of filing this false certification and

affidavit in Court was the bank's desire to quickly seal the foreclosure case and whisk two million dollars from SBA, even it meant filing bogus pleadings and affidavits.

**Predicate Act No. 9:**

The bank induced 'new buyer' Sean Sheikh never got service, but upon the side of the caution, had appointed a Chicago Attorney Robert Habib to look after his interests. Bank officials acting directly or thru Townsend were negotiating with Attorney Habib. There were letters and emails between the parties for a negotiated settlement. Exhibit N shows Townsend invoices for negotiating and writing to Attorney Habib.

Three weeks before getting judgment, on February 26, Jeff Nitti sends an email to Sean Sheikh, acknowledging that the bank is negotiating with his attorney Habib. (Exhibit R). In response Sean Sheikh responds that all further communication regarding these matters should be discussed with his attorney. (Exhibit R – 1). Still Townsend without serving Sean's attorney Habib or even notifying him that she is going to file 'Motion for summary judgment' surreptitiously files and secures the judgment. Attorney Habib lamented that in thirty years of his legal practice in Illinois, though he has seen a lot, but nothing of this sort has ever happened to him nor he has heard of such a deceptive act, where an adversary is negotiating with you and at the same time planning and acting to secure a judgment against your client in such a deceptive manner. It was all an effort on part of Townsend, Wheeler and Nitti to make exorbitant profits and get their

33

hands on two million dollars, as soon as possible, disregarding Court rules, code of civil procedures and guidelines, simple human decency and legal requirements.

**Predicate Act No. 10:**

Plaintiff zafar sheikh was not served in the foreclosure lawsuit, at least the Countryside bank, Wheeler, Nitti and Townsend admit that in their certified pleadings and affidavits, though their position was that 'it was not necessary to serve him to get a two million dollar judgment'. Despite their own acknowledgment that Plaintiff was not served, Townsend starts bombarding him with interrogatories. (Exhibit S). Granted, Townsend is a debt collector but at the same time, she is member of the Indiana bar. Indiana rules of civil procedure and Indiana Supreme Court rules prohibit serving interrogatories prior to the service being perfected on the defendants. Of course Ms. Townsend knew that, but her motive was to intimidate the Plaintiff, engage in racketeering and serve the enterprise, in an effort to reap financial rewards and participate in high commissions and fees after foreclosing and extracting two million dollars from SBA guaranteed loan.

**Predicate Act No. 11:**

The mortgage agreement provided that upon delinquency the Countryside bank will have absolute right to appoint a receiver who will primarily be responsible for taking care of the property. The 'receiver clause' is almost always added in commercial mortgages, so in case the property becomes vacant, the bank could quickly appoint a receiver, so he could tend to the property, so it retains its value and save it from deterioration. Despite this clause and despite repeated

34

solicitations from the Plaintiff to appoint a receiver, who could either lease or sell the property, the bank completely ignored those pleas. The purpose of this inaction was the malicious intent of Nitti, Wheeler and Townsend, who wanted the property to stay shuttered, so it could degenerate in appearance and value, so they could maximize their claim against the Plaintiff and recover a highest possible paycheck from SBA.

These shenanigans and deceptive practices which exclusively relied upon the Wire and Mail services, in violation of 18 U.S.C. § 1341 and 18 U.S.C. § 1343, which these individuals exercised in enhancing the scope and sphere of their 'predatory lending enterprise' to collect a debt that was unlawful. The debt was unlawful to begin with, when it was approved and disbursed, in complete violation of the SBA rules as well as the rules of the FDIC. So if the debt is unlawful, its collection, regardless of whether legal recourse thru the courts was being utilized, remains illegal and against the spirit of racketeering act. Plaintiff has suffered tremendously, financially and emotionally and the trio plus Lannin must compensate the Plaintiff for the full amount of the loan, which is at least two million dollars plus treble damages and attorney fees and court costs.

## COUNT 111 – RACKETEERING CONSPIRACY
### AGAINST WHEELER, BADRI, NITTI , TOWNSEND & CANNIN

Plaintiff realleges all allegations made in the preceding paragraphs of this complaint. That John Wheeler, Raj Badri, Jeff Nitti and Townsend along with other individuals who may not be named herein, in concert with each other, acted individually or jointly in an association engaged in activities which affected interstate commerce, did

knowingly conspire and agree, with each other and others as yet unknown, to conduct and participate, directly and indirectly, in their 'predatory lending enterprise' as described in this complaint, through a pattern of racketeering activity, as the term is fully described in 18 U.S.C. § 1961(1) and (5), in violation of 18 U.S.C. §1962(b) and (c).

Wheeler, Badri, Nitti, Townsend and Lannin knowingly conspired and agreed with each other, and others as yet known or unknown, to conceal their true motives and set actions in motion to underwrite a 'predatory lending scheme' by undertaking acts specifically prohibited by the SBA and the FDIC (federal deposit insurance corporation), and by inflating the value of the property thru a fraudulent and / or negligent appraisal, which was pre planned and contrived, and to derive and seek to derive high profits, from a pattern of racketeering activity, as that term is defined in 18 U.S.C. § 1961(1) and (5), and to use, directly and / or indirectly some or all of the income and proceeds of that income in the operation of their illegally conceived 'predatory lending enterprise', that engaged in and whose activities affected interstate and foreign commerce in violation of 18 U.S.C. § 1962(a).

The foregoing racketeering activity consisted of various racketeering acts set forth in Count 1 and 2 of this complaint and fully elaborated in this complaint earlier, which are being realleged here fully.

As a direct and proximate result of the defendants actions and by the reason of the foregoing violations of 18 U.S.C. § 1962(d), the Plaintiff has been injured in the business and property because they have been unable to operate itself or to lease or sell that business and property as the conspirators and the co-conspirators as described in this complaint took actions, making that an impossibility.

36

That as a direct and proximate result of the Defendants actions resulted in injury to the business and property of the Plaintiff resulting in substantial loss of principal and inventory amounting to a sum exceeding two million dollars, which the Plaintiff should recover from the Defendants. Plaintiff is also entitled for triple damages under the racketeering act along with reasonable attorney fees and costs associated with this lawsuit.

## COUNT 1V
## AIDING, ABETTING, CONSPIRING AND PARTICIPATING IN FRAUDULENT ACTIVITY
### Against Wheeler, Badri, Nitti, Lannin and Townsend

Plaintiff realleges and incorporates by reference the allegations made in the preceding paragraphs.

Wheeler and Badri concocted the scheme in which they enlisted Lannin to inflate the value of the property before doing the SBA loan. Lannin's inflated appraisal was a pivotal factor in approval of the loan. The appraisal had completely neglected or failed to look at the condition of the refrigeration system and the condition of the roof. The equivalence of the refrigeration system's importance to the supermarket is similar to what the jet engines are for flying a plane. Both cannot conceivably function without their respective pivotal component. No appraisal can be considered authentic which tends to fix the value of a plane without carefully examining its engines.

After Wheeler and Badri demanded extortionate sums to transfer the loan to Bushra Naseer, and the Plaintiff's refusal to cede to those demands, the loan because of the refrigeration system's failure and other factors outlined in this complaint, came under stress. To foreclose on the loan and recoup the insurance proceeds from the SBA, the

37

premiums for which insurance, coincidentally the plaintiff had paid, Wheeler enlisted the help of Nitti and brought him on board. Nitti was assigned the task of making sure that the Lease that the Plaintiff was negotiating never gets implemented or enforced. To subvert the lease, Jeff Nitti openly made threats of unspecified action to the Plaintiff and to the Lessee. Having not been able to stop the parties from going forward, Wheeler and Nitti sought the help of Nancy Townsend and instructed her to hide behind the color of law and file a vexatious lawsuit against the Plaintiff and the Lessee Hasan Musleh. That lawsuit falsely accused them of stealing the collateral from the store, engaging in fraud and violating the terms of the mortgage.

With Townsend's extensive and direct assistance, and aiding and abetting the illegal and fraudulent scheme, Nitti and Wheeler were successful in convincing the Lessee Hasan Musleh that it will be in his interest to walk away from the lease or face substantial legal fees in defending an otherwise bogus and vexatious lawsuit.

As a direct and proximate result of the malign actions of Townsend, Badri, Wheeler and Nitti the store which had been leased could not be occupied by the Lessees resulting in spoliation and expiration of all food inventory in the store, as well as monthly rental income of ten thousand dollars a month, which was and could have been enough to avert the loan default forced upon the borrowers. Thus Defendants actions have directly affected the interstate and foreign commerce in violation of 18 U.S.C. § 1962(a). Defendants' actions have injured and harmed the Plaintiff and Chaudry and the Plaintiff seeks full compensation of the amount of inventory loss as well as the loss of rental income and seek two million dollars in compensatory damages and triple damages for violation of racketeering laws and reasonable attorney fees and costs of this lawsuit.

## COUNT V
## VICARIOUS LIABILITY
## Against Burk Costanza & Carberry , Appraisal Research Counselors & WINDSOR ADVANTAGE

Plaintiff realleges and incorporates by reference all allegations as recited earlier in the complaint. Throughout the time underlying the events in this case, Townsend was a person under the statute who was acting as a partner, counsel and or agent of Burke, Costanza and Carberry, as well as the Countryside bank and under the direct supervision and direction of John Wheeler and Jeffery Nitti.

Townsend engaged in the various wrongful acts, errors and omissions set out in this complaint in the ordinary course of business of their implied partnership. Townsend's acts, errors and omissions were made within the regular scope of her employment and authority of Burke Costanza and Carberry and the Countryside bank and Windsor advantage and supervised by Wheeler and Nitti, and were meant to further the interests of Burke, Costanza and Carberry. For example:

A:       Burke Costanza and Carberry advertised and continue to advertise the so called expertise of Nancy Townsend in debt collection and other bank friendly and bank oriented endeavors.

B:       Burke Costanza and Carberry billed Countryside bank and/or Windsor advantage relating to the counseling that Townsend provided towards filing the bogus and vexatious lawsuit and other related matters for the sole purpose of malicious and vexatious prosecution.

C:       In furtherance of Countryside's schemes Townsend transmitted correspondence using Burke Costanza and Carberry letterhead and the firm's email address and received correspondence at Burke Costanza and Carberry's address and the firm's email address.

D:       Similarly Cary Lannin at all times relevant in this complaint was
employed and continues to be employed as appraiser by Appraisal Research Counselors
and takes its guidance and directives from its top management. Cary Lannin acts as an
agent for the 'Appraisal Research Counselors' for the benefit of John Wheeler,
Countryside Bank and the 'predatory lending enterprise'.

E:       Similarly Jeffery Nitti at all times relevant in this complaint was
employed and continues to be employed as an official with supervisory disposition, and
takes its directives and is guided by Windsor Advantage. Defendant Nitti acts as an agent
for the said outfit for the benefit of Windsor Advantage and to advance their commercial
interests and financial bottom line. Nitti with the help and guidance of Windsor
Advantage rendered their services to John Wheeler and Countryside bank to help steer
and advance the aims of the 'predatory lending enterprise'.

## C O U N T   VI
### FAKE, FALSE, FABRICATED & FRAUDULENT APPRAISALS
### Against John Wheeler. Raj Badri, Countryside Bank, Cannin
### & Appraisal research counselors

John Wheeler and Raj Badri after agreeing to do the SBA loan, had insisted to
hire and do their own appraisal, as they contended that they had a very *'reputable*
*appraiser who mostly did commercial appraisals, and specialized in meat and*
*supermarket appraisals'.* The appraiser that the Countryside Bank hired was Mr. Cary
Lannin who worked for 'Appraisal Research Counselors'. Any commercial appraiser
would look at two pivotal things in a meat/supermarket, which are the refrigeration
system and the roof of the building. Cary Lannin, who was either instructed not to look at
both, the refrigeration system and the roof, or at his own initiative decided that if he had

40

to present to the bank an appraisal which would facilitate the loan, he would have to forego checking or evaluating both items. As such, on information and belief, Mr. Lannin decided to skip checking the refrigeration system and the roof, which were both in disrepair. This neglect was a clear and deliberate violation of Uniform Standards of Professional Appraisal Practice (USPAP). USPAP requires that any element which is pivotal in evaluating the true appraised value of any business or property must be looked at and included in arriving at appropriate market valuation. Refrigeration system and roof, are the nerve center of a meat and supermarket and Appraisal Research Counselors and Cary Lannin should have carefully and deliberately evaluated their functionality.

Countryside, Badri and Wheeler had hired Cary Lannin and Appraisal Research Counselors, for the sole purpose of performing an appraisal as their duly appointed and designated agents. The Countryside bank, Wheeler and Badri acted as their principal.

The appraisal either because of fraud or outright negligence failed to select appropriate comparable sales, and failed to accurately reflect certain information necessary for a valid, legitimate, authentic and bona fide appraisal. For the Plaintiff, the semantics do not matter, whether it was fraud, whether it was negligence or outright ineptitude, as their proximate acts or omissions caused and inflicted irreparable harm.

It is noteworthy that after the Plaintiff's business came under stress, the Countryside bank ordered an additional appraisal on the property. This time the Plaintiffs **insisted** that any appraisal that the bank orders, must include the evaluation of the refrigeration system and the roof of the property. Interestingly this new appraisal, which included the roof and refrigeration system's evaluation, came to reflect a price which was **almost half** of the original appraised value of 1.1 million dollars, conducted barely two

years earlier. Though the Plaintiff has repeatedly asked that he be furnished a copy of the most recent appraisal, Nitti and John Wheeler have stonewalled this request and refused to either share or provide a copy of this latest appraisal.

The rule of thumb in real estate market is that the valuations of the properties over time go up 3-5% a year. Whereas in this situation, in which the Plaintiff insisted that the new appraisal evaluate the roof and refrigeration systems, valuation fell almost 50%. That is what the value of the property *was* to begin with, had a true appraisal been conducted by the bank and the 'Appraisal Research Counselors'.

On information and belief the Plaintiff assumes that the Countryside bank also provided a copy of the first bogus appraisal that was deliberately inflated to the FDIC and the SBA, which clearly is a violation of False Claims Act. The False Claims Act makes it unlawful to knowingly "use a false record or statement to conceal or decrease an obligation to pay money to the United States." 31 U.S.C. § 3729(a)(7). The banks are required to report quarterly their cash exposures and loan portfolios to the FDIC as well as the Federal Reserve. They are required to maintain a certain equilibrium in dispensing loans against the assets they use as collateral. Thus by falsifying and inflating the real value of an asset, the banks can and have been said to exceed their requisite loan underwriting limits.

### C O U N T  V11
### TORTIOUS  INTERFERENCE
#### Against John Wheeler, Jeff Nitti & Nancy Townsend

The Plaintiff realleges and reincorporates the preceding paragraphs as elaborated in this Complaint. After the Plaintiff entered into a valid enforceable lease with the Lessee Hasan Musleh, a copy of that lease was forwarded to Jeff Nitti.  That lease

conferred mutually enforceable obligations on both parties. This lease was discussed and rehearsed with Jeff Nitti who was at all times relevant worked as a paid and hired consultant for John Wheeler and Countryside Bank and was directing all actions that Townsend was taking or was being advised to take.

Jeff Nitti shared the lease with John Wheeler and Nancy Townsend and immediately surmised that a lease would negate their designs on foreclosing on the loan and recouping the whole amount of loan amount from the SBA against the insurance which was paid by the Plaintiff. As such all three of them started concocting a plan which would split the contractual parties to the lease and would induce them to breach and walk away from that lease.

Nancy Townsend under the color of law filed a lawsuit against the Lessor and the Lessee and accused them falsely of fraud and theft. Nitti, Townsend and Wheeler also told the Lessee that the Bank would not honor the lease and at first instance would evict them, thus jeopardizing the lessee's investments of over $700,000. Such threats by Wheeler and Nitti had the desired effect and the Lessee after trying for at least three months to bring the bank on board, decided to abandon their plans to jump start the supermarket and walked away from the lease. (Exhibit T: Nitti's text message to Lessee Hasan Musleh, forwarded to Plaintiff Sheikh).

Such actions of the defendants were intentional and demonstrated malice. The tortuous interference of the Defendants in a legitimate enforceable contract demonstrates conduct that is tortuous and malicious in itself and it laid bare the undue influence of the defendants to impact the outcome of a transaction which would have denied the bank to implement their scheme of extracting two million dollars from the

SBA, and put the plaintiff under legal and financial jeopardy. That this conduct of the defendants directly inflicted financial harm on the Plaintiff and Chaudry as it denied them the ability to meet their contractual obligations to the bank, re-coup ten thousand dollars a month in lease payments and be able to get fully paid for the inventory amounting to $300,000. As such the Defendants should compensate the Plaintiff for the loss of rental amounts for the full term of the lease, the full amount of the inventory, which by now may have spoiled just sitting in the supermarket, and should be ordered to pay the lost sum of $540,000. Defendants should also pay $5,000,000 in penalties for their tortuous interference in a valid enforceable contract between the Plaintiff and the lessees.

### C O U N T    V111
### FILING OF VEXATIOUS & FRIVILOUS LAWSUIT
### Against Townsend, John Wheeler, Nitti, Countryside bank,
### Burke Costanza and Carberry & Windson Advantage

The Plaintiff realleges and reincorporate the preceding paragraphs as elaborated in this Complaint. Having failed in their efforts to intimidate the Plaintiff and the Lessee in breaking up the lease contract, John Wheeler and Countryside bank, and Jeff Nitti and Windsor advantage registered the help of Nancy Townsend and Burke Costanza and Carberry to devise a scheme to use legal means with illegal ends to sabotage the lease agreement, thus planning to pave the way for Countryside bank to proceed and collect from SBA the full amount of loan insured by the SBA, so that the Countryside could quickly pocket two million dollars and walk away. Nancy Townsend with the help of her associates and colleagues at Burke Costanza and Carberry filed a completely false, frivolous and bogus lawsuit against the Plaintiff, Chaudry and the Lessee Hasan Musleh for fraud and theft. Ironically all the Plaintiff had done was enter into a legal and binding

document with the Lessee, had the inventory taken thru a reputable inventory company, received deposit from the Lessee and handed over the keys to the Lessee. The lawsuit alleged that the Plaintiff and the Lessee had removed all inventory and equipment from the store. The Plaintiff and the Lessee told Townsend that it was not true and she should not have resorted to such tactics. But the false lawsuit had the desired effect into scaring the Lessee, who withdrew from the lease. After being notified of this by the Lessee, Townsend after waiting six months, filed another motion in Court, withdrawing her charges and stating in her motion filed in Court, "new information has since been obtained by the bank and the lawsuit is not necessary anymore" and informed the Court that she withdraws the fraud and theft charges and dismisses the Plaintiff and the Lessee from the lawsuit.

But regardless of the dismissal of the Plaintiff and the Lessee from the lawsuit, the damage had been done and Lessee decided to ditch the lease.

This lawsuit was false and frivolous and the sole purpose of this lawsuit was to harass, intimidate, subdue and suppress their adversaries. This false lawsuit was a clear violation of the Illinois Supreme Court rule 137, and Rule 11 of FRCP, which mandates that an attorney should review objectively the information before filing a lawsuit, which a client submits to determine if the facts support the claim. Townsend was required, no matter what she was told by Wheeler or Nitti to thoroughly investigate the important facts, any discrepancies or inconsistencies or gaps between the information and claims before filing a lawsuit. As such Illinois Supreme Court rule 137 was violated as the lawsuit was premised entirely on meritless claims based upon speculation and falsehoods and there were no facts that supported those allegations.

Because of the false and vexatious lawsuit the plaintiff has been injured materially and emotionally and seeks unspecified monetary damages which are to be determined by the court.

## C O U N T    1X
## COMMON LAW FRAUD, CONSUMER FRAUD & DECEPTIVE BUSINESS PRACTICES
### Against Wheeler, Nitti, Badri, Countryside Bank, Windsor Advantage

After signing the Agreement to purchase the supermarket, with Naser Musleh, the Plaintiff had approached John Wheeler and Badi at the Countryside bank, who informed the Plaintiff and Chaudry that since their credit scores were not high enough, so they should put forward someone with sounder credit. Wheeler and Badri had also promised that within 90 days of the SBA loan closing, they would re-finance the loan and transfer the loan from Sean Sheikh to Bushra Naseer.

Upon this inducement alone, and this commitment alone, and on reliance upon this solid undertaking the two 'new buyers' who were out of State, and out of the Country, had volunteered to step up and take the Countryside's bait.

After ninety days wait, when the Plaintiffs approached Badri and Wheeler to refinance and transfer the loan, as per their commitment, they both refused to do the transfer without any costs or fees. Though they agreed to transfer the loan but with new conditions and at extortionate sums. These conditions put forward by Wheeler and Badri were new and not agreed to when these individuals made the initial commitments upon doing the original loan. As such the original commitments made by Badri and Wheeler were deceptive and were made only to induce the Plaintiff and Chaudry to enter into doing the loan with Countryside bank. These defendants also knew when making those

46

commitments that those commitments were made merely to induce the Plaintiff and Chaudry and will not be lived up to or adhered to when the time came.

Badri, Wheeler and Nitti also deceived the Plaintiff when they told him that the bank will agree to the sale or lease of the supermarket. Upon that recommendation and advise, the Plaintiff and Chaudry had spent an additional fifty thousand dollars to partly fix the refrigeration system and had also advanced an additional fifty five thousand dollars to AWG wholesale grocers as security deposit.

815 ILCS 505/1 et seq that describes the elements of common-law fraud are (1) a false statement of material fact; (2) the defendant's knowledge that the statement was false; (3) the defendant's intent that the statement would induce the plaintiff to act; (4) the plaintiff's reliance on the statement; and (5) the plaintiff's damages resulting from reliance on that statement.

Plaintiff's reliance on the deceptive and false promises and commitments made by Badri, Nitti and Wheeler and the proximate result of those false commitments resulted in Plaintiff suffering tremendous loss that ultimately resulted in the loan default. The Court should award the Plaintiff a minimum of $2,000,000 in damages, plus the cost of this lawsuit and reasonable attorney fees.

### C O U N T    X
### VIOLATIONS  OF  31 CFR 1020.220(a)(2), 31 CFR 1023.220(a)(2), 31 CFR 1024.220, and 31 CFR 1026.220(a)(2).
#### Against Countryside bank, John Wheeler & Raj Badri

U.S. Department of Treasury has promulgated certain requirements that the banks must comply with. One of those requirements is known as CIP or *customer identification procedures*. These regulations are also known as KYC or

47

*know your client* or *know your customer*. These rules are also known as CDD rules or *Customer due diligence requirements*. The CDD Rule requires financial institutions to establish and maintain written procedures that are reasonably designed to identify and verify the beneficial owners or people who are dealing with the banks. These procedures must enable the institution to identify the beneficial owners or each customer at the time a new account is opened, and/or credit is granted or some other commercial transaction takes place between the bank and the customer. Also, the procedures must establish risk-based practices for verifying the identity of each beneficial owner identified to the covered financial institution. (covered by FDIC). The bank procedures must contain the elements required for verifying the identity of customers that are individuals under applicable customer identification program ("CIP") requirements. In short, covered financial institutions are required to obtain, verify, and record the identities of the beneficial owners of legal entity customers. All these requirements are covered under 31 CFR 1020.220(a)(2), 31 CFR 1023.220(a)(2), 31 CFR 1024.220, and 31 CFR 1026.220(a)(2).

Countryside bank, John Wheeler and Badri flaunted those mandatory requirements when they extended almost two million dollar loan to Bushra Naseer and Sean Sheikh, without ever meeting them, or having them come to visit them in their branch and knowing that they will not be the beneficial owners of the business or the property. This bank induced conduct was in manifest violations of the treasury rules. Wheeler and Badri's main purpose remained pushing their racket so it could benefit their predatory money lending enterprise.

48

(Exhibit U: questions & explanations covered in Treasury's guidelines regarding beneficial owners and Nominee owners are explained in *Q & A* 9, 10. 11 and 12 pages 2,3,4).

## C O U N T   X1
## DEFAMATION & CHARACTER ASSASINATION
### Against Townsend, John Wheeler, Nitti, Countryside bank,
### Burke Costanza and Carberry & Windsor Advantage

The Plaintiff realleges and reincorporate the preceding paragraphs as elaborated in this Complaint. During all times relevant in this complaint, the Defendants Wheeler, Nitti and Townsend working thru and on behalf of their outfits namely Countryside bank, Windsor Advantage and Burke Costanza and Carberry devised a scheme to impugn and cast a shadow of doubt on the character of the Plaintiff, by falsely accusing him of theft and fraud. On information and belief they discussed among themselves as to the dynamics to use towards that end, and while filing a foreclosure action, falsely alleged that the Plaintiff had been guilty of fraud and theft.

After printing that libelous statement, Townsend mailed a copy of those false allegations to numerous parties. The parties that were mailed those libelous statements included the individuals who had sold the Central Market to the Plaintiff in 2015, Naser Musleh, the wholesale suppliers of the merchandise to the Central Market namely Associated Wholesale Grocers in Kansas city, Kansas, to a prominent bank namely Wilshire bank in California and to the individuals who had leased the Central Market from the Plaintiff in Indiana and in Illinois.

Townsend made a deliberate effort to personally call AWG (affiliated wholesale grocers) across the state lines, in Kansas City, Kansas, in February 2018 and talked to

their legal department and berated the Plaintiff and detailed and hyped the fraud and theft charges against him. Townsend told AWG that since the Plaintiff had committed grand larceny, so the amount of $30,000 deposit that belonged to the Plaintiff, and kept with AWG as security deposit for merchandise purchases should not be refunded back to him, but rather be mailed to her.

Having not been satisfied by limited dissemination of these libelous and false statements against the Plaintiff and Chaudry, the Defendants decided to post those libelous writings and allegation on Google, making it available to potentially millions of viewers across the U.S. and on the *world wide web.*

After thoroughly defaming and assassinating the Plaintiff's reputation and character, and having served their purpose of intimidating, manipulating and tarnishing the Plaintiff's image, the Defendants half heartedly admitted that those allegations were false and asked the Court in a motion practically admitting their guilt and stating, that "since filing the lawsuit new information has come to their knowledge and they withdraw those allegations against the Plaintiff".

The Defendants held a vendetta and malicious intent against the Plaintiff for trying to lease the supermarket which would have delayed the Countryside bank's scheme to apply to the SBA and re-coup the full or the maximum amount of two million dollar that the agency guaranteed against the loan default.

Defendants defamatory statements under the Illinois law (740 ILCS 145) constitutes defamation per se. Those statements were slanderous in nature and falsely impute the commission of a criminal offense, and/or inability or want of integrity in

performing the Plaintiff's duties in his trade or profession, which was in willful, intentional and/or reckless disregard of truth and were made with actual malice. Defendants knew full well that the Plaintiff was not a 'public figure'.

This wide and affirmative publication and dissemination of false statements damaged and impugned the integrity of the Plaintiff and caused him actual pecuniary loss of face and emotional distress.

As a direct and proximate result of the Defendants actions, the Plaintiff has suffered irreparable damage and every defendant should be levied a penalty of five million dollars each ($5,000,000) for their misdeeds.

## C O U N T   X11
## VIOLATIONS OF LEASE TERMS & NON-PAYMENTS OF RENTS
### Against Hasan Musleh, Nidal Musleh

Hasan Musleh and his partner Nidal Musleh (Lessee) who had entered into a binding lease agreement with the Plaintiff and Chaudry have failed to follow thru and abide by the terms and conditions of that lease. After the expiry of over nine months, they have failed to pay any rents at all.

The Agreement that was entered into with them also specifies that the Lessee will start paying for the inventory that they received from the Plaintiff in 13 equal installments. So far the Lessee/s have not made a single payment towards the cost of the inventory. Altogether the Lessee owes the Plaintiff over One hundred and fifty thousand dollars as of the date of filing this lawsuit. It is prayed that the Court issue an order directing the Lessee to pay the Plaintiff one hundred and fifty thousand dollars along with the statutory interest to get current on the lease and if they do not intend to start the

supermarket and honor the lease, then the Court should order them to pay the full amount for the term of the lease and the cost of the inventory, which comes to a net sum of three hundred and seventy thousand dollars. ($370,000), plus the statutory interest.

### C O U N T   X111

### LEGAL & PROFESSIONAL MISCONDUCT  & MALPRACTICE AGAINST BURKE COSTANZA & CARBERRY  WHICH  HAS A  CHECKERED PAST

Plaintiff repeats and realleges the allegations in the preceding paragraphs of this complaint. Burke Costanza & Carberry (previously Burke Costanza & Cuppy) is not a stranger in the halls and chambers of the Northern District of Illinois. This law firm has a checkered past. Frederick Cuppy who started and sustained this firm and who helped swindle hundreds of millions of dollars was a reputed partner of Burke Costanza and was a confidant, supporter, mentor and associate of Defendant Nancy Townsend. Judge Harry D. Leinenweber reprimanded and even sent Frederick Cuppy to federal prison, but apparently even that had no affect on this law firm. Though the firm did change its name from Burke CoStanza & Cuppy to Burke CoStanza & Carberry, it continues to retain its culture of impunity and their deeply ingrained mentality of being above and beyond the law. This firm's and Townsend's actions are not in isolation. They demonstrate a clearly defined pattern. Pattern of fraud, pattern of perjury and pattern of obstruction of justice, as cited by Judge Leinenweber in sentencing Nancy Townsend's partner and mentor to prison. Burke Costanza and Carberry must be held accountable for their deeds.

Because of the actions of Nancy Townsend of conspiring with Nitti, Wheeler and Countryside bank in filing a vexatious lawsuit and using the legal system to harass, embarrass, blackmail and manipulate the Plaintiff, the Plaintiff has been hurt emotionally

and financially and will continue to bear these scars for some time to come. Burke Costanza and Carberry cannot divest its responsibilities and liabilities as being isolated in nature. Nancy Townsend was not merely representing a party, but she had decided to become a party. It was a deliberate and calculated decision on her part. Burke Costanza and Carberry bears the ultimate responsibility for what goes on in that office, that houses Townsend.

It was the duty of Burke Costanza and Carberry, at all of the foregoing times to use the skills of reasonable, competent and trained attorneys and lawyers to represent their clients within the scope of law, to adhere to the rules laid out by the Supreme Court of Indiana and Illinois and rule 11 of the Federal rules of civil procedures.

At all times relevant, Nancy Townsend was the agent, servant and employee and/or partner of Burke Costanza and Carberry and was always acting within the scope of her agency, service and employment. Burke Costanza and Carberry failed to supervise and administer Townsend knowing that she was about to embark upon an activity expressly forbidden by Rule 11, Illinois & Indiana Supreme Court rules as well as rules and conduct expressly forbidden by the Attorney Registration and Disciplinary Commission, who may ultimately bear the burden to disbar her or discipline her. Burke Costanza and Carberry failed to have policies, procedures and practices in place to prevent lawyers, including Townsend, from working on client's matters independent of oversight and their duty to manage and supervise their employees or associates.

Burke Costanza and Carberry allowed Townsend to act unsupervised in firm's name, representing firm's clients and let its other employees including secretaries, research analysts, receptionists and messengers as well work for Townsend

independently and unsupervised by them. It also allowed its infrastructure, including fax machines, computers, telephone systems, stationary, envelopes, postage and mail room, messenger services, firm vendors and other firm assets to be used and abused by Nancy Townsend.

As a direct and proximate acts and/or omissions of Burke Costanza and Carberry, and Nancy Townsend, the Plaintiff was injured in an as yet undetermined amount, materially and emotionally. This amount is believed to be no less than $5,000.000. (five million dollars).

### PRAYER FOR RELIEF

It was barely ten years ago that the corrupt and greedy bankers and their cahoots in the appraiser community brought our nation to its knees and almost certain financial ruin which we barely dodged. This lead to many new laws that the congress legislated and promulgated but despite this Countryside, its surrogates and accomplices embarked upon a racket that this court is now called upon to reckon with.

Another important element that the Court should consider is whether these individuals, Nitti, Townsend, Wheeler, Badri and Lannin were mentally inclined to engage in racketeering activity. Looking at the history of this case, the answer is yes. These individuals are successful in their respective fields, they knew exactly what they were doing, had a strong financial incentive to make millions and to engage in a pattern of activities which lasted a sizeable time span. The pattern of their activities was not innocuous, but rather their actions were carefully calculated. From their first act of inducing the Plaintiff and Chaudry as how to apply for a loan, making false promises to refinance, and then trying to extort an additional $190,000, to filing false and vexatious lawsuit to blackmail the Plaintiff and Chaudry, and forcing and intimidating Musleh from

assuming and abiding by the lease, so they could quickly grab two million dollars from SBA on their insurance guaranty are proof positive of their racketeering activity.

WHEREFORE, Plaintiff respectfully requests that the Court:

1. Award Plaintiff such equitable injunctive and ancillary relief as may be necessary to avert the likelihood of Plaintiff suffering irreparable harm.

2. Award Plaintiff a declaratory judgment that they were wronged.

3- Award Plaintiff Sheikh in this case five million dollars for defamation sustained because of actions perpetrated by Townsend, Nitti, Wheeler and Countryside Bank on advertising and disseminating the bogus fraud and theft charges on internet and world wide web.

4- Award two million dollars to Plaintiff to be payable by Wheeler, Badri and Lannin for engaging and ordering an inflated and fraudulent appraisal.

5- Award One million dollars to the Plaintiff to be payable by Townsend, Nitti and Wheeler for filing a vexatious lawsuit and engaging in acts of performing 'sewer service', violating Illinois and Indiana Supreme Court rules, and deliberately violating Rule 11 of the FRCP for filing false pleadings and affidavits in a court of law.

6- Award One million dollars to the Plaintiff to be payable by Nitti, Townsend, Windsor Advantage and Wheeler for engaging in 'tortious interference' in a business relationship with the Musleh defendants and scuttling of lease.

7- Award three hundred thousand dollars for the loss of inventory that was contracted to be sold to the Musleh defendants, that was wasted or got spoiled because of scuttling of lease by Nitti, Wheeler and Townsend.

8- Award two year's rent to the Plaintiff to be payable by Musleh defendants for not paying rents for the store that they leased, plus $300,000 of inventory that they had agreed to pay in installments over a period of 13 months.

9. Enter judgment against RICO Defendants Wheeler, Countryside bank, Raj Badri, Nancy Townsend, Cary Lannin, Jeffery Nitti and Windsor Advantage in an amount equal to the amount of mortgage that went in default plus three times the amount of damages what these Plaintiffs have sustained because of RICO Defendants' actions, and violation of 18 U.S.C. § 1961-1964;

10- Award reasonable attorney fees, and cost of bringing this lawsuit.

11- Any other relief that this Court deems fair, just and equitable.

7-24-18

Zafar Sheikh. Pro-se
3155 West Wallen Avenue,
Chicago. IL. 60645.
Tele: (847) 414 - 9670

Ex A

# AGREEMENT TO PURCHASE
## CENTRAL MARKET

This Agreement is signed by & between Zafar Sheikh a resident of the City of Chicago, Illinois and Bashir Chaudry, a resident of the city of Lincolnwood, Illinois collectively known as the Purchasers or the First Party and Nasser Musleh as being the owner of Central Market of Lake Station, LLC, a corporation organized and existing under the laws of the State of Indiana, hereinafter to be known as the Seller or the Second party.

The Second Party is desirous of selling a Grocery store business owned and operated by the Seller which is located at 3232 Central Avenue, Lake Station, Indiana and the First Party is interested in purchasing that business. Therefore both parties enter into the following agreement, terms and conditions of which are being laid down below:

1- The First Party has offered to purchase and the Second Party has accepted the offer to sell the Grocery Store business along with the property where the grocery store is located and operated. The Grocery store is commonly known as 'Central Market' and is located at 3232 Central Avenue, in Lake Station, Indiana.

2- The price of the business and the property has been agreed to be 1.9 million dollars and the breakdown is as follows:

|  |  |
|---|---|
| Business : | $500,000. |
| Property: | $800,000. |
| Inventory: | $600,000. (at actual cost) |

3- It is the intent of the Parties to close this transaction and set the closing by the 31st of January, 2015. Both parties though realize that the transaction is contingent upon the Purchaser getting a loan. Both parties realize that the loan process is difficult, cumbersome and lengthy. But both parties are desirous of meeting this deadline and will do their utmost to close this transaction by the end of January 2015.

1

4- The business will include all of the operating business along with all its goodwill, fixtures and equipment that is being currently in use at the above cited premises.

5- The Seller has stated that the Business is doing a minimum of six million dollars in sale per annum, which includes grocery, deli, produce and meats. This figure of six million dollars does not include Lottery sales, money orders or similar commission based items.

6- The actual inventory of the store will be taken at the closing of the transaction by an independent inventory company at the retail value and 35% of it will be deducted to arrive at the actual cost. Expired or redundant inventory will not be counted in calculating the value of the inventory.

7- The Purchaser will have the option of purchasing the corporation under which the Seller is operating its business. Though the final decision will be made upon the advice of the Buyer's and Seller's respective attorneys.

8- The Seller will train the Purchaser in operating the store and this training will start thirty days prior to the closing date. Hours of this training will be mutually agreed between the parties. Seller has indicated that he is willing to stay after the closing date to make sure that the Purchaser adjusts and familiarizes himself with the operation of the business. The duration of such further stay will be agreed upon between the parties and may be based upon a part time or consultative basis.

9- Seller will deliver all equipment of the store in good working condition and if any equipment including the heating and air-conditioning units of the store are in need of repairs, the Seller will make sure that it delivers those equipments in good working condition.

2

10- The Seller will not compete with the Purchaser nor operate any grocery store or similar business either directly or indirectly thru his family or friends within a radius of ~~Five~~ *Ten* miles from Lake Station, Indiana for a period of ~~one~~ *Five* year from the date of closing.

11- Purchaser will continue with and hire all current employees and Seller will encourage those employees to stay on with the Purchaser and will not take any employee with him or ask any one of them to leave.

12- The Purchaser has decided to stay on with "Central Grocers" as its main supplier for purchasing the groceries, produce and meats and the Seller will do its best to facilitate the signing up of the Purchaser with the Central Grocery Company.

13- The Seller will clear any health or code related violations that it may have against the building or the business and will obtain a general clearance before the closing.

14- The Seller has assured the Buyer that there are no roof leaks in the building nor there are any environmental or other regulatory problems as far as the building is concerned. Nor the building is under threat of condemnation by the State or federal authorities.

15- The Seller will clear all tax issues, if any, regarding Sales Taxes or other user taxes with the State of Indiana or income taxes with the State or Federal authorities. In case such issues relating to the unpaid or balances due on any of the state or federal filings with the IRS or State revenue department are brought up, the Seller will immediately pay them or settle with the authorities, so the Purchaser of the new business establishment does not suffer any penalties, hindrances or obstacles in its operations.

16- The Seller upon signing of this Agreement will provide the last three years of business and corporate tax returns to facilitate the loan that will be applied by the Purchaser and will co-operate in providing all reports or paper work which may be required to obtain the loan by the banks or regulative authorities.

Having agreed to the above terms and conditions, both parties set their hands below on the 30th of November 2014.

Zafar Sheikh
Purchaser

Nasser Mosleh
Seller

Bashir Chaudry
Purchaser

4

Exb. B

# AGREEMENT FOR SALE OF ASSETS OF
## CENTRAL MARKET OF LAKE STATION, LLC

THIS AGREEMENT ("Agreement") is made at Merrillville, in the County of Lake, State of Indiana, on the 1st day of December, 2014, by and between Central Market of Indiana, Inc., an Indiana Corporation ("Buyer"), and Central Market of Lake Station, LLC, an Indiana Limited Liability Company ("Seller").

### RECITAL

Buyer desires to purchase from Seller, and Seller desires to sell to Buyer, all of Seller's assets and business as a going concern.

THEREFORE, in consideration of the mutual promises and conditions contained in this Agreement, the parties agree as follows:

## Section 1.    Purchase and Sale

Buyer shall purchase from Seller, and Seller shall sell to Buyer, all of Seller's assets described in the attached schedule, herein marked Exhibit B together with Seller's grocery/market business named Central Market, located at 3232 Central Avenue, Lake Station, Indiana 46405, as a going concern, including all accounts receivable of Seller remaining unpaid at the date of closing, and excluding the following:

a. Any and all rebates, refunds, and/or coupon redemptions from grocers, vendors, suppliers and/or manufacturers associated with or arising from transactions and/or retail sales occurring through the date of closing;
b. The receipts of any and all debit/credit card purchases made through the date of closing that are not processed and deposited to Seller prior to the date of closing;
c. Fixtures, displays or other equipment provided by vendors and are not owned by Seller. All such items are more fully described in and attached hereto as Exhibit C.

## Section 2.    Purchase Price

a.      The purchase price is One Million Two Hundred Thousand Dollars and No Cents ($1,200,000.00)

The purchase price shall be and is allocated as follows:

| | | |
|---|---|---|
| 1. | Inventory | $ 600,000.00 (approximately – please see below) |
| 2. | Fixtures | $ 500,000.00 |

1

3.　　Goodwill　　　　$ 100,000.00

**TOTAL**　　　　　　**$1,200,000.00 (approximately – please see below)**

b.　　Inventory:

Prior to closing, the Seller and the Buyer will mutually agree on an inventory company to take the inventory of the Seller. The inventory will count the merchandise sold by the Seller and will include but not be limited to all groceries, fruits, vegetables, meats and all other goods sold by the Seller in its normal course of business.

The inventory will be taken at the Seller's retail price, from which thirty five percent (35%) from the total price of the inventory will be deducted in order to determine the actual cost of the inventory price for the purposes of this Agreement. Any items that cannot have a deduction, such as cigarettes or cigars or any similar item, will be inventoried at retail price. Said items will be determined by agreement by Seller and Buyer.

## Section 3.　　Buyer and Seller's Debts, Liabilities, and Obligations

a.　　**Buyer shall not assume any debts, liabilities, or obligations of Seller.**

b.　　Except as otherwise expressly provided herein, Seller and/or shareholders and/or members indemnify Buyer against and save it harmless from any and all debts, liabilities, and obligations of Seller accruing or based upon or arising out of facts occurring before the closing date. Buyer shall indemnify Seller against and save it harmless from any and all debts, liabilities, and obligations accruing or based upon or arising out of facts occurring after the closing date and connected with the property and business sold hereunder or the operations thereof. In the case of claims and liabilities under workmen's compensation and employer liability statutes, where the claim is based upon facts occurring in part before and in part after the closing date, the claim shall be apportioned between the parties as provided by law.

c.　　The assumption by Buyer of Seller's contract obligations provided for in this Agreement shall not apply to accounts payable and debts accruing there under prior to closing date.

d.　　Whenever either party shall learn through the filing of a claim or the commencement of a proceeding or otherwise of the existence of any liability for which the other party is or may be responsible under this Agreement, such party shall notify the other party promptly and furnish such copies of documents (and make originals thereof available) and other information as such party may have which may be used or useful in the defense of such claims and shall afford the other party full opportunity to defend the

same in the name of any party and shall generally cooperate with the other party in the defense of any such claim.

## Section 4.    Closing Date

This sale transaction shall be closed at the office of Northwest Indiana Title within sixty (60) days of execution of this Agreement, provided the terms of this Agreement have been satisfied; or if the conditions of this Agreement then require, or the convenience of the parties reasonably demands, as soon thereafter as can mutually be arranged between the parties.

## Section 5.    Sales, Purchase, or Use Tax

Any sales, purchase, or use tax under the law of the State of Indiana or of any county, city, or subdivision thereof which may be payable by reason of the sale of all or any portion of the property under this agreement shall be borne by Buyer, and Buyer agrees to reimburse Seller on demand for any such tax.

## Section 6.    Seller's Obligations on Closing

At the closing, Seller shall deliver to Buyer all deeds, bills of sale, endorsements, assignments, and other good and sufficient instruments of conveyance and transfer in a form satisfactory to Buyer's counsel, containing full warranties of title as necessary and effective to vest in Buyer good, absolute, and marketable title to the properties, assets, and business being transferred by Seller, free and clear of all liens, charges, encumbrances, and other restrictions. Seller shall deliver to Buyer all contracts, dealer franchises, and agreements, commitments, and rights pertaining to Seller's business and other data relating to its assets, business, and operation, except its books of account and supporting records, corporate minute books, and stock transfer records. Seller shall take all steps that may be required to put Buyer in actual possession, operation, and control of the properties, assets, and business to be transferred under this Agreement. All applicable taxes and fees that may be due or payable as a result of the conveyance, assignment, transfer, or delivery of the property, assets, or business to be conveyed and transferred as provided in this Agreement, whether levied on Seller or Buyer, shall be paid by Seller.

## Section 7.    Subject to the Closing of the Sale as Provided Herein:

a.    Effective as of the closing date, Seller hereby transfers and assigns to Buyer all rights of Seller existing at the date of closing in and under any and all sales orders and sales contracts, purchase orders and purchase contracts, and such other contracts and property as are listed and described in Exhibit B, attached hereto and made a part hereof; and Buyer hereby assumes and agrees to perform all obligations of Seller there under then remaining unperformed, except as provided herein.

3

b.     Notwithstanding the foregoing, if any of such contracts are not assignable either by virtue of the provisions thereof or under applicable law, Seller will use its best efforts to obtain the necessary consents thereto and until such consent shall be obtained neither this Agreement nor the bill of sale shall constitute an assignment thereof.  In the event that any purchase order or contract shall not be assignable by Seller, Buyer agrees to purchase from Seller at the contract price all property there under which Seller is obligated to purchase.  In the event that any sales order or contract shall not be assignable, Buyer agrees, to sell to Seller and/or shareholders any products required to complete such contracts at the same prices provided for therein.

## Section 8.     Seller's Continuing Obligations

After the closing and at the request of Buyer, Seller shall execute and deliver to Buyer other instruments of conveyance and transfer and take other action as Buyer may reasonably require more effectively to convey, transfer to, and vest in Buyer, and to put Buyer in possession of, any of the properties or assets to be conveyed, transferred, and delivered to Buyer under this Agreement.

## Section 9.     Organization of Seller

Seller represents and warrants that Seller is a Limited Liability Company duly organized, validly existing, and in good standing under the laws of the State of Indiana and has all requisite corporate power and authority to carry on its business as it is currently being conducted, to enter into this Agreement, and to carry out and perform the terms and provisions of this Agreement. Seller has no subsidiaries and has no direct or indirect interest, other than as a trade creditor, in any other corporation or any firm, association, or other business enterprise.

## Section 10.     Lawsuits and Proceedings

Seller represents and warrants that to the best of Seller's knowledge there are no lawsuits or administrative proceedings pending or threatened against Seller or affecting any of its properties or rights, nor is Seller or any of its officers or directors aware of any acts that reasonably could result in a lawsuit or administrative proceeding against Seller or affecting any of its properties or rights.

## Section 11.     Compliance with Law and Other Instruments

Seller represents and warrants that Seller is not in violation of any term or provision of any charter, by-law, mortgage, indenture, contract, agreement, instrument, judgment, decree, order, statute, rule, or regulation; and Seller's execution, delivery, and performance of this Agreement will not result in any violation or in the creation of any mortgage, lien, encumbrance, or charge on any of the properties or assets of Seller.

## Section 12.   Shareholders'/Members' Approval

Seller represents and warrants that the sale and transfer of assets by Seller, as provided for in this Agreement, have been approved by the Directors(s)/Manager(s) and by the requisite number of Shareholders/Members.  Shareholders/Members jointly and severally represent and warrant to Buyer that they are the owners and holders of all the issued and outstanding ownership shares/units of Seller and hereby consent to the sale of the assets of Seller on the terms and conditions set forth herein.  Seller agrees to furnish Buyer with a certified copy of the resolution of its Directors(s)/Manager(s) and its Shareholders/Members authorizing the sale hereunder.

The Shareholders/Members of Seller shall execute and deliver to Buyer a joint and several guaranty and contract of indemnity, dated as of the date of the closing, in the form attached to this contract, herein named Exhibit A.

## Section 13.   Seller's Title

Seller warrants that Seller has good, absolute, and marketable title to all of its properties and assets being sold to Buyer pursuant to this Agreement, and that Seller holds those properties and assets subject to no lease, mortgage, pledge, lien, charge, security interest, encumbrance, or restriction.

## Section 14.   Condition of Tangible Assets

Seller represents that the furniture, fixtures, equipment, and other tangible assets of Seller being sold under this Agreement are in good condition and repair, reasonable wear and tear excepted.

## Section 15.   Brokers

Seller represents and warrants that the introduction of Seller to Buyer and all negotiations on the part of Seller relative to this Agreement and the transaction contemplated by this Agreement have been effected and carried on by Seller directly with Buyer without the intervention of any broker, finder, or other person.

## Section 16.   Satisfaction of Debts

Seller covenants that, promptly after the closing, it will satisfy in full all of its debts, liabilities, and obligations. From and after the closing, Seller will not engage in any business or other activity, except as required to wind up and dissolve the corporation.

## Section 17.   Risk of Loss, Fire, or Casualty

a.      Seller assumes all risk of destruction, loss, or damage due to fire or other casualty up to the time closing has concluded. In the event of the destruction, loss, or damage due to fire or other casualty of substantially all of the assets listed in Exhibit B, Buyer shall have the option to terminate this Agreement, and all rights of Buyer and Seller shall terminate. Buyer shall notify Seller within ten (10) days after receiving written notice of the destruction, loss, or damage due to fire or other casualty, of Buyer's decision whether to terminate this Agreement. If Buyer does not timely notify Seller of termination, this Agreement shall remain in full force and effect, provided, however, that the purchase price shall be adjusted at the closing to reflect the destruction, loss, or damage, and if Buyer and Seller are unable to agree on the amount of the adjustment, the dispute shall be determined by an independent appraiser and the determination shall be binding on both Buyer and Seller in this Agreement.

b.      Seller shall keep said assets as listed in Exhibit B insured, for the benefit of Buyer, so long as Seller is obligated to Buyer under this Agreement, until midnight on the day of closing.

## Section 18.   Use of Business Name

Buyer shall have the right to use the name Central Market, and Seller and Members agree that they will not authorize anyone else to use said name or any names substantially similar thereto, and that they will not use said name or any names substantially similar thereto except in the course of winding up the affairs of Seller.

## Section 19.   Warranties of Seller

Buyer has been afforded full opportunity to examine the property to be purchased by it hereunder and no representations or warranties whatever with respect thereto are made by Seller and shareholders or any of them except that:

a.      Seller will have at the closing date and will convey to Buyer good and marketable title to all property agreed to be sold by Seller hereunder free and clear of any lien or encumbrance, to the matters affecting title set forth therein.

b.      Seller will not be in default on the closing date in any material respect in the performance of any of Seller's obligations under any contract or agreement sold to Buyer hereunder; the contracts and other documents and property listed or described in Exhibit B hereto are all contracts and documents of the type therein listed; and there are no amendments thereto or modifications thereof except those designated in such exhibit.

c.      Seller has obtained, or will before the closing date obtain, all consents, releases, and permission of any kind or nature, whether from the public authorities or

6

### Section 25.   Attorneys' Fees

Should any litigation be commenced between the parties to this Agreement concerning the rights and duties of either party in relation to the Business or this Agreement, the prevailing party in the litigation shall be entitled to (in addition to any other relief that may be granted) a reasonable sum as and for attorneys' fees in the arbitration or litigation, which sum shall be determined by the court or other person presiding in the arbitration or litigation or in a separate action brought for that purpose.

### Section 26.   Headings

Headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.

### Section 27.   Counterpart Execution

This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute but one and the same instrument.

### Section 28.   Parties in Interest

All the terms and provisions of this Agreement shall be binding on and inure to the benefit of, and be enforceable by, Seller and Buyer and their successors and assigns.

### Section 29.   Integrated Contract

This Agreement constitutes the entire agreement between the parties, and there are no agreements, understandings, restrictions, warranties, or representations between the parties other than those set forth or provided for in this Agreement.

### Section 30.   Notice

Any notice required or permitted to be delivered under this Agreement shall be deemed received when sent by United States mail, postage prepaid, certified mail, return receipt requested, addressed to Seller or Buyer, as the case may be, at the following:

Attorney for Buyer:
Sophia J. Arshad, Esq.
Arshad, Pangere and Warring LLP
7899 Taft Street
Merrillville, Indiana 46410
Phone:  219/736-6500

Attorney for Seller:
George Ivancevich, Esq.
Johnson, Stracci & Ivancevich, LLP
250 East 90th Drive
Merrillville, Indiana 46410
Phone:  219/769-0087

8

Executed at Merrillville, Indiana, on the date first above written.

SELLER:

_____

Central Market of Lake Station, LLC
By: Naser Musleh
Its: Member


BUYER:

_____

Central Market of Indiana, Inc.
By:_____
Its:_____


Instrument Prepared By:
Sophia J. Arshad, Esq. 7899 Taft Street, Merrillville, IN 46410 (219) 736-6500

## EXHIBIT A

## GUARANTY BY MEMBERS

To induce the execution by Central Market of Lake Station, LLC of the foregoing Agreement for the purchase and sale of assets, and in consideration of the benefits accruing to the undersigned pursuant to the Agreement, the undersigned, being all of the Members of Central Market of Lake Station, LLC covenant, represent, warrant, agree, and guarantee that (1) each of the representations, warranties, and agreements of Seller is accurate and complete and will be accurate and complete at the time Buyer acquires Seller's assets and properties; (2) the undersigned will vote or cause to be voted all shares of Seller's common stock in favor of the foregoing Agreement and the transactions contemplated in the foregoing Agreement and will take every action within their power to cause Seller to carry out all of its undertakings pursuant to the foregoing Agreement; (3) to the extent provided for in the foregoing Agreement, the undersigned will indemnify and hold Buyer harmless against any losses, damages, costs, or expenses that Buyer may sustain as a result of a breach of any of the foregoing representations, warranties, or agreements by the undersigned, or a breach by Seller of any of the representations, warranties, or agreements contained in the foregoing Agreement; and (4) the undersigned will comply with the terms of the covenant not to compete provided for in the foregoing Agreement.

Members:

_____

SSN:

Address:

Date of birth:

## EXHIBIT B

## ASSETS OF SELLER

## Please see attached

Attorney for Buyer:

Sophia J. Arshad, Esq.
Arshad, Pangere and Warring LLP
7899 Taft Street
Merrillville, Indiana 46410
Phone: 219/736-6500

Attorney for Sellers:

George Ivancevich, Esq.
Johnson, Stracci & Ivancevich, LLP
250 East 90th Drive
Merrillville, Indiana 46410
Phone: 219/769-0087



## Mechanical Construction
### INC.

321 E. Main St.
Griffith, IN 46319
(219) 924-3600 - www.tmmechanical.net

**Invoice - 1711**

Exb. C

**Date:** 5/21/2015
**Account ID:** 50
**PO Number:** .

**Bill to:** Central Market-Key Lake Station
Attention Accounts Payable
3232 Central Avenue
Lake Station, IN 46405

**Service at:** Central Market-Key Lake Station
Attention Accounts Payable
3232 Central Avenue
Lake Station, IN 46405

**Reference:** Work Order - 1490
Fan on condensor stopped working.

**Terms:** Net 15 Days

| Item | Description | Quantity | Unit Price | Amount |
|---|---|---|---|---|
| **Labor** | | | | |
| | 4/8/2015-Tony Fryza - Labor - In Agreement $115.00<br>Rack-A low temp condenser had a bad motor bracket, disconnected wiring pulled bracket out to get it sized, will order up new one.<br>Rack-B medium temp condenser had blown fuses for header fan, because wiring was rubbing up against metal, cut back wiring, re-spliced wiring, & replaced bad fuses. | 2.75 | $115.0000 | $316.25 |
| | 4/14/2015-Tim Morris - Service Repair<br>Fabricated and installed broken motor brackets. | 3.00 | $115.0000 | $345.00 |
| | | **Labor Subtotal:** | | **$661.25** |
| **Miscellaneous** | | | | |
| | Truck Charge | 1.00 | $45.0000 | $45.00 |
| | Short Uni Strut | 40.00 | $2.0000 | $80.00 |
| | | **Miscellaneous Subtotal:** | | **$125.00** |
| **Parts** | | | | |
| | 4XC61 Fuses, 15A, Midget, FNQ, 500VAC, Fibergl | 2.00 | $30.0400 | $60.08 |
| | ELECTRICAL KIT Electrical Kit | 1.00 | $10.0000 | $10.00 |
| | | **Parts Subtotal:** | | **$70.08** |

| | |
|---|---|
| **Subtotal:** | $856.33 |
| **Sales Tax:** | $10.51 |
| **Payments:** | $866.84 |
| **Total Due:** | $0.00 |



# Mechanical Construction
INC.

321 E. Main St.
Griffith, IN 46319
(219) 924-3600 - www.tmmechanical.net

**Invoice - 1712**

**Date:** 5/21/2015
**Account ID:** 50
**PO Number:**

**Bill to:** Central Market-Key Lake Station
Attention Accounts Payable
3232 Central Avenue
Lake Station, IN 46405

**Service at:** Central Market-Key Lake Station
Attention Accounts Payable
3232 Central Avenue
Lake Station, IN 46405

**Reference:** Work Order - 1505

**Terms:** Net 15 Days

| Item | Description | Quantity | Unit Price | Amount |
|---|---|---|---|---|
| **Labor** | | | | |
| | 4/12/2015-Tim Morris - Labor - In Standard $125.00 <br> Low Temp. system, condenser fan motor broke, and ruptured coil. Total loss of refrigerant, isolated condenser, placed system under evacuation, removed damaged passes of condenser from circuit, pressure test condenser with 250 psi of nitrogen for 1 hour ok. Placed condenser under evacuation. Recharge rack with 600 Lbs. R404-A | 7.00 | $172.5000 | $1,207.50 |
| | 4/12/2015-Ryan Kalis - Labor - In Standard $125.00 <br> Parts, and assist | 6.00 | $172.5000 | $1,035.00 |
| | 4/14/2015-Tim Morris - Labor - In Standard $125.00 <br> Replaced drier cores with high moisture cores. | 4.00 | $115.0000 | $460.00 |
| | 4/17/2015-Tim Morris - Labor - In Standard $125.00 <br> Check pressure drop across liquid drier cores, minimal drop. Leak checked Cond. repair, no leak, receiver level 30-40% | 1.00 | $115.0000 | $115.00 |
| | 5/9/2015-Richard Ledwa - Service Repair <br> Changed out the coil EPR valve. Changed out 2 evaporator motors. Traced wiring to ensure proper operation. Checked all levels. Operational at this time. | 7.50 | $172.5000 | $1,293.75 |
| | 5/7/2015-Barry Gasik - Service Repair <br> Installed motor bracket, fan motors on both med to low temp condensers. Extended wiring to motors. Installed fan blades, cut off excessive shaft. Installed fan grills. Checked rotation to amp's ok. <br><br> Found N.W. low temp condenser with another bad fan motor. Talked with Jeff, ordered parts. <br><br> Note: Condenser coils need cleaning. | 7.00 | $115.0000 | $805.00 |
| | | **Labor Subtotal:** | | **$4,916.25** |
| **Miscellaneous** | | | | |
| | Truck Charge | 1.00 | $45.0000 | $45.00 |
| | Vacuum Pump Kit | 1.00 | $45.0000 | $45.00 |
| | Nitrogen | 2.00 | $44.0000 | $88.00 |



## Mechanical Construction INC.

321 E. Main St.
Griffith, IN 46319
(219) 924-3600 - www.tmmechanical.net

**Invoice - 1712**

**Date:** 5/21/2015
**Account ID:** 50
**PO Number:**

**Bill to:** Central Market-Key Lake Station
Attention Accounts Payable
3232 Central Avenue
Lake Station, IN 46405

**Service at:** Central Market-Key Lake Station
Attention Accounts Payable
3232 Central Avenue
Lake Station, IN 46405

**Reference:** Work Order - 1505

**Terms:** Net 15 Days

| Item | Description | Quantity | Unit Price | Amount |
|------|-------------|----------|-----------|--------|
| | 5834845 DVO-24 Gal Vac. Oil | 2.00 | $52.2000 | $104.40 |
| | After hours opening | 1.00 | $180.0000 | $180.00 |
| | 8522301 RC-4864 Core C19217 | 2.00 | $43.7940 | $87.59 |
| | Gold Core High moisture filter Drier | 2.00 | $72.7380 | $145.48 |
| | Tube of Leak Lock | 1.00 | $10.3400 | $10.34 |
| | Kramer Fan blade | 2.00 | $382.0000 | $764.00 |
| | Kramer motor mount | 2.00 | $338.0000 | $676.00 |
| | Shipping and Frieght | 1.00 | $230.0000 | $230.00 |
| | Motor S81-143 | 2.00 | $563.9533 | $1,127.91 |
| | Electronic Leak Detector | 1.00 | $45.0000 | $45.00 |
| | **Miscellaneous Subtotal:** | | | **$3,548.72** |
| Parts | | | | |
| | R404A 1-LB R-404A 1-LB | 600.00 | $10.0000 | $6,000.00 |
| | TORCH KIT Torch Kit | 1.00 | $35.0000 | $35.00 |
| | ELECTRICAL KIT Electrical Kit | 3.00 | $10.0000 | $30.00 |
| | **Parts Subtotal:** | | | **$6,065.00** |



## Mechanical Construction

321 E. Main St.
Griffith, IN 46319
(219) 924-3600 - www.tmmechanical.net

**Invoice - 1712**

**Date:** 5/21/2015
**Account ID:** 50
**PO Number:**

**Bill to:** Central Market-Key Lake Station
Attention Accounts Payable
3232 Central Avenue
Lake Station, IN 46405

**Service at:** Central Market-Key Lake Station
Attention Accounts Payable
3232 Central Avenue
Lake Station, IN 46405

**Reference:** Work Order - 1505

**Terms:** Net 15 Days

| Item | Description | Quantity | Unit Price | Amount |
|------|-------------|----------|------------|--------|

| | |
|---|---|
| Subtotal: | $14,529.97 |
| Sales Tax: | $663.51 |
| Payments: | $15,193.48 |
| Total Due: | $0.00 |

**T&M**

**Mechanical Construction** INC.

321 E. Main St.
Griffith, IN 46319
(219) 924-3600 - www.tmmechanical.net

**Invoice - 1717**

**Date:** 5/21/2015
**Account ID:** 50
**PO Number:**

**Bill to:** Central Market-Key Lake Station
Attention Accounts Payable
3232 Central Avenue
Lake Station, IN 46405

**Service at:** Central Market-Key Lake Station
Attention Accounts Payable
3232 Central Avenue
Lake Station, IN 46405

**Reference:** Work Order - 1582
Replace fan motor.

**Terms:** Net 15 Days

| Item | Description | Quantity | Unit Price | Amount |
|------|-------------|----------|------------|--------|
| **Labor** | | | | |
| | 5/15/2015-Barry Gasik – Service Repair | 3.75 | $115.0000 | $431.25 |
| | Picked up the new parts. Removed old burnt out fan motor and blade. Installed new motor to blade. Rewired. Checked rotation and amps. | | | |
| | | | **Labor Subtotal:** | **$431.25** |
| **Miscellaneous** | | | | |
| | HTPG Fan Blade 30x24 | 2.00 | $382.0000 | $764.00 |
| | Shipping and Frieght | 1.00 | $117.5600 | $117.56 |
| | Motor S81-143 | 2.00 | $626.6138 | $1,253.23 |
| | | | **Miscellaneous Subtotal:** | **$2,134.79** |
| **Parts** | | | | |
| | ELECTRICAL KIT Electrical Kit | 1.00 | $10.0000 | $10.00 |
| | G31-509 Fuse FNQ-15 | 1.00 | $25.4900 | $25.49 |
| | | | **Parts Subtotal:** | **$35.49** |

| | |
|---|---|
| **Subtotal:** | $2,601.53 |
| **Sales Tax:** | $151.92 |
| **Payments:** | $2,753.45 |
| **Total Due:** | $0.00 |

# T&M Mechanical Construction INC.

**Invoice - 1783**

321 E. Main St.
Griffith, IN 46319
(219) 924-3600 - www.tmmechanical.net

**Date:** 6/11/2015
**Account ID:** 50
**PO Number:**

**Bill to:** Central Market-Key Lake Station
Attention Accounts Payable
3232 Central Avenue
Lake Station, IN 46405

**Service at:** Central Market-Key Lake Station
Attention Accounts Payable
3232 Central Avenue
Lake Station, IN 46405

**Reference:** Work Order - 1610
Check A/C and clean cond. Replace fan blade.

**Terms:** Net 15 Days

| Item | Description | Quantity | Unit Price | Amount |
|------|-------------|----------|-----------|--------|
| **Labor** | | | | |
| | 6/5/2015-Richard Ledwa - Labor - In Standard $125.00 | 3.25 | $125.0000 | $406.25 |
| | Changed broken condenser fan blade, cleaned the condenser coil, and rewired the fan motor that had the broken blade. Customer asked if we can measure the island coolers to save energy at night. I recommended that they spoke with with Adam or Paul to follow up on the idea. | | | |
| | | | **Labor Subtotal:** | **$406.25** |
| **Miscellaneous** | | | | |
| | Fan Blade LA680556 | 1.00 | $95.4000 | $95.40 |
| | Shipping and Frieght | 1.00 | $20.0000 | $20.00 |
| | Truck Charge | 1.00 | $45.0000 | $45.00 |
| | coil cleaner | 1.00 | $20.0000 | $20.00 |
| | Electrical kit | 1.00 | $10.0000 | $10.00 |
| | | | **Miscellaneous Subtotal:** | **$190.40** |

| | |
|------|--------|
| Subtotal: | $596.65 |
| Sales Tax: | $10.18 |
| Payments: | $606.83 |
| **Total Due:** | **$0.00** |



## Mechanical Construction

321 E. Main St.
Griffith, IN 46319
(219) 924-3600 - www.tmmechanical.net

**Invoice - 2081**

**Date:** 8/4/2015
**Account ID:** 50
**PO Number:**

**Bill to:** Central Market-Key Lake Station
Attention Accounts Payable
3232 Central Avenue
Lake Station, IN 46405

**Service at:** Central Market-Key Lake Station
Attention Accounts Payable
3232 Central Avenue
Lake Station, IN 46405

**Reference:** Work Order - 1810
Refrigerant leak in low temperature rack in the back room.

**Terms:** Net 15 Days

| Item | Description | Quantity | Unit Price | Amount |
|------|-------------|----------|------------|--------|
| **Labor** | | | | |
| | 7/27/2015-Barry Gasik - Service Repair<br>Upon arrival, oil line leaking between separator and reservoir. Shut off system and isolated all lines, repaired leak in the line, reopened isolation valves. Started up system and added refrigerant R-404A to clear sight glass. System operational on departure. | 5.75 | $187.5000 | $1,078.13 |
| | | | **Labor Subtotal:** | $1,078.13 |
| **Miscellaneous** | | | | |
| | Consumable Material | 1.00 | $45.0000 | $45.00 |
| | Afterhours Opening Fee | 1.00 | $180.0000 | $180.00 |
| | Cylinder Deposit | 2.00 | $350.0000 | $700.00 |
| | | | **Miscellaneous Subtotal:** | $925.00 |
| **Parts** | | | | |
| | TORCH KIT Torch Kit | 1.00 | $35.0000 | $35.00 |
| | R404A 1-LB R-404A 1-LB | 200.00 | $10.0000 | $2,000.00 |
| | | | **Parts Subtotal:** | $2,035.00 |

| | |
|---|---|
| Subtotal: | $4,038.13 |
| Sales Tax: | $204.05 |
| Payments: | $4,242.18 |
| Total Due: | $0.00 |



**Invoice - 2198**

## T&M Mechanical Construction INC.

321 E. Main St.
Griffith, IN 46319
(219) 924-3600 - www.tmmechanical.net

**Date:** 9/10/2015
**Account ID:** 50
**PO Number:**

**Bill to:** Central Market-Key Lake Station
Attention Accounts Payable
3232 Central Avenue
Lake Station, IN 46405

**Service at:** Central Market-Key Lake Station
Attention Accounts Payable
3232 Central Avenue
Lake Station, IN 46405

**Reference:** Work Order - 1738
Breaker keeps blowing out, wants to get refrigerant
pressures on medium temp. system checked out.  Also,
wants frozen food coolers checked out for repairs on
electric heaters.

**Terms:** Net 15 Days

| Item | Description | Quantity | Unit Price | Amount |
|------|-------------|----------|------------|--------|
| | Circuit Breaker 50A | 1.00 | $72.0200 | $72.02 |
| | Circuit Breaker 50A | -1.00 | $208.9600 | -$208.96 |
| | Mullion Door Heaters | 3.00 | $172.5200 | $517.56 |
| | Shipping and Frieght | 1.00 | $31.0800 | $31.08 |
| | | **Miscellaneous Subtotal:** | | **$1,189.40** |
| Parts | | | | |
| | R22* R-22 Refrigerant | 20.00 | $26.4000 | $528.00 |
| | ELECTRICAL KIT Electrical Kit | 1.00 | $10.0000 | $10.00 |
| | | **Parts Subtotal:** | | **$538.00** |

| | |
|---|---|
| Subtotal: | $3,687.40 |
| Sales Tax: | $117.77 |
| Payments: | $3,805.17 |
| Total Due: | $0.00 |



# Mechanical Construction

321 E. Main St.
Griffith, IN 46319
(219) 924-3600 - www.tmmechanical.net

**Invoice - 2178**

**Date:** 9/2/2015
**Account ID:** 50
**PO Number:**

**Bill to:** Central Market-Key Lake Station
Attention Accounts Payable
3232 Central Avenue
Lake Station, IN 46405

**Service at:** Central Market-Key Lake Station
Attention Accounts Payable
3232 Central Avenue
Lake Station, IN 46405

**Reference:** Work Order - 1890
Low temp. refrigeration rack- compressors covered in oil.

**Terms:** Net 15 Days

| Item | Description | Quantity | Unit Price | Amount |
|------|-------------|----------|------------|--------|
| **Labor** | | | | |
| | 8/27/2015-Russell - Service Repair<br>Upon arrival, found oil under compressor and all over the compressor body, checked for leaks and found the discharge service valve off the compressor leaking. T&M will order a new one discharge service valve and return to install the following day. | 2.50 | $125.0000 | $312.50 |
| | 8/28/2015-Russell - Service Repair<br>Upon arrival, on 8/28/2015 started replacement of the leaky discharge valve with the new one. Brazed in new service valve during nitrogen purge of the line, pulled a vacuum on the compressor after, and topped off the compressor with refrigerant R-404A (customers supplied). Leak checked after installation was complete and found no more leaks. Set the compressor back into operational sequence, low temperature rack system operational on departure. | 5.00 | $125.0000 | $625.00 |
| | **Labor Subtotal:** | | | **$937.50** |
| **Miscellaneous** | | | | |
| | Consumable Material | 1.00 | $45.0000 | $45.00 |
| | SVC Valve 1-1/8 OD | 1.00 | $150.4200 | $150.42 |
| | Vacuum Pump Kit | 1.00 | $45.0000 | $45.00 |
| | **Miscellaneous Subtotal:** | | | **$240.42** |
| **Parts** | | | | |
| | 4287-34 Cleaner | 1.00 | $20.0000 | $20.00 |
| | **Parts Subtotal:** | | | **$20.00** |



**Mechanical Construction** IN:

321 E. Main St.
Griffith, IN 46319
(219) 924-3600 - www.tmmechanical.net

**Invoice - 2178**

**Date:** 9/2/2015
**Account ID:** 50
**PO Number:**

**Bill to:** Central Market-Key Lake Station
Attention Accounts Payable
3232 Central Avenue
Lake Station, IN 46405

**Service at:** Central Market-Key Lake Station
Attention Accounts Payable
3232 Central Avenue
Lake Station, IN 46405

**Reference:** Work Order - 1890

Low temp. refrigeration rack- compressors covered in oil.

**Terms:** Net 15 Days

| Item | Description | Quantity | Unit Price | Amount |
|------|-------------|----------|------------|--------|

| | | |
|---|---|---|
| **Subtotal:** | $1,197.92 |
| **Sales Tax:** | $11.93 |
| **Payments:** | $1,209.85 |
| **Total Due:** | $0.00 |



**Mechanical Construction**
IN'J.

**Invoice - 2195**

321 E. Main St.
Griffith, IN 46319
(219) 924-3600 - www.tmmechanical.net

**Date:** 9/10/2015
**Account ID:** 50
**PO Number:**

**Bill to:** Central Market-Key Lake Station
Attention Accounts Payable
3232 Central Avenue
Lake Station, IN 46405

**Service at:** Central Market-Key Lake Station
Attention Accounts Payable
3232 Central Avenue
Lake Station, IN 46405

**Reference:** Work Order - 1912

**Terms:** Net 15 Days

Fan motor not operational on 5 door reach-in (Ice
cream freezer). Both 5 door and 3 door cases not
draining water and all iced up.

| Item | Description | Quantity | Unit Price | Amount |
|------|-------------|----------|------------|--------|
| **Labor** | | | | |
| | 9/2/2015-Barry Gasik - Service Repair | 2.25 | $125.0000 | $281.25 |
| | Upon arrival, 8 door reach-in ice cream freezer drains blocked and iced over, fan motor was not running. Removed fan panels to access drain opening and used hot water to clear ice in drain pan. Blew out drains with nitrogen and found fan blade hitting bottom of case. Repaired motor brackets, tested motor and fan rotation. Reinstalled in the case and started refrigeration mode, all evaporator fans started, started the defrost mode to clear additional ice and check fan controls. Recommended to the employees to clean out the reach-in freezer, there was cardboard stuck to the bottom and everything was sticky (may be the problem with the blocked drains). | | | |
| | | | **Labor Subtotal:** | $281.25 |
| **Miscellaneous** | | | | |
| | Consumable Material | 1.00 | $45.0000 | $45.00 |
| | | | **Miscellaneous Subtotal:** | $45.00 |
| **Parts** | | | | |
| | NITROGEN KIT Nitrogen Kit | 1.00 | $25.0000 | $25.00 |
| | | | **Parts Subtotal:** | $25.00 |

| | |
|---|---|
| Subtotal: | $351.25 |
| Sales Tax: | $1.75 |
| Payments: | $353.00 |
| Total Due: | $0.00 |

**T & M Mechanical Construction INC.**

**Invoice - 2198**

321 E. Main St.
Griffith, IN 46319
(219) 924-3600 - www.tmmechanical.net

**Date:** 9/10/2015
**Account ID:** 50
**PO Number:**

**Bill to:** Central Market-Key Lake Station
Attention Accounts Payable
3232 Central Avenue
Lake Station, IN 46405

**Service at:** Central Market-Key Lake Station
Attention Accounts Payable
3232 Central Avenue
Lake Station, IN 46405

**Reference:** Work Order - 1738
Breaker keeps blowing out, wants to get refrigerant pressures on medium temp. system checked out. Also, wants frozen food coolers checked out for repairs on electric heaters.

**Terms:** Net 15 Days

| Item | Description | Quantity | Unit Price | Amount |
|------|-------------|----------|------------|--------|
| **Labor** | | | | |
| | 7/6/2015-Barry Gasik - Service Repair<br>Overtime | 0.50 | $170.0000 | $85.00 |
| | 7/6/2015-Barry Gasik - Service Repair<br>Upon arrival, medium temperature condenser breaker was bad, needs replacing. Also, need 3 contactors for medium condenser fans and repaired burnt wiring to the contactors. Mullion heaters on 3 door case need replacing, ordered from part supplier. Both A/C systems need to be clean, checked, and charged. Repaired door closer on freezer case. Will return on rescheduled date for final repairs. | 2.00 | $125.0000 | $250.00 |
| | 7/14/2015-Barry Gasik - Service Repair<br>Upon arrival, replaced medium temperature main breaker, replaced 3 motor contactors and burnt wiring. Checked motors operations and rotation, everything checked out okay. Checked motor on low temperature condenser, everything okay. Replaced fuses and started motor. Checked northeast A/C systems, both units flashing in sight glass, added refrigerant to clear the sight glass on both units. Both A/C systems need to be leak checked. Everything was operational on departure. | 7.25 | $125.0000 | $906.25 |
| | 9/2/2015-Barry Gasik - Service Repair<br>Upon arrival, removed access panels for wiring the mullion heaters. Removed old mullion heaters from around door frames, installed new mullion door heaters, rewired and tested. Mullion heaters checked out for normal operation. Reassembled door frames and wiring access panels. Mullion door heaters operational on departure. | 5.75 | $125.0000 | $718.75 |
| | | **Labor Subtotal:** | | **$1,960.00** |
| **Miscellaneous** | | | | |
| | Consumable Material | 1.00 | $45.0000 | $45.00 |
| | Time Delay Fuse FNQ-15 | 3.00 | $31.8600 | $95.58 |
| | Circuit Breaker | 1.00 | $208.9600 | $208.96 |
| | Contactor DP 40A. 3P. | 3.00 | $142.7200 | $428.16 |



**T&M Mechanical Construction** INC.

**Invoice - 2266**

321 E. Main St.
Griffith, IN 46319
(219) 924-3600 - www.tmmechanical.net

**Date:** 9/29/2015
**Account ID:** 50
**PO Number:**

**Bill to:** Central Market-Key Lake Station
Attention Accounts Payable
3232 Central Avenue
Lake Station, IN 46405

**Service at:** Central Market-Key Lake Station
Attention Accounts Payable
3232 Central Avenue
Lake Station, IN 46405

**Reference:** Work Order - 1973
Emergency Call- Entire Low temp. rack is down.

**Terms:** Net 15 Days

| Item | Description | Quantity | Unit Price | Amount |
|---|---|---|---|---|
| **Labor** | | | | |
| | 9/24/2015-Barry Gasik - Service Repair | 13.50 | $170.0000 | $2,295.00 |
| | Upon arrival, received an emergency night call regarding the entire freezer rack down. Checked system, found system completely out of refrigerant. Checked low temperature rack, piping, and condensing coil. Found condenser fan motor bracket and fan blade broken, motor dropped down and punctured the condenser coil. Called for materials, repaired condensing coil, had Dominic replace driers and started evacuating isolated system. Pressure checked the condenser coil with nitrogen and leak checked. Started evacuating high side of system. Added 500 lbs of R-404a to system, freezer temperature dropping on departure. | | | |
| | 9/24/2015-Dominic - Service Repair | 6.00 | $170.0000 | $1,020.00 |
| | Emergency Night call- Upon arrival, assisted Barry with repair on low temperature rack system. Started to change drier cores on the system and pull vacuum on the system. | | | |
| | | | **Labor Subtotal:** | $3,315.00 |
| **Miscellaneous** | | | | |
| | Consumable Material | 1.00 | $45.0000 | $45.00 |
| | 100lb R404A Refrigerant | 4.00 | $863.6425 | $3,454.57 |
| | 24lb R-404A Refrigerant | 4.00 | $236.9400 | $947.76 |
| | Emergency Opening Fee | 1.00 | $300.0000 | $300.00 |
| | Electronic Leak Detector | 1.00 | $45.0000 | $45.00 |
| | Vacuum Pump Kit | 1.00 | $45.0000 | $45.00 |
| | | | **Miscellaneous Subtotal:** | $4,837.33 |
| **Parts** | | | | |
| | NITROGEN KIT Nitrogen Kit | 1.00 | $25.0000 | $25.00 |
| | TORCH KIT Torch Kit | 1.00 | $35.0000 | $35.00 |



**Mechanical Construction** INC.

**Invoice - 2266**

321 E. Main St.
Griffith, IN 46319
(219) 924-3600 - www.tmmechanical.net

Date: 9/29/2015
Account ID: 50
PO Number:

Bill to: Central Market-Key Lake Station
Attention Accounts Payable
3232 Central Avenue
Lake Station, IN 46405

Service at: Central Market-Key Lake Station
Attention Accounts Payable
3232 Central Avenue
Lake Station, IN 46405

Reference: Work Order - 1973
Emergency Call- Entire Low temp. rack is down.

Terms: Net 15 Days

| Item | Description | Quantity | Unit Price | Amount |
|------|-------------|----------|------------|--------|
| | | Parts Subtotal: | | $60.00 |

| | |
|---|---|
| Subtotal: | $8,212.33 |
| Sales Tax: | $333.36 |
| Payments: | $8,545.69 |
| Total Due: | $0.00 |



**Mechanical Construction** IN-J.

321 E. Main St.
Griffith, IN 46319
(219) 924-3600 - www.tmmechanical.net

**Invoice - 2732**

**Date:** 12/28/2015
**Account ID:** 50
**PO Number:**

**Bill to:** Central Market-Key Lake Station
Attention Accounts Payable
3232 Central Avenue
Lake Station, IN 46405

**Service at:** Central Market-Key Lake Station
Attention Accounts Payable
3232 Central Avenue
Lake Station, IN 46405

**Reference:** Work Order - 2376
Dairy/meat section down on the rack system.

**Terms:** Net 15 Days

| Item | Description | Quantity | Unit Price | Amount |
|------|-------------|----------|------------|--------|
| **Labor** | | | | |
| | 12/22/2015-Russell - Serivce Labor-In-Comm-Reg | 3.00 | $125.0000 | $375.00 |
| | Upon arrival, assisted Barry with the leak repair of the medium temperature rack system. | | | |
| | 12/22/2015-Russell - Serivce Labor-In-Comm-Ot | 5.00 | $170.0000 | $850.00 |
| | 12/22/2015-Barry Gasik - Serivce Labor-In-Comm-Reg | 6.50 | $125.0000 | $812.50 |
| | Upon arrival, found medium temperature rack system completely down and out of refrigerant. Investigated and found the condenser fan motor had come loose and cut through the condenser coil. Found three different leaks in the coil. Made repairs to the condenser to fix the apparent leaks. Re-piped condenser where the fan cut through. Replaced (3) liquid line driers on the medium temperature system. Checked the repaired leaks with an entire 80 cu ft of nitrogen. Found no leaks after repair, started to charge the system with 500 lbs of R-404A. Checked system pressures after adding refrigerant. Systems refrigerant levels are still flashing, system still needs more refrigerant added to it. Will return following day to add more refrigerant and start-up medium temperature system. | | | |
| | 12/22/2015-Barry Gasik - Serivce Labor-In-Comm-Ot | 4.50 | $170.0000 | $765.00 |
| | 12/23/2015-Barry Gasik - Serivce Labor-In-Comm-Reg | 4.00 | $125.0000 | $500.00 |
| | Upon arrival, checked medium temperature system pressures. System still needs more R-404A refrigerant added to it, added another 288 lbs of refrigerant. Checked systems pressures, system is no longer flashing refrigerant. Pressures are back to normal, condenser is running normally. Condenser has five fans running at the moment, system is operational on departure. Bashir requested that we order a new condenser fan motor, bracket, fan blade, fuses, and hardware. Will turn over to service to get parts ordered and will contact owner with a date for replacement. | | | |
| | | | **Labor Subtotal:** | **$3,302.50** |
| **Miscellaneous** | | | | |
| | W-48HH High Moisture Driers | 3.00 | $61.3400 | $184.02 |
| | R-404A Refrigerant 24lb | 12.00 | $265.2800 | $3,183.36 |
| | R-404A Refrigerant 24lb | -1.00 | $258.4600 | -$258.46 |

**T&M Mechanical Construction** INC.

**Invoice - 2732**

321 E. Main St.
Griffith, IN 46319
(219) 924-3600 - www.tmmechanical.net

**Date:** 12/28/2015
**Account ID:** 50
**PO Number:**

**Bill to:** Central Market-Key Lake Station
Attention Accounts Payable
3232 Central Avenue
Lake Station, IN 46405

**Service at:** Central Market-Key Lake Station
Attention Accounts Payable
3232 Central Avenue
Lake Station, IN 46405

**Reference:** Work Order - 2376
Dairy/meat section down on the rack system.

**Terms:** Net 15 Days

| Item | Description | Quantity | Unit Price | Amount |
|---|---|---|---|---|
| | Electronic Leak Detector | 1.00 | $45.0000 | $45.00 |
| | Vacuum Pump Kit | 2.00 | $45.0000 | $90.00 |
| | R-404A 24lb | 17.00 | $258.4600 | $4,393.82 |
| | | **Miscellaneous Subtotal:** | | **$7,637.74** |
| Parts | | | | |
| | NITROGEN KIT Nitrogen Kit | 1.00 | $45.0000 | $45.00 |
| | R404A R-404A Refrigerant | 100.00 | $10.7500 | $1,075.00 |
| | KH04010 Pipe Cop Type K 1/2" | 5.00 | $4.1400 | $20.70 |
| | W 10145 Cplg Cop 1/2" | 3.00 | $1.0200 | $3.06 |
| | TORCH KIT Torch Kit | 1.00 | $35.0000 | $35.00 |
| | | **Parts Subtotal:** | | **$1,178.76** |

| | |
|---|---|
| Subtotal: | $12,119.00 |
| Sales Tax: | $607.71 |
| Payments: | $12,726.71 |
| Total Due: | $0.00 |



## Mechanical Construction

**Invoice - 2946**

321 E. Main St.
Griffith, IN 46319
(219) 924-3600 - www.tmmechanical.net

**Date:** 2/16/2016
**Account ID:** 50
**PO Number:**

**Bill to:** Central Market-Key Lake Station
Attention Accounts Payable
3232 Central Avenue
Lake Station, IN 46405

**Service at:** Central Market-Key Lake Station
Attention Accounts Payable
3232 Central Avenue
Lake Station, IN 46405

**Reference:** Work Order - 2583

**Terms:** Net 15 Days

OT APPROVED/PICKED UP (1)CHECK
(1) FOR $12,726.71
WENT UPSTAIRS FOUND FAN BLADE CAME APART
AND CUT INTO COIL, LOOSING FREON.
CUSTOMER STATES THAT FREON WAS S/O.

| Item | Description | Quantity | Unit Price | Amount |
|---|---|---|---|---|
| **Labor** | | | | |
| | 2/15/2016-Barry Gasik - Serivce Labor-In-Comm-Ot | 8.25 | $170.0000 | $1,402.50 |
| | Upon arrival, found condenser fan motor bracket and blade broken off mount on freezer section. Motor and bracket dropped into condensing coil, found (2) holes in condensing coil. Repaired holes found in condensing coil and leak checked, found no leaks after repair. Changed liquid line driers on the system and evacuated the isolated drier and condensing coil with the vacuum pump. Opened isolation valves and charged the system with R-404A. Customer saved most of the refrigerant by valving off line in basement, only added (1) jug of R-404A refrigerant to system. System is up and running on departure, will return to install new condenser motor, fan, and mount. | | | |
| | 2/15/2016-Adam Turbin - Serivce Labor-In-Comm-Ot | 6.50 | $170.0000 | $1,105.00 |
| | Upon arrival, assisted Barry in the repairs of freezer section condensing coil after motor fell into condensing coil. | | | |
| | | | **Labor Subtotal:** | **$2,507.50** |
| **Miscellaneous** | | | | |
| | Consumable Material | 1.00 | $45.0000 | $45.00 |
| | Vacuum Pump Kit | 1.00 | $45.0000 | $45.00 |
| | Electronic Leak Detector | 1.00 | $45.0000 | $45.00 |
| | Core Type High Moisture W-48HH | 2.00 | $61.3400 | $122.68 |
| | Cylinder 404A Refrigerant | 1.00 | $239.3000 | $239.30 |
| | | | **Miscellaneous Subtotal:** | **$496.98** |
| **Parts** | | | | |
| | TORCH KIT Torch Kit | 1.00 | $35.0000 | $35.00 |



**Mechanical Construction** INC.

*Invoice - 2946*

321 E. Main St.
Griffith, IN 46319
(219) 924-3600 - www.tmmechanical.net

**Date:** 2/16/2016
**Account ID:** 50
**PO Number:**

**Bill to:** Central Market-Key Lake Station
Attention Accounts Payable
3232 Central Avenue
Lake Station, IN 46405

**Service at:** Central Market-Key Lake Station
Attention Accounts Payable
3232 Central Avenue
Lake Station, IN 46405

**Reference:** Work Order - 2583

**Terms:** Net 15 Days

OT APPROVED/PICKED UP (1)CHECK
(1) FOR $12,726.71
WENT UPSTAIRS FOUND FAN BLADE CAME APART
AND CUT INTO COIL, LOOSING FREON.
CUSTOMER STATES THAT FREON WAS S/O.

| Item | Description | Quantity | Unit Price | Amount |
|------|-------------|----------|------------|--------|

**Parts Subtotal:** $35.00

| | |
|---|---|
| **Subtotal:** | $3,039.48 |
| **Sales Tax:** | $27.79 |
| **Payments:** | $3,067.27 |
| **Total Due:** | $0.00 |



**Mechanical Construction**
INC.

321 E. Main St.
Griffith, IN 46319
(219) 924-3600 - www.tmmechanical.net

**Invoice - 2982**

**Date:** 2/23/2016
**Account ID:** 50
**PO Number:**

**Bill to:** Central Market-Key Lake Station
Attention Accounts Payable
3232 Central Avenue
Lake Station, IN 46405

**Service at:** Central Market-Key Lake Station
Attention Accounts Payable
3232 Central Avenue
Lake Station, IN 46405

**Reference:** Work Order - 2589
LEAD# 021613
Quoted $2,100 Per AW
F/I (1) Cond. Motor, (1) Mounting Bracket, and (1) Fan
Blade.

**Terms:** Net 15 Days

| Item | Description | Quantity | Unit Price | Amount |
|------|-------------|----------|------------|--------|
| **Miscellaneous** | | | | |
| | Progress Billing: 100.00% Complete | 1.00 | $2,100.0000 | $2,100.00 |
| | 2/17/16 Barry Gasik | | | |
| | Upon arrival, removed old motor, fan, and mounting bracket. Found bracket to be the wrong size. Will return once new bracket is received. | | | |
| | 2/19/16 Barry Gasik | | | |
| | Upon arrival, installed new motor bracket, motor, and fan blade on low temperature condensing unit. Installed over sized washers for reinforcement on motor bracket. Rewired motor and checked rotation and amperage. Reinstalled fan grill and secured to unit, condensing fan motor mount and bracket are operation on departure | | | |

**Miscellaneous Subtotal:** **$2,100.00**

| | |
|---|---|
| Subtotal: | $2,100.00 |
| Sales Tax: | $0.00 |
| Payments: | $2,100.00 |
| **Total Due:** | **$0.00** |



**Invoice - 3067**

**Mechanical Construction**
INC.

321 E. Main St.
Griffith, IN 46319
(219) 924-3600 - www.tmmechanical.net

**Date:** 3/17/2016
**Account ID:** 50
**PO Number:**

**Bill to:** Central Market-Key Lake Station
Attention Accounts Payable
3232 Central Avenue
Lake Station, IN 46405

**Service at:** Central Market-Key Lake Station
Attention Accounts Payable
3232 Central Avenue
Lake Station, IN 46405

**Reference:** Work Order - 2638
Freezer Section Down

**Terms:** Net 15 Days

| Item | Description | Quantity | Unit Price | Amount |
|------|-------------|----------|------------|--------|
| **Labor** | | | | |
| | 3/13/2016-Barry Gasik - Serivce Labor-In-Comm-Agreement Ot | 6.75 | $156.4000 | $1,055.70 |
| | Upon arrival, found freezer systems warming in areas. Checked freezer cases, condensing coils/ fans, and compressors. Found the refrigerant levels a little low, added 63 lbs of refrigerant R-404A to system. Case temperatures are dropping on departure. Told customer to check levels on Monday morning, may need to come back to perform leak search on cases. | | | |
| | | | **Labor Subtotal:** | **$1,055.70** |
| **Miscellaneous** | | | | |
| | Consumable Material | 1.00 | $45.0000 | $45.00 |
| | | | **Miscellaneous Subtotal:** | **$45.00** |
| **Parts** | | | | |
| | R404A R-404A Refrigerant | 63.00 | $10.0000 | $630.00 |
| | | | **Parts Subtotal:** | **$630.00** |

| | |
|---|---|
| **Subtotal:** | $1,730.70 |
| **Sales Tax:** | $44.10 |
| **Payments:** | $0.00 |
| **Total Due:** | **$1,774.80** |



## Mechanical Construction
INC.

321 E. Main St.
Griffith, IN 46319
(219) 924-3600 - www.tmmechanical.net

**Invoice - 3080**

**Date:** 3/22/2016
**Account ID:** 50
**PO Number:**

**Bill to:** Central Market-Key Lake Station
Attention Accounts Payable
3232 Central Avenue
Lake Station, IN 46405

**Service at:** Central Market-Key Lake Station
Attention Accounts Payable
3232 Central Avenue
Lake Station, IN 46405

**Reference:** Work Order - 2650
Frozen Food is thawing- Possible leak

**Terms:** Net 15 Days

| Item | Description | Quantity | Unit Price | Amount |
|------|-------------|----------|------------|--------|
| **Labor** | | | | |
| | 3/17/2016-Russell - Serivce Labor-In-Comm-Reg | 6.25 | $125.0000 | $781.25 |
| | Upon arrival, customer has refrigerant leaks throughout low temperature circuit. Fixed all leaks that were discovered and recharged system up with 127 lbs of R-404A.. | | | |
| | 3/17/2016-Barry Gasik - Serivce Labor-In-Comm-Reg | 5.25 | $125.0000 | $656.25 |
| | Upon arrival, started to leak check entire low temperature system. Repaired leaks as needed along the refrigerant lines. Added 127 lbs of R404-A refrigerant to the system. System is still low on refrigerant, need to return in the morning with more refrigerant. | | | |
| | 3/17/2016-Barry Gasik - Serivce Labor-In-Comm-Ot | 2.00 | $170.0000 | $340.00 |
| | 3/18/2016-Barry Gasik - Serivce Labor-In-Comm-Reg | 3.00 | $125.0000 | $375.00 |
| | Upon arrival, added 48 lbs of R-404A refrigerant to low temperature system. Checked all repaired leaks in low temperature lines. Checked temperatures and made sure that system is running normally after adding more refrigerant. Receiver level is now at 30-40%, which is normal for operation. Low temperature system is running normally on departure. | | | |
| | | | **Labor Subtotal:** | **$2,152.50** |
| **Miscellaneous** | | | | |
| | Consumable Material | 1.00 | $45.0000 | $45.00 |
| | R-404A Refrigerant | 2.00 | $279.3800 | $558.76 |
| | Electronic Leak Detector | 1.00 | $45.0000 | $45.00 |
| | | | **Miscellaneous Subtotal:** | **$648.76** |
| **Parts** | | | | |
| | R404A 1-LB R-404A 1-LB | 127.00 | $10.0000 | $1,270.00 |
| | | | **Parts Subtotal:** | **$1,270.00** |



## Mechanical Construction
IN-2.

321 E. Main St.
Griffith, IN 46319
(219) 924-3600 - www.tmmechanical.net

**Invoice - 3080**

**Date:** 3/22/2016
**Account ID:** 50
**PO Number:**

**Bill to:** Central Market-Key Lake Station
Attention Accounts Payable
3232 Central Avenue
Lake Station, IN 46405

**Service at:** Central Market-Key Lake Station
Attention Accounts Payable
3232 Central Avenue
Lake Station, IN 46405

**Reference:** Work Order - 2650
Frozen Food is thawing- Possible leak

**Terms:** Net 15 Days

| Item | Description | Quantity | Unit Price | Amount |
|------|-------------|----------|------------|--------|

| | |
|---|---|
| Subtotal: | $4,071.26 |
| Sales Tax: | $128.01 |
| Payments: | $0.00 |
| **Total Due:** | **$4,199.27** |



**T&M Mechanical Construction** INC.

**Invoice - 3097**

Page 1 of

321 E. Main St.
Griffith, IN 46319
(219) 924-3600 ~ www.tmmechanical.net

**Date:** 4/4/2016
**Account ID:** 50
**PO Number:**

**Bill to:** Central Market-Key Lake Station
Attention Accounts Payable
3232 Central Avenue
Lake Station, IN 46405

**Service at:** Central Market-Key Lake Station
Attention Accounts Payable
3232 Central Avenue
Lake Station, IN 46405

**Reference:** Work Order - 2671

**Terms:** Net 15 Days

Freezer section is down and flashing on refrigerant.

| Item | Description | Quantity | Unit Price | Amount |
|------|-------------|----------|-----------|--------|
| **Labor** | | | | |
| | 3/28/2016-Barry Gasik - Serivce Labor-In-Comm-Reg | 8.00 | $125.0000 | $1,000.00 |
| | Upon arrival, found freezer low temperature section low on refrigerant. Began leak checking all over store and repair leaks along the way. Will return following day to finish repairs. | | | |
| | 3/28/2016-Barry Gasik - Serivce Labor-In-Comm-Ot | 1.25 | $170.0000 | $212.50 |
| | 3/28/2016-Russell - Serivce Labor-In-Comm-Reg | 4.00 | $125.0000 | $500.00 |
| | Upon arrival, assisted Barry in leak checking low temperature system and repair. Added (5) 24lb jugs of R-404a refrigerant. | | | |
| | 3/29/2016-Russell - Serivce Labor-In-Comm-Reg | 7.25 | $125.0000 | $906.25 |
| | Upon arrival, finished up with fixing leaks in roof top condenser for low temperature application. Also, finished repairing leaks on A5 and A6 circuits. Added (4) 24lb tanks of R-404A refrigerant. | | | |
| | 3/29/2016-Russell - Serivce Labor-In-Comm-Ot | 4.50 | $170.0000 | $765.00 |
| | 3/29/2016-Barry Gasik - Serivce Labor-In-Comm-Reg | 8.00 | $125.0000 | $1,000.00 |
| | Upon arrival, finished leak check or entire low temperature system. Leak checked & repaired piping and condenser coil. Repaired leaks in A-5 & A-6 cases. Pressure checked with nitrogen and evacuated condenser coil to a 500 micron vacuum and added refrigerant. | | | |
| | 3/29/2016-Barry Gasik - Serivce Labor-In-Comm-Ot | 5.00 | $170.0000 | $850.00 |
| | | **Labor Subtotal:** | | $5,233.75 |
| **Miscellaneous** | | | | |
| | Consumable Material | 1.00 | $45.0000 | $45.00 |
| | R-404A 24lb | 9.00 | $295.1800 | $2,656.62 |
| | Vacuum Pump Kit | 1.00 | $45.0000 | $45.00 |
| | Electronic Leak Detector | 2.00 | $45.0000 | $90.00 |
| | | **Miscellaneous Subtotal:** | | $2,836.62 |



**Mechanical Construction** INC.

321 E. Main St.
Griffith, IN 46319
(219) 924-3600 - www.tmmechanical.net

**Invoice - 3097**

Page 2 of 2

**Date:** 4/4/2016
**Account ID:** 50
**PO Number:**

**Bill to:** Central Market-Key Lake Station
Attention Accounts Payable
3232 Central Avenue
Lake Station, IN 46405

**Service at:** Central Market-Key Lake Station
Attention Accounts Payable
3232 Central Avenue
Lake Station, IN 46405

**Reference:** Work Order - 2671

**Terms:** Net 15 Days

Freezer section is down and flashing on refrigerant.

| Item | Description | Quantity | Unit Price | Amount |
|------|-------------|----------|------------|--------|
| Parts | | | | |
| | TORCH KIT Torch Kit | 1.00 | $35.0000 | $35.00 |
| | NITROGEN KIT Nitrogen Kit | 3.00 | $25.0000 | $75.00 |
| | | | **Parts Subtotal:** | **$110.00** |

| | |
|---|---|
| **Subtotal:** | $8,180.37 |
| **Sales Tax:** | $193.66 |
| **Payments:** | $0.00 |
| **Total Due:** | $8,374.03 |



**Mechanical Construction**
INC.

**Invoice - 3097**

321 E. Main St.
Griffith, IN 46319
(219) 924-3600 - www.tmmechanical.net

**Date:** 4/4/2016
**Account ID:** 50
**PO Number:**

**Bill to:** Central Market-Key Lake Station
Attention Accounts Payable
3232 Central Avenue
Lake Station, IN 46405

**Service at:** Central Market-Key Lake Station
Attention Accounts Payable
3232 Central Avenue
Lake Station, IN 46405

**Reference:** Work Order - 2671
Freezer section is down and flashing on refrigerant.

**Terms:** Net 15 Days

| Item | Description | Quantity | Unit Price | Amount |
|------|-------------|----------|------------|--------|
| **Labor** | | | | |
| | 3/28/2016-Barry Gasik - Serivce Labor-In-Comm-Reg | 8.00 | $125.0000 | $1,000.00 |
| | Upon arrival, found freezer low temperature section low on refrigerant. Began leak checking all over store and repair leaks along the way. Will return following day to finish repairs. | | | |
| | 3/28/2016-Barry Gasik - Serivce Labor-In-Comm-Ot | 1.25 | $170.0000 | $212.50 |
| | 3/28/2016-Russell - Serivce Labor-In-Comm-Reg | 4.00 | $125.0000 | $500.00 |
| | Upon arrival, assisted Barry in leak checking low temperature system and repair. Added (5) 24lb jugs of R-404a refrigerant. | | | |
| | 3/29/2016-Russell - Serivce Labor-In-Comm-Reg | 7.25 | $125.0000 | $906.25 |
| | Upon arrival, finished up with fixing leaks in roof top condenser for low temperature application. Also, finished repairing leaks on A5 and A6 circuits. Added (4) 24lb tanks of R-404A refrigerant. | | | |
| | 3/29/2016-Russell - Serivce Labor-In-Comm-Ot | 4.50 | $170.0000 | $765.00 |
| | 3/29/2016-Barry Gasik - Serivce Labor-In-Comm-Reg | 8.00 | $125.0000 | $1,000.00 |
| | Upon arrival, finished leak check or entire low temperature system. Leak checked & repaired piping and condenser coil. Repaired leaks in A-5 & A-6 cases. Pressure checked with nitrogen and evacuated condenser coil to a 500 micron vacuum and added refrigerant. | | | |
| | 3/29/2016-Barry Gasik - Serivce Labor-In-Comm-Ot | 5.00 | $170.0000 | $850.00 |
| | | | **Labor Subtotal:** | $5,233.75 |
| **Miscellaneous** | | | | |
| | Consumable Material | 1.00 | $45.0000 | $45.00 |
| | R-404A 24lb | 9.00 | $295.1800 | $2,656.62 |
| | Vacuum Pump Kit | 1.00 | $45.0000 | $45.00 |
| | Electronic Leak Detector | 2.00 | $45.0000 | $90.00 |
| | | | **Miscellaneous Subtotal:** | $2,836.62 |



**Mechanical Construction** INC.

**Invoice - 3097**

321 E. Main St.
Griffith, IN 46319
(219) 924-3600 - www.tmmechanical.net

**Date:** 4/4/2016
**Account ID:** 50
**PO Number:**

**Bill to:** Central Market-Key Lake Station
Attention Accounts Payable
3232 Central Avenue
Lake Station, IN 46405

**Service at:** Central Market-Key Lake Station
Attention Accounts Payable
3232 Central Avenue
Lake Station, IN 46405

**Reference:** Work Order - 2671
Freezer section is down and flashing on refrigerant.

**Terms:** Net 15 Days

| Item | Description | Quantity | Unit Price | Amount |
|------|-------------|----------|------------|--------|
| Parts | | | | |
| | TORCH KIT Torch Kit | 1.00 | $35.0000 | $35.00 |
| | NITROGEN KIT Nitrogen Kit | 3.00 | $25.0000 | $75.00 |

**Parts Subtotal:** $110.00

| | |
|---|---|
| Subtotal: | $8,180.37 |
| Sales Tax: | $193.66 |
| Payments: | $0.00 |
| Total Due: | $8,374.03 |

Exb. D

## RE: Question regarding central market sale

From   **fmusleh** fmusleh@centralmarketllc com

To   **Raj Badri** Raj.Badri@banksbc.com

Cc   **chaudrybashir** chaudrybashir@yahoo.com,   **zafarsheikh313** zafarsheikh313@aol.com,   **Mohammade Musleh** mohamm

show image slideshow



Raj,

I hope all is well and I apologize for the delay in response.
Attached, please find a copy of the 2014 property tax for the store property.

With regards to the $159k in insurance that shows on the expense list for the store, that includes all insura
insurance, property insurance, general insurance, as well as all the health insurance that was paid through
insurance is no longer provided through the store and now has become the responsibility of the employees

If you have any further questions about anything, please notify me.

Respectfully,

Feras Musleh
Operations Manager

**CENTRAL MARKET**

3232 Central Avenue
Lake Station, IN 46405
219.962.1234 - phone
219.746.1041 - cell
219.962.1834 - fax
www.CentralMarketLLC.com


-------- Original Message --------
Subject: RE: Question regarding central market sale
From: Raj Badri <Raj.Badri@banksbc.com>
Date: Mon, December 08, 2014 4:11 pm
To: "'fmusleh@centralmarketllc.com'" <fmusleh@centralmarketllc.com>

Sorry here is the attachment.

Thanks,

**Raj Badri**
*Vice President, Managing Director of SBA Lending*
State Bank of Countryside
6734 Joliet Road
Countryside, IL 60525
Tel: 708 485 0081

$E \times b. E$ 1

**From:** Jeffrey Nitti
**Sent:** Friday, November 03, 2017 3:22 PM
**To:** 'zafar sheikh' <zafarsheikh313@aol.com>; chaudrybashir@yahoo.com
**Cc:** chack1973@aol.com; seansheikh@gmail.com; Raj.Badri@bankcountryside.com;
Debra.Fickett@bankcountryside.com;seansheikh@gmail.com

Hi Mr. Sheikh,
Thank you for the call this afternoon. As discussed, please provide any additional correspondence you may have with the two interested parties to further document the Lender's file.

We will need to ensure constant communication throughout this process with weekly discussions at a minimum.

Please note, the Bank must review and approve any and all agreements prior to execution.

Thank you and look forward to reviewing the initial negotiation correspondence.

**Jeffrey Nitti**
**Manager – Special Assets**
Windsor Advantage, LLC
P: 312.465.7846 | C: 708.785.6273

E xb. E

**Sent:** Friday, October 27, 2017 10:25 AM
**To:** 'chack1973@aol.com' <chack1973@aol.com>; 'seansheikh@gmail.com'
<seansheikh@gmail.com>
**Cc:** 'Raj Badri' <Raj.Badri@bankcountryside.com>; Debra L. Fickett
<Debra.Fickett@bankcountryside.com>
**Subject:** Central Market of Lake Station LLC - SBA Loan Default Letter
**Importance:** High

Good morning Sean and Bushra,

Windsor Advantage has been retained to assist Countryside Bank in this matter going forward.
In proper course, please see the attached correspondence for your records.

I understand with speaking with Raj Badri there may have been some significant events recently
with a potential LOI with a Lease to Buy structure and want to continue those discussion
towards an amicable solution for all parties.

We would like to set up a brief introductory call this afternoon or Monday afternoon, October
30th, to discuss and detail next steps.

Please let me know what your schedule may look like to hop on a call.

Thank you and look forward to working with you.

**Jeffrey Nitti**
**Manager – Special Assets**
Windsor Advantage, LLC
444 N Wells St., Suite 201
Chicago, IL 60654
P: 312.465.7846 | C: 708.785.6273

Exb. F

**Sent:** Friday, October 27, 2017 10:25 AM
**To:** 'chack1973@aol.com' <chack1973@aol.com>; 'seansheikh@gmail.com'
<seansheikh@gmail.com>
**Cc:** 'Raj Badri' <Raj.Badri@bankcountryside.com>; Debra L. Fickett
<Debra.Fickett@bankcountryside.com>
**Subject:** Central Market of Lake Station LLC - SBA Loan Default Letter
**Importance:** High

Good morning Sean and Bushra,

Windsor Advantage has been retained to assist Countryside Bank in this matter going forward.
In proper course, please see the attached correspondence for your records.

I understand with speaking with Raj Badri there may have been some significant events recently
with a potential LOI with a Lease to Buy structure and want to continue those discussion
towards an amicable solution for all parties.

We would like to set up a brief introductory call this afternoon or Monday afternoon, October
30th, to discuss and detail next steps.

Please let me know what your schedule may look like to hop on a call.

Thank you and look forward to working with you.

**Jeffrey Nitti**
**Manager – Special Assets**
**Windsor Advantage, LLC**
**444 N Wells St., Suite 201**
**Chicago, IL 60654**
**P: 312.465.7846 | C: 708.785.6273**

Exb. F

-----Original Message-----
From: Jeffrey Nitti <jnitti@windsoradvantage.com>
To: zafar sheikh <zafarsheikh313@aol.com>
Sent: Tue, Jan 30, 2018 11:13 am
Subject: RE: Lease

Good Morning Zafar,

Who is Mr. Nidal? We have been working with Mr. Hasan Musleh as the lessee.

I understand your concerns and are in constant communication w Mr. Hasan Musleh. The bank is looking into insurance that may already be covered as well as conducting the necessary roof repairs to proceed.

I expect final determination by tomorrow.

Thank you,

**Jeffrey Nitti**
**Manager – Special Assets**
Windsor Advantage, LLC
**P: 312.465.7846 | C: 708.785.6273**
Connect on LinkedIn:

Secured Email: **SEND ME SECURED EMAIL**

CONFIDENTIALITY NOTICE: The content of this e-mail, along with any attachments, is covered by state and federal law governing electronic communications and may contain confidential and legally privileged information. The information is intended only for the use by the individual or entity named above. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution or the taking of any action in reliance on the contents of this e-mailed information is strictly prohibited. If you have received this e-mail in error, please contact the sender and delete the e-mail and any attachments from all computers.

LENDER WRITTEN APPROVAL REQUIRED: Please note that Windsor Advantage, LLC is not a lender and is, rather, a lender service provider. To the extent you are seeking to: (1) obtain a loan from a lender or (2) settle a disputed matter, only the lender may: (1) approve such loan and underlying loan terms or (2) agree to any settlement and any lender approval for (1) and (2) must be in writing signed by the lender.

**From:** zafar sheikh [mailto:zafarsheikh313@aol.com]
**Sent:** Tuesday, January 30, 2018 11:07 AM
**To:** Jeffrey Nitti <jnitti@windsoradvantage.com>
**Subject:** Lease

Good Morning Jeff:

The Lessee, Mr. Nidal is getting very impatient. If the bank doesn't give him a go ahead soon, he is going to call it quits.
Please move without further delay.

Ex: F

The other important thing is insurance of the property. I had written to Mr. Badri last year, without any response.

You are also being reminded that the property needs to be insured against loss. It should have casualty and liability insurance to safeguard the property against any loss.

Regards:
zafar sheikhs

## COMMERCIAL STORE LEASE

Exb. G

### 3232 Central Avenue, Lake Station, Indiana.

**1. PARTIES**

The LESSOR 3232 Central Market, LLC, hereinafter also known as the Lessor, its heirs, successors and assigns where the context so admits, does hereby lease to: M. R. Allah a corporation organized under the laws of the State of Indiana, with its legal address of _____ hereinafter also to be known individually or jointly as LESSEE, which expression shall include their successors, executors, and administrators, where the context so admits, and Leases to the LESSEE the premises as described above. The Lease is in the Corporation's name, but The corporation M.R. Allah inc. will be guarantors of this lease for the two years.

**2. PREMISES**

A store front located at 3232 Central Avenue, in Lake Station, Indiana, 46405. The premises includes a store, plus storage area and second story offices.

**3. REPAIRS or/**
**Alterations**

Any improvements for the start of grocery store operation

which may include decorations or in-store additions or divisions, will be the sole responsibility of the Lessee.

**4. TERM**

The term of this lease shall be for a period of two (2) years. It will commence on the 1st day of December 2017, and will terminate on the 1st day of December 2019. Lessee will have the option to renew the lease for two additional ten year periods. The Lessee will give the Lessor at least 60 days Notice prior to the expiration of the lease that he wants to renew the lease and this Notice will be given by certified mail.

The Lessee will be granted two month free rent to commence upon the premises being ready to open as grocery store. Lessee shall also not be required to pay any rent during the time lessee is preparing the premises for opening as a grocery store

~~be not required to pay the rent during the time Lessee is preparing the premises for opening the store.~~

Both parties fully understand and acknowledge that this contract is for the lease of the store only and there is no business, equipment and/or goodwill involved in this transaction. No good will, equipment or business is changing hands. This Contract is only for the lease of the store. Lessors are not selling anything and Lessees are not buying anything except the inventory as described in article 24 of this lease. All grocery store equipment inside the store will remain the property of the Lessor.

**5- SIGNS**      Paragraph five (5) intentionally omotted.

**6. RENT**      The LESSEE shall pay to the LESSOR a net rent of $ 10,000.00 (Ten thousand) per month and this rent will be due and payable on the 1st day of each month, and will be deposited directly into the account of the Lessor via ACH system. Any rent that is more than five days late will be assessed a late fee of $100. If the ACH requests is denied by the bank for insufficient funds, in that case the Lessee will be assessed a flat fee of $250.

**7. SECURITY DEPOSIT**      The Security deposit for the leased premises is one month's rent, which amounts to $10,000. The Lessee will pay one month's rent and one months security at the signing of this lease. This sum will be paid in certified funds. The Security deposit will be returned to the Lessee upon the satisfactory compliance of the terms and conditions and at the termination of this lease. No interest will accrue on this security deposit. Upon signing of this lease the Lessor acknowledges that he has received one month's rent and one month's security.

**8- Rent Increases**      The rent of the premises will increase 2.5% after two years. After the first two years, further rents will increase every three years at 2.5%.

**9. UTILITIES**      The LESSEE shall pay, as they become due, all bills for electricity, gas, water, telephone, garbage disposal and any other utilities or services that it may order, install, use or consume for its own benefit or for the benefit of his customers including the internet or broadband connections. Upon signing this lease, the Lessee will call all utility companies and transfer gas, electric, and water accounts to his name. Lessee will also order his own garbage disposal container which will not be less than eight yards and will have a bi-weekly pick-up service, as leftover food can quickly

2

decay and create hazardous conditions which invite rodents and other insects.

Lessee will also retain the services of a pest control company as required by the City of Lake Station, which will regularly spray and keep the premises clean of all insects and roaches. If the City of Lake Station issues any ticket for not maintaining the grass or keeping the garbage area clean, the Lessee will be responsible for paying those fines and will keep the Lessor harmless from all these fines.

**10. USE OF LEASED**  The LESSEE shall use the leased premises only for the purpose of operating a Grocery Store/super market and related business.

**11. COMPLIANCE**  The LESSEE acknowledges that Grocery store which is to be operated and for which this space is being leased, shall be conducted in conformance with State, local and federal laws. The leased premises will not be used for any purpose thereof which will be unlawful, improper, noisy, offensive, or contrary to any law or ordinance of the City of Lake Station's municipal code or its by-laws in force in the city or ward in which the premises are situated. In case the Lessee violates any laws or codes, it will itself be responsible for paying any fines or tickets that may be issued for such infractions of violations.

**12. FIRE INSURANCE**  The LESSEE shall not permit any use of the leased premises which may void any insurance on the property of which the leased premises are insured or on the contents of said property or which shall be contrary to any law or regulation from time to time established by the New England Fire Insurance Rating Association, or any similar body succeeding to its powers. Upon signing this lease the Lessee will purchase such insurance and will also insure the premises during the repairs or renovations of the space. Lessee will also obtain workmen compensation and liability insurance for food contamination or for food poisoning. A copy of all such policies will be provided to the Lessor, in which the Lessor will be an additional insured.

**13. MAINTENA-NCE**  The LESSEE agrees to maintain the leased premises in good condition and whenever necessary, to replace if broken, plate glass and other glass therein, and maintaining its appearance. The Lessee acknowledges that it has received the premises in good repair and will be responsible for all its subsequent repairs and maintenance, including heating and cooling, floors, toilets, and ceiling. Lessee also agrees that any work that it undertakes will be paid for promptly and it would not allow any Mechanic's lien or any other kind of lien be placed against the landlord or the property itself.

Lessee will obtain city permits before starting any work, that needs city permits.

**14. LESSEE'S OBLIGATIONS**

The LESSEE shall not permit the leased premises to be overloaded, damaged, stripped, or defaced, nor suffer any waste. LESSEE shall obtain written consent of LESSOR before making any changes in its setup or before undertaking any construction work. Lessors will be responsible for all their vendor payments and will hold the Lessee harmless from their obligations.

**15. ALTERATIONS/ ADDITIONS**

The LESSEE shall not make structural alterations or additions to the leased premises, but may make non-structural alterations with the consent of the Lessor which will be obtained, in advance, thereto in writing, which Consent will not be unreasonably withheld or delayed. All such allowed alterations shall be at LESSEE's expense and shall be in quality at least equal to the present quality of construction. Any alterations or improvements made by the LESSEE shall become the property of the LESSOR at the termination of occupancy as provided herein. All improvements will be made with proper City building permits applied and obtained in advance before the commencement of any work is undertaken by the Tenant.

**16. ASSIGNMENT**

The LESSEE will not assign or sublet the whole or any part of the premises without Lessor's prior written consent, which consent shall not be unreasonably withheld. The Lessee is permitted to transfer this lease to a wholly owned corporation for government filing or tax purposes. Notwithstanding such sub-leasing or transferring to this wholly owned corporation, for filing or other governmental purposes, the Lessee will remain liable to the Lessor for the payment all rents and absolute performance of the terms and conditions of this lease. Lessee will have the right to purchase the property anytime during this lease and shall also have the right of first refusal.

**17. SUBORD- INATION**

This lease shall be subject and subordinate to any and all mortgages of trust and other instruments in the nature of a mortgage, now or at any time hereafter, a lien or liens on the property of which the leased premises are a part and the LESSEE shall, when requested, promptly execute and deliver such written instruments as shall be necessary to show the subordination of this lease to said mortgages, deeds of trust or other such instruments in the nature of a mortgage.

4

**18. LESSOR'S ACCESS**    The LESSOR or agents of the LESSOR may, at reasonable times, view the leased premises to make sure that the Lessee is in compliance with the terms and conditions of this lease.

**19. INDEMNIFI-CATION AND LIABILITY**    The LESSEE shall save the LESSOR harmless from all loss occasioned by the use or escape of water or by the bursting of pipes or from any claim or damage resulting from neglect in not removing snow and ice from the roof of the building or from the sidewalks bordering upon the premises so leased, or by any nuisance made or suffered on the leased premises. The removal of snow and ice from the sidewalks bordering upon the leased premises shall be the sole responsibility of the Lessee. In case there are any municipal codes which warrant and assign such responsibilities and those codes are violated, the Lessee will himself deal with such violations and citations and will not let any lien or encumbrance be placed against the property.

**20. LESSEE'S LIABILITY INSURANCE**    The LESSEE shall maintain with respect to the leased premises all property of which the leased premises are a part, with full comprehensive liability in the amount of $1,000,000.00 with property damage including fire insurance in limits of 1,000,000.00 with responsible companies AAA rated or qualified to do business in the State of Indiana and in good standing therein insuring the LESSOR as well as LESSEE against injury to persons or damage to property as provided. The LESSEE shall deposit with the LESSOR certificates for such insurance at or prior to the commencement of the term of this lease, and thereafter within thirty (30) days prior to the expiration of any such policies, on an annual basis. All such insurance certificates shall provide that such policies shall not be cancelled without at least ten (10) days prior written notice to each assured named therein. Lessor will be an additional insured in all Lessee's Insurance policies. Lessor will be responsible for the property insurance.

**21. FIRE & Loss**    Lessee will maintain his own Fire, Casualty and Liability insurance, including theft, vandalism and loss of assets or loss of income. Lessor will not be responsible for any kind of theft, pilferage, or loss of the Lessee, whether its personal or business loss. All Lessee insurances will name the Lessor as an 'additional insured".

**22. NOTICE**    Any notice from the LESSOR to the LESSEE relating to the leased Premises relating to the occupancy thereof, or concerning this lease shall be deemed duly served, if left at the leased premises

5

addressed to the LESSEE, or if mailed to the leased premises, registered or certified mail, return receipt requested, postage prepaid, addressed to the LESSEE. Any notice from the LESSEE to the LESSOR relating to the leased premises or to the occupancy thereof shall be deemed duly served, if mailed to the LESSOR by registered or certified mail, return receipt requested, postage prepaid addressed to the LESSOR at following address or any other address as the LESSOR may from time to time advise in writing. All rent notices shall be paid and sent to the LESSOR at the agreed mailing address. Notices will also be served to the Lessee at the following address:

| Lessor's address: | 3155 West Wallen Avenue, Chicago. Illinois. 60645. |
| Lessee's address: | Hasan Musleh 4562 West Church Skokie. IL. 60076. |

In case the Lessor has to proceed to Court to enforce any of the provisions of this lease or for any violations of this lease by the Lessee, the jurisdiction and venue will be the appropriate court with proper jurisdiction. Lessee will also be responsible for attorney fees if the Lessor is forced to go to Court, to enforce any of the terms and conditions of this lease.

**23. SURRENDER**   The LESSEE shall at the expiration or termination of this lease will remove all LESSEE's goods and effects from the leased premises, and return the keys to the Lessor in at least as good a condition in which it received the premises. It will pay all utilities and any/all charges that it owes any party and will provide payment receipts to the Landlord.

24- INVENTORY    On the _____ of _____ 2017, , Lessor and the Lessee will *ASAP 2* hire an inventory company, who will take the inventory of the merchandise being left at the store by the Lessor. After taking the inventory at the retail, 30% of the value will be deducted from the total price to reach at the cost factor and the cost price. Lessor had offered 20% deduction from the total cost of inventory, but since the store is being liquidated, this percentage has been increased to 30%.

Lessor will put a 50% sale on all food items that may be expiring in the next three months. Whatever is left, the Lessee will purchase them for the same 50% deduction, rather than the 30% as described

6

above. This deduction will be taken out on the day of the inventory.

The Lessee will pay Lessor the cost of this inventory, so calculated as described above, in twelve (12) equal installments which will be due the day of the public opening of the store. The Lessee will issue the remaining 11 checks on the same day. All checks will be issued in favor of Zafar Sheikh. Lessee will also enter into and sign an unconditional 'promissory note' guaranteeing the full and complete payment of the inventory. There will not be any inventory issue after the inventory settlement date.

25. **Whole Agreement**

Both parties agree and acknowledge that this agreement is the only agreement between the parties, and that there are no additional written or verbal agreements between them, and that any understandings or agreements that they may enter into future will only be in writing, duly signed and executed.

UPON WITNESS WHEREOF, the said parties hereunto set their hands and seals this _____30th_____ day of _____November_____, 2017.


_____
Zafar sheikh
3232 Central Avenue, LLc.
Lessor / Owner

_____
Bashir Chaudry
3232 Central Avenue, LLc.
Lessor / Owner

_____
Hasan Musleh
Lessee/Tenant

_____
By: Managing Member
M. R. Allah, LLC

7

(708) 474-5712 INVOICE (708) 380-3400

# WHITE INVENTORY SERVICE $Exb. H$

P.O. Box 183 • Steger, Illinois 60475-0183
www.whiteinventory.com • bob@whiteinventory.com

TO: _____ CENTRAL MARKET _____ ATTN: _____ NIDAL / ZAVAR _____

_____ 3232 CENTRAL AVE _____ PHONE #: NIDAL — HADEER @Yahoo.com

Lake STATION, IN 46405 Email ZAFARSHEIKH313@AOL.com

TERMS: NET: CASH # $500.00$       DATE: 12-6-17

RETAIL INVENTORY _____ $ 129,698.35

      COST LESS 30% _____ 90,788.60

      COST LESS 50% _____ 64,849.00

      CIGARETTES AT COST = 4692.20

      SUPPLIES AT COST = 1600.00

Exb. 1

**From:** zafar sheikh [mailto:zafarsheikh313@aol.com]
**Sent:** Friday, February 16, 2018 12:30 PM
**To:** Jeffrey Nitti <jnitti@windsoradvantage.com>
**Cc:** David.Veurink@bankcountryside.com
**Subject:** Re: Urgent Action needed to save collateral

Mr. Jeff Nitti:
Windsor advantage,
444 North Wells Street, Ste 201
Chicago. Illinois. 60654.
(copy sent to President John Wheeler thru David Veurink for immediate action).
Countryside Bank

Dear Mr. Nitti:

I have written to you on numerous occasions concerning the lease of the Central Market. I regret to say that I am hardly getting any response.

Mr. Musleh who signed the lease, because of continued delays caused by the bank, in not giving him the green light, may walk away from this lease. This lease was negotiated with your knowledge and input, as you had been giving us an impression since at least October 2017, that the bank is motivated in having the store leased.

Mr. Musleh is a serious contender, who was going to invest upwards of 500k to 750k to stock the store, fix things up and jump start the business. Stocking a 25,000 sq ft store is not for fainthearted individuals. When we took over the store, the inventory was well in excess of 750K. (you can check the closing statement and the inventory report). There is additional danger in delaying this transaction, which is that the current food stuff inventory in the store, which is in excess of 100K is in danger of expiring, if the store does not open in the very near future. All food items are mandated to carry an expiration date.

Mr. Hasan Musleh was hoping to start the store by January 1st. Musleh had also indicated that he would purchase the property in due time, after setting his foot on the ground and establishing his clientele.

As per the SBA's 'standard operating procedures' and numerous guidelines, saving the collateral and the property from further deterioration should take precedence over any other petty concerns that the bank may have. This loan has already many holes, some of which were pointed out in my letter to the bank, for instance the buyers, Sean Sheikh and Bushra Naseer never met the seller Mr. Naser, never even visited the store or saw the location, never went to the Countryside bank or even met any loan officers. Mr. Badri was well aware of all this and according to him, he had kept Mr. Wheeler well abreast of this. I once again urge you not to discourage Mr. Hasan Musleh from opening at his earliest. You should call him immediately and give him the green light.

If the Countryside bank wants me to sign some documents or any other paperwork, I am willing to go to the Countryside bank today and sign whatever is required of me, so at least the property and the collateral could be saved from further deterioration. If there is damage to the collateral, including the property and the inventory, it will be the bank's responsibility to provide whatever answers the SBA may demand from them. If the bank doesn't move expeditiously to save the collateral, we reserve our right to notify the inspector general of the SBA and seek his assistance. On the other hand, if the bank is counting on letting the collateral deteriorate and recoup its money from SBA, they should know that the SBA loan guarantees are not unconditional and are contingent upon many incriminating factors.

In view of the complicated nature of the issues, as you pointed out in your first email to us in October '17, and to which we fully agree, that we should all work amicably to wind down this process. And the first step to achieve this end is to safeguard the collateral, let Mr. Musleh start the business and then discuss other issues in good faith.

Thanks & Regards:
Zafar Sheikh

$E \times b$. $J$

**From:** Jeffrey Nitti
**Sent:** Thursday, February 08, 2018 6:31 PM
**To:** 'zafar sheikh' <zafarsheikh313@aol.com>; 'Chaudry Bashir'
<chaudrybashir@yahoo.com>; 'Sean Sheikh' <seansheikh@gmail.com>; 'Nazeer'
<nbmd44@yahoo.com>
**Cc:** 'David J. Veurink' <David.Veurink@bankcountryside.com>; 'Debra L. Fickett-Sass'
<Debra.Fickett@bankcountryside.com>
**Subject:** RE: Central Market of Lake Station IN Meeting with Countryside Bank 2/9/18
**Importance:** High

All,

A meeting/call will no longer be necessary for tomorrow.

Thank you,


**Jeffrey Nitti**
**Manager – Special Assets**
Windsor Advantage, LLC
P: **312.465.7846 | C: 708.785.6273**

Exb. K

From: Jeffrey Nitti <jnitti@windsoradvantage.com>
To: zafar sheikh <zafarsheikh313@aol.com>; Chaudry Bashir <chaudrybashir@yahoo.com>;
Sean Sheikh <seansheikh@gmail.com>; Nazeer <nbmd44@yahoo.com>
Cc: David J. Veurink <David.Veurink@bankcountryside.com>; Debra L. Fickett-Sass
<Debra.Fickett@bankcountryside.com>; 'Nancy J. Townsend' <Townsend@bcclegal.com>
Sent: Mon, Feb 12, 2018 4:15 pm
Subject: RE: Central Market of Lake Station IN Meeting with Countryside Bank 2/9/18

All,

In light of the attached letter received by Countryside Bank on Thursday, February 8, 2017, the
Bank is no longer in a position to continue to negotiate and discuss the current lease
agreement.

The best route at this time will be to have a 3rd party receiver implemented to dictate the
direction of the property and continue negations of a potential lease agreement with Mr.
Musleh.

Thank you,


**Jeffrey Nitti**
**Manager – Special Assets**
Windsor Advantage, LLC
P: 312.465.7846 | C: 708.785.6273


Connect on LinkedIn:

Exb. L

STATE OF INDIANA   )
                ) SS:
COUNTY OF LAKE   )

IN THE LAKE SUPERIOR COURT
ROOM NO. TWO

COUNTRYSIDE BANK,
   Plaintiff,                  )
                          )
   v.                         )   CAUSE NO. 45D02-1712-MF-00218
BUSHRA NASEER and SEAN Z. SHEIKH, JR.,  )
CENTRAL MARKET OF INDIANA, INC., an  )
Indiana corporation, 3232 CENTRAL AVENUE  )
LLC, an Indiana limited liability company, NASER  )
MUSLEH, HASAN MUSLEH, M.R. ALLAH,  )
LLC, ZAFAR SHEIKH, BASHIR CHAUDRY,  )
ASSOCIATED WHOLESALE GROCERS, INC.,  )
WILSHIRE BANK and UNKNOWN OWNERS  )
and NON-RECORD CLAIMANTS  )
   Defendants.

## PLAINTIFF'S MOTION TO DISMISS VOLUNTARILY COUNTS VI, VII, and VIII

Plaintiff Countryside Bank ("Countryside"), by its attorneys, BURKE COSTANZA & CARBERRY LLP, files this Motion to Dismiss Voluntarily Counts VI, VII, and VIII as follows:

Countryside filed this mortgage foreclosure action (along with related claims) on 12/27/2018. On 3/16/2018, this Court entered two separate judgments on Countryside's Complaint: (A) a Judgment of Foreclosure on the Note and Mortgage (Counts I and II) against 3232 Central Avenue LLC and Central Market of Indiana, Inc. (collectively, "Borrowers") and against 3232 Central Avenue LLC, as Mortgagor (the "Note and Foreclosure Judgment"); and (B) a separate judgment on Counts III through VI of the Complaint (the "Judgment on Counts III through VI"), including:

1.    Judgment against Bushra Naseer and Sean Z. Sheikh, Jr. (collectively, "Guarantors") on Count III of the Complaint (Liability of Guarantors on Unconditional Guarantees);

2.    Judgment against Borrowers, Guarantors, and Naser Musleh on Count IV of the Complaint (Breach of Subordination Agreement);

3.    Judgment on Count V of the Complaint (Foreclosure of Commercial Security Agreement and Request for Accounting); and

4.    Judgment on Count VI (Enforcement of Assignment of Rents and Request for Accounting) against Defendants Zafar Sheikh and Bashir Chaudry.

Both the Note and Foreclosure Judgment and the Judgment on Counts III through VI included a finding of "no just reason for delay" and directed the entry of final judgment as to those claims. The time to appeal those judgments therefore expired on 4/16/2018, 30 days after entry.

The Complaint also included (a) a Count VII (Fraud by Bushra Naseer, Sean Z. Sheikh, Jr., and Naser Musleh for a scheme to defraud related to their representation that a $300,000 Promissory Note to Naser Musleh would be subordinated to Countryside's Note;[1] and (b) a Count VIII (Fraud by Zafar Sheikh, Bashir Chaudry, and Hasan Musleh for executing a scheme to defraud Countryside of its interest in Collateral).[2] Countryside has determined to dismiss all of Counts VI, VII, and VIII, based on circumstances that occurred after the filing of the Complaint.

WHEREFORE, Countryside requests that the Court vacate the summary judgment on Count VI only, dismiss Count VI, Count VII, and Count VIII without prejudice, and grant such other relief in favor of Countryside as it deems appropriate.

Respectfully submitted,

BURKE COSTANZA & CARBERRY LLP
Attorneys for Plaintiff
/s/ Nancy J. Townsend
Nancy J. Townsend (17178-45)
9191 Broadway
Merrillville, IN 46410
(219) 769-1313

### CERTIFICATE OF SERVICE

The undersigned hereby certifies that on 7/10/2018 the foregoing was filed using the Court's CM/ECF system, by which parties can access this filing and which will send notice to:

Daniel Zamudio, counsel for Naser Musleh, email: dan@zlawpro.com
Kimberly A. Mouratides, counsel for Sean Z. Sheikh, email: kim2@kmmglawfirm.com
Douglas R. Kvachkoff, counsel for Hasan Musleh, email: doug@indianatitlenetwork.com

The undersigned further certifies that a true and accurate copy of the attached was served on 7/10/2018 on the following parties of record by depositing same in the U.S. Mail at the addresses listed below:

Bushra Naseer, 3673 W. Northshore Avenue, Lincolnwood, IL 60712
Central Market of Indiana, Inc. c/o Bushra Naseer as its Officer, 3673 West Northshore Avenue, Lincolnwood, IL 60712
3232 Central Avenue, LLC c/o Lynn Fisel, Registered Agent, P.O. Box 437, 123 North Main Street, Hebron, IN 46341
M.R. Allah, LLC c/o Hasan Musleh, Registered Agent, 9141 Randall Drive, St. John, IN 46373
Zafar Sheikh, 3155 W. Wallen Avenue, Chicago, IL 60645
Associated Wholesale Grocers, Inc. c/o Highest Company Official, 5000 Kansas Ave., Kansas City, KS 66106
Associated Wholesale Grocers, Inc. c/o Stephen M. James, 5000 Kansas Ave., Kansas City, KS 66106
Wilshire Bank c/o Highest Company Official, 3200 Wilshire Blvd., 7th Floor, Los Angeles, CA 90010
Bashir Chaudry, 6655 North Monticello Ave., Lincolnwood, IL 60712
Adedoyin Gomih, MBA, JD, Adedoyin Gomih Law, LLC, 394-396 West 80th Place, Merrillville, IN 46410

/s/ Nancy J. Townsend

---

[1] Complaint, ¶¶59-62.
[2] Complaint, ¶¶63-67.

STATE OF INDIANA    )
                   ) SS:
COUNTY OF LAKE    )

IN THE LAKE SUPERIOR COURT
ROOM NO. TWO

COUNTRYSIDE BANK,
    Plaintiff,
  v.
BUSHRA NASEER and SEAN Z. SHEIKH, JR.,
CENTRAL MARKET OF INDIANA, INC., an
Indiana corporation, 3232 CENTRAL AVENUE
LLC, an Indiana limited liability company, NASER
MUSLEH, HASAN MUSLEH, M.R. ALLAH,
LLC, ZAFAR SHEIKH, BASHIR CHAUDRY,
ASSOCIATED WHOLESALE GROCERS, INC.,
WILSHIRE BANK and UNKNOWN OWNERS
and NON-RECORD CLAIMANTS
    Defendants.

CAUSE NO. 45D02-1712-MF-00218

### ORDER

This matter is before the Court on Plaintiff's Motion to Dismiss Voluntarily Counts VI, VII and VIII of its Complaint. The Court, having reviewed Plaintiff's Motion and being duly advised, now GRANTS the same.

IT IS, THEREFORE ORDERED that:

(a)    The summary judgment on Count VI of Plaintiff's Complaint is hereby vacated; and

(b)    Counts VI, VII and VIII of Plaintiff's Complaint are hereby dismissed, without prejudice.

**SO ORDERED:** _____, 2018.

_____
JUDGE

Distribution:
Townsend
Zamudio
Kvachkoff
Mouratides
All parties of record

Please call me to discuss resolution of the lawsuit. Thank you.
Nancy J. Townsend

Exb. M



## NANCY J. TOWNSEND
Partner

9191 Broadway
Merrillville, IN 46410
219-769-1313 x159
Townsend@bcclegal.com | bcclegal.com

**Providing Legal Services at 150 N. Michigan Ave., 8th Floor, Chicago, IL 60601**

CONFIDENTIALITY NOTICE: This email is for my intended recipient only; if you are not my intended recipient, please immediately notify me by replying to this email and then deleting it. Thank you.

**From:** zafar sheikh [mailto:zafarsheikh313@aol.com]
**Sent:** Monday, April 2, 2018 10:07 AM
**To:** Nancy J. Townsend <Townsend@bcclegal.com>
**Subject:** Countryside bank v. Naseer et el.

Nancy Townsend
Burke Costanza & Carberry
9191 Broadway,
Merriville. IN. 46410.

### Ref: Countryside Bank v. Bushra Naseer et el.,

Dear Ms. Townsend:

I have received a 'request to produce' some documents. I was surprised to see those, since as of today, I haven't even been served. Regardless I waive service and request that you mail me all case documents that you have filed. You can send me the documents via regular U.S. mail. You have my address.

Other defendant Bushra Naseer is out of the U.S., and permanently resides in Pakistan. An additional Defendant Mr. Bashir Chaudry has also told me that he has not been served as of today. Sean Sheikh resides in Texas and I am not aware if he has been served as yet.

Regards:
zafar sheikh

$Exb.M$

From: zafar sheikh <zafarsheikh313@aol.com>
**To:** jnitti <jnitti@windsoradvantage.com>
**Cc:** raj.badri <raj.badri@bankcountryside.com>; Debra.Fickett <Debra.Fickett@bankcountryside.com>
**Subject:** Re: 3232 Central Avenue, Lake Station, Indiana.
**Date:** Thu, Nov 16, 2017 7:25 pm

Hello Jeff:

In reference to the whereabouts of Bushra Naseer, the main signatory on Central Market loan in Indiana, please advise what action have you or the bank taken so far. It is important that Ms. Naseer be located and asked to communicate directly with either you or the bank. We have been unable to locate her since she is out of the U.S. for over three years.

I would like to know the following:

- when did she apply for the loan, and did she ever visit the bank.
- did anyone at the bank ever physically see her.
- did someone interview her when she applied for the loan and before the loan was approved.
- Did anyone ever talked to her on the telephone.
- Is Ms. Naseer a real person or merely a front or a ghost.

I have done some research and it seems that she has also obtained more than one loan from Countryside bank. All loans were approved while she was not even in the U.S.

I will appreciate if you could furnish me with all the above information. We would like to move this matter further along.

Regards:
zafar sheikh

-----Original Message-----
From: Jeffrey Nitti <jnitti@windsoradvantage.com>
To: zafar sheikh <zafarsheikh313@aol.com>
Sent: Wed, Nov 8, 2017 1:55 pm
Subject: RE: Lease of 3232 Central Avenue, Lake Station

All received.

Thank you,

**Jeffrey Nitti**
**Manager – Special Assets**
**Windsor Advantage, LLC**
**P: 312.465.7846 | C: 708.785.6273**

Connect on LinkedIn:

Secured Email: <u>SEND ME SECURED EMAIL</u>

CONFIDENTIALITY NOTICE: The content of this e-mail, along with any attachments, is covered by state and federal law governing electronic communications and may contain confidential and legally privileged information. The information is intended only for the use by the individual or entity named above. If you are not the intended

Fwd: Central Market of Lake Station LLC - SBA Loan Default Letter

From: Sean Sheikh <seansheikh@gmail.com>
To: Zafar Sheikh <zafarsheikh313@aol.com>
Subject: Fwd: Central Market of Lake Station LLC - SBA Loan Default Letter
Date: Mon, Oct 30, 2017 4:50 pm

Exb. M

---------- Forwarded message ----------
From: **Sean Sheikh** <seansheikh@gmail.com>
Date: Monday, October 30, 2017
Subject: Central Market of Lake Station LLC - SBA Loan Default Letter
To: Jeffrey Nitti <jnitti@windsoradvantage.com>
Cc: "chack1973@aol.com" <chack1973@aol.com>, Raj Badri <Raj.Badri@bankcountryside.com>, "Debra L. Fickett" <Debra.Fickett@bankcountryside.com>

Hello Jeff:

I am surprised that the bank keeps on sending me notices, whereas Bushra Naseer does not get any notice at all. All email addresses you sent the correspondence to, indicate that none of those emails belong to Ms. Naseer. Bushra Naseer is the one who got the loan. The understanding with Mr. Badri was that upon the granting of loan, my name will be taken off. After the closing, just a few months after that I asked Mr. Badri to take my name off the loan. Instead he started demanding 5% penalty from me for taking out my name. According to him, that penalty is imposed by SBA.

According to my information Bushra Naseer is not even in the Country for the last three years or so. I too have never even visited the store. I am somewhat surprised how the loan was even approved in the first place. The sellers apparently supplied false figures and a lawsuit has been filed against them for fraud in the U.S. District Court in Chicago. The case is captioned as: *Bashir chaudry v. Naser Musleh (17 - C - 01813)*. The sellers supplied false figures to the bank as well, and misrepresented the health insurance premium payments and the condition of the cooling systems in the store. I was told that taking care of those items alone cost over three hundred thousand dollars. The appraiser that the bank hired should have checked the condition of the cooling system. The bank failed to exercise due and proper diligence.

For any further input, please talk to Mr. Chaudry. You can also talk to my father, Zafar Sheikh, who is more familiar with the situation. He can be reached at: 847-414-9670.

Best Regards,

Sean Sheikh

On Fri, Oct 27, 2017 at 10:25 AM, Jeffrey Nitti <jnitti@windsoradvantage.com> wrote:

Good morning Sean and Bushra,


Windsor Advantage has been retained to assist Countryside Bank in this matter going forward. In proper course, please see the attached correspondence for your records.


I understand with speaking with Raj Badri there may have been some significant events recently with a potential LOI with a Lease to Buy structure and want to continue those discussion towards an amicable

| Client | Trans Date | H Tmkr P | Tcode/ Task Code | Stmt # Rate | Hours to Bill | Amount | | Ref # |
|---|---|---|---|---|---|---|---|---|
| **Client ID 18202.0001 COUNTRYSIDE BANK** | | | | | | | | |
| | | | | | | contact court re possible hearing date; finalize motion for appointment of receiver; correspondence to Receiver Paul Chael re possible hearing dates. | | |
| 18202.0001 | 01/26/2018 | 9 A | 1 | 280.00 | 0.10 | 25.00 | Review and respond to correspondence from J.Nitti re status. | ARCH |
| 18202.0001 | 01/29/2018 | 9 A | 1 | 250.00 | 0.50 | 125.00 | Telephone conference w /Windsor Advantage and Countryside reps re possible lease/repairs of building; review follow-up correspondence from Dave Veurink. | ARCH |
| 18202.0001 | 02/08/2018 | 9 A | 1 | 250.00 | 0.20 | 50.00 | Review returned service on Central Market of Indiana, Inc.; direct paralegal re follow-up. | ARCH |
| 18202.0001 | 02/09/2018 | 9 A | 1 | 250.00 | 0.30 | 75.00 | Review and respond to multiple items of correspondence re letter from borrower and strategy going forward; telephone conference with Jeffrey Nitti re same. | ARCH |
| 18202.0001 | 02/12/2018 | 9 A | 1 | 250.00 | 1.10 | 275.00 | Review correspondence from Zafar Shaikh letter re leasing the property; telephone conference with D.Veurink and J.Nitti re status and strategy with prospective lessor and receiver; communications with receiver re executing appointment and re returning oath. | ARCH |
| 18202.0001 | 02/13/2018 | 9 A | 1 | 250.00 | 0.40 | 100.00 | Review and respond to correspondence and telephone call from J.Nitti re outstanding fees; telephone call from Attorney Robert Habib (312-201-1421) re his representation of Sean Shaikh in the MF case and in a case against Sellers for fraud in the sales transaction (pending in N.D. IL); review and respond to request from Jeffrey Nitti for additional information. | ARCH |
| 18202.0001 | 02/16/2018 | 9 A | 1 | 250.00 | 0.50 | 125.00 | Telephone call from Attorney Bob Habib 312.201.1421 re offer of deed in lieu; prepare correspondence to Countryside and J. Nitti re same. | ARCH |
| 18202.0001 | 02/20/2018 | A | 996 | | | 7,853.53 | Payment - Ck #208217 | ARCH |
| 18202.0001 | 02/27/2018 | 9 A | 319 | | | 1,262.29 | E-Filing fees - Lake County Clerk | ARCH |
| 18202.0001 | 02/28/2018 | 9 A | 1 | 250.00 | 0.20 | 50.00 | Review and respond to several items of correspondence regarding communications from borrower. | ARCH |
| 18202.0001 | 02/28/2018 | 9 P | 1 | 250.00 | 0.10 | 25.00 | Prepare correspondence to forward copy of filed Complaint; check judge assignment. | 15 |
| 18202.0001 | 03/01/2018 | 9 P | 1 | 250.00 | 0.10 | 25.00 | Review and respond to correspondence from Jeff Nitti re answers received and answers due. | 30 |
| 18202.0001 | 03/02/2018 | 9 P | 1 | 250.00 | 0.50 | 125.00 | Begin preparing motion for summary judgment; check answer dates. | 31 |
| 18202.0001 | 03/05/2018 | 9 P | 1 | 250.00 | 4.45 | 1,112.50 | Begin drafting Motion for Summary Judgment on Note, Guaranties, Mortgage, Assignment of Rents, Security Agreement, and Subordination Agreement; telephone call to Attorney Stephen James re funds being held by Associated Wholesale Grocer for Borrowers. | 32 |
| 18202.0001 | 03/06/2018 | 9 P | 1 | 250.00 | 2.60 | 650.00 | Review correspondence from J.Nitti and D.Veurink re payments due from Associated Wholesale Grocers and re information for Affidavit of Debt; revise Affidavit of Debt and other documents in support of motion for summary judgment; prepare correspondence to J.Nitti re affidavit of debt and new payoff statement; review options for borrowers' violation of assignment of rents clause by retaining $20,000 payment; telephone call from Attorney Robert Habib 312-201-1421 representing Sean Shaikh, inquiring whether bank will accept Deed in Lieu and forgive deficiency. | 33 |
| 18202.0001 | 03/07/2018 | 9 P | 1 | 250.00 | 5.10 | 1,275.00 | Complete draft motion for summary judgment and affidavits; prepare proposed orders granting summary judgment for foreclosure and for other relief on summary judgment; review and prepare response to Letter from Robert Habib; prepare correspondence to forward to Countryside and J.Nitti; prepare requests for documents from eight defendants. | 34 |
| 18202.0001 | 03/08/2018 | 9 P | 1 | 250.00 | 0.40 | 100.00 | Review and revise requests for production of documents; prepare follow-up correspondence re affidavit of debt. | 35 |
| 18202.0001 | 03/09/2018 | 9 P | 1 | 250.00 | 0.50 | 125.00 | Review updated Affidavit of Debt and revise summary judgment motion and exhibits accordingly. | 36 37 |
| **Total for Client ID 18202.0001** | | | | Billable Payments | 44.30 | 13,212.29 7,853.53 | COUNTRYSIDE BANK CENTRAL MARKET FORECLOSURE | |

| | | | | **GRAND TOTALS** | | | |
|---|---|---|---|---|---|---|---|
| | | | | Billable Payments | 44.30 | 13,212.29 7,853.53 | |

E-FILED   2018 Mar 14 PM 1 50   LAKE COUNTY CLERK OF THE COURT Michael A Brown

45D02-1712-MF-00218

Exb. O



PROCESSED, 2018 Feb 08 A.M 04:12 PM
KE COUNTY CLERK BY: GEODATE: Michael A Brown

45D02-1712-MF-C H
E-FILED 2018 Feb 6 2:57 PM

CERTIFIED MAIL

7021 3490 0001 2272 5959

First-Class Mail
Postage & Fees Paid
USPS
Permit No. G-10

United States
Postal Service

9590 9406 2627 7069 2957 86

• Sender:

MICHAEL A. BROWN
Lake County Clerk
3711 Main Street
East Chicago, IN 46312

(http://www.INBiz.IN.gov)



## Business Details

Print Entity Details

| | | | |
|---|---|---|---|
| Business Name: | **CENTRAL MARKET OF INDIANA INC.** | Business ID: | **2015033000027** |
| Entity Type: | **Domestic For-Profit Corporation** | Business Status: | **Admin Dissolved** |
| Creation Date: | **03/27/2015** | Inactive Date: | **09/05/2017** |
| Principal Office Address: | **3232 CENTRAL AVENUE, LAKE STATION, IN, 46405, USA** | Expiration Date: | **Perpetual** |
| Jurisdiction of Formation: | **Indiana** | Business Entity Report Due Date: | **03/31/2017** |
| | | Years Due: | **2017/2018** |

### Incorporators Information

| Title | Name | Address |
|---|---|---|
| Incorporator | SEAN SHEIKH | 66 MOTT STREET, NEW YORK, NY, 10013, USA |
| Incorporator | BUSHRA NASEER | 3673 WEST NORTHSHORE, LINCOLNWOOD, IL, 60172, USA |

Page 1 of 1, records 1 to 2 of 2

### Principal Information

| Title | Name | Address |
|---|---|---|
| Other | BUSHRA NASEER | 3232 CENTRAL AVENUE, LAKE STATION, IN, 46405, USA |
| President | zafar i Sheikh | 3155 west wallen avenue, Chicago, IL, 60645, USA |

Page 1 of 1, records 1 to 2 of 2

### Registered Agent Information

Type: **Individual**

Name: **SHEIKH ANEEQA**

Address: **3232 CENTRAL AVENUE, LAKE STATION, IN, 46405, USA**

| | | | | |
|---|---|---|---|---|
| Back | Return to Search | Filing History | Name History | Assumed Name History |
| | | | | Certified Copies Request |

3232 CENTRAL AVENUE, LLC has not appeared, answered, or otherwise defended and is in default.

HASAN MUSLEH has not appeared, answered, or otherwise defended and is in default.

M. R. ALLAH, LLC has not appeared, answered, or otherwise defended and is in default.

BASHIR CHAUDRY has not appeared, answered, or otherwise defended and is in default.

ASSOCIATED WHOLESALE GROCERS, INC. has not appeared, answered, or otherwise defended and is in default.

WILSHIRE BANK has not appeared, answered, or otherwise defended and is in default.

ZAFAR SHEIKH has not been served and has not appeared or answered. As he is not a mortgagor, borrower, or guarantor and has no interest in the Mortgaged Property, service on him is not required for purposes of this Foreclosure Judgment.

## FINDINGS AND ORDER

### 1. Ownership and Legal Description of Mortgaged Real Estate.

On 5/14/2018, 3232 Central Avenue LLC, a limited liability company owned the fee simple interest in the following "Mortgaged Property:" commonly known as 3232 Central Avenue, Lake Station, Indiana and legally described as:



| | |
|---|---|
| s/ CALVIN HAWKINS, Judge | |
| **E-FILED** 2018 Mar 16 AM 11 37 | Lake County Superior Court - Civil Division - Room 2 |

*Exb. Q*

| STATE OF INDIANA | )<br>) SS: | IN THE LAKE SUPERIOR COURT<br>ROOM NO. TWO |
|---|---|---|
| COUNTY OF LAKE | ) | |

COUNTRYSIDE BANK,
  Plaintiff,
    v.
BUSHRA NASEER et al.
  Defendants.

)
)
)   CAUSE NO. 45D02-1712-MF-00218
)
)

## AFFIDAVIT OF SERVING MOTION FOR SUMMARY JUDGMENT

I, Rhonda L. Bertram, being duly sworn upon my oath, states as follows:

1. I am older than eighteen (18) years of age and fully competent to render testimony.

2. I have personal knowledge of all matters relative to this Verified Affidavit of Service.

3. I am the legal assistant to attorney Nancy J. Townsend, partner at Burke Costanza & Carberry LLP, who is counsel of record for Plaintiff, Countryside Bank.

4. On or about 3/15/2018, Ms. Townsend filed Plaintiff's Motion for Summary Judgment and Brief in Support thereof via the Court's CM/ECF system. All parties of record were served a copy of same via regular first-class mail. At the time of the aforementioned filing, the service list used is set forth below:

- Naser Musleh c/o Daniel Zamudio, Esq., 233 S. Colfax St., Griffith, IN 46319
- Sean Z. Sheikh, 51 Rainey Street, Apt. 2211, Austin, TX 78701
- Bushra Naseer, 3673 W. Northshore Avenue, Lincolnwood, IL 60712
- Central Market of Indiana, Inc. c/o Bushra Naseer as its Officer, 3673 West Northshore Avenue, Lincolnwood, IL 60712
- 3232 Central Avenue, LLC c/o Lynn Fisel, Resident Agent, P.O. Box 437, 123 North Main Street, Hebron, IN 46341
- Hasan Musleh, 9141 Randall Drive, St. John, IN 46373
- M.R. Allah, LLC c/o Hasan Musleh, Registered Agent, 9141 Randall Drive, St. John, IN 46373
- Zafar Sheikh, 3155 N. Wallen Ave., Chicago, IL 60645 AND 4555 N. Central Ave. #5, Chicago, IL 60630
- Associated Wholesale Grocers, Inc. c/o Highest Company Official, 5000 Kansas Ave., Kansas City, KS 66106
- Associated Wholesale Grocers, Inc. c/o Stephen M. James, 5000 Kansas Avenue, Kansas City, KS 66106, email: steve.james@awginc.com
- Wilshire Bank c/o Highest Company Official, 3200 Wilshire Blvd., 7th Floor, Los Angeles, CA 90010
- Bashir Chaudry, 6655 North Monticello Ave., Lincolnwood, IL 60712

5. None of the mailings referenced above was return to me as undeliverable as addressed.

I affirm under the penalties for perjury that the foregoing representations are true and correct to the best of my knowledge and belief.

Dated: 7/9 , 2018.

_____
Rhonda L. Bertram

STATE OF INDIANA
COUNTY OF LAKE
    Subscribed and Sworn before me this 9th day of July 2018.

_____
Notary Public

LILLIAN M. SAJDYK
NOTARY PUBLIC
Lake County, State of Indiana
Commission Number: 706103
My Commission Expires October 5, 2025

NOTARY PUBLIC
SEAL
INDIANA

**EXHIBIT**

2

Exb. R

 Gmail

**Sean Sheikh <seansheikh@gmail.com>**

## SBA OIC Procedures

**Jeffrey Nitti** <jnitti@windsoradvantage.com>
To: Sean Sheikh <seansheikh@gmail.com>

Mon, Feb 26, 2018 at 1:17 PM

Good afternoon Sean,

In understand you and your counsel have recently presented a potential settlement to the Bank's Counsel. Typically that process cannot conclude until such time as all collateral securing the loan has been liquidated/addressed and will have to be approved by the Bank and the SBA. In an effort to work concurrently, please see the below and attached information that will need to be completed/collected by each guarantor in order for the Bank to consider such compromise for release on this matter.

Thanks!

-

### 1) **Offer and Supporting Documents**

Each Obligor submitting an offer in compromise must submit the following documents:

1.   **Written Offer – SBA Form 1150** (Offer in Compromise), and explain any special circumstances that the Obligor would like taken into consideration.

2.   **Financial Statement - SBA Form 770** (Financial Statement of Debtor).

3.   **Personal Federal Income Tax Returns –** A complete copy of the personal federal income tax returns that the Obligor filed with the IRS for the past two years or a written explanation as to why a copy is not available, together with an executed **IRS Form 4506-T** (Request for Transcript of Tax Return); and

   a.   2015

   b.   2016

   c.   2017, when available.

Please review and completed the aforementioned items in order to begin the review process of your request.

Thank you,

**Jeffrey C. Nitti**
**Windsor Advantage, LLC**
**444 N Wells St., Suite 201**
**Chicago, IL 60654**
**P: 312.465.7846 | C: 708.785.6273**

**Secured Email: SEND ME SECURED EMAIL**

Exb. R - 1

 Gmail

**Sean Sheikh <seansheikh@gmail.com>**

## SBA OIC Procedures

**Sean Sheikh** <seansheikh@gmail.com>
To: Jeffrey Nitti <jnitti@windsoradvantage.com>

Wed, Feb 28, 2018 at 12:52 PM

Dear Mr. Nitti:

My attorney reached out to the bank's attorney and has offered bank a 'deed in lieu of foreclosure', basically
to save the property from further deterioration. Beyond that we have nothing to offer. Our position is clear,
which is that the whole loan and the process is in clear violation of the SBA rules. I never saw the business,
nor the sellers, nor I ever met any loan officer of the bank. The loan was for Zafar Sheikh and Bashir
Chaudry.

They bought the business. Bushra Naseer and me were used by the bank. Mr. Badri and Mr. Wheeler
concocted the whole thing. You should send the SBA forms to them.

Other than that I am prepared to fly to Chicago and meet the SBA's regional director along with Badri and
Mr. Wheeler. If that is something you want me to arrange, please notify Mr. Habib.

Regards,

Sean Sheikh
[Quoted text hidden]

Exb. S

# BCC

**BURKE COSTANZA & CARBERRY** LLP

ATTORNEYS AT LAW

Nancy J. Townsend
Chicago / Merrillville Offices

March 9, 2018

Zafar Sheihk
3155 West Wallen Avenue
Chicago, IL 60645

Zafar Sheikh
4555 North Central Avenue #5
60630

Re:     Countryside Bank v. Bushra Naseer, et al.
         Cause No. 45D02-1712-MF-00218

Dear Mr. Sheikh:

I have enclosed *Plaintiff's First Request for Production of Documents to Defendant Zafar Sheikh.*

Your discovery responses are due within thirty (30) days.

Should you have any questions or concerns, please feel free to contact me.

Very truly yours,

Nancy J. Townsend
townsend@bcclegal.com

rlb
Enclosure

Advisors you want. **Advocates you need.**

Exb. 5

STATE OF INDIANA    )      IN THE LAKE SUPERIOR COURT
                     ) SS:
COUNTY OF LAKE    )      ROOM NO. TWO

| | |
|---|---|
| COUNTRYSIDE BANK,<br>    Plaintiff,<br><br>v.<br><br>BUSHRA NASEER, SEAN Z. SHEIKH, JR.,<br>CENTRAL MARKET OF INDIANA, INC., an<br>Indiana corporation, 3232 CENTRAL AVENUE<br>LLC, an Indiana limited liability company, NASER<br>MUSLEH, HASAN MUSLEH, M.R. ALLAH,<br>LLC, ZAFAR SHEIKH, ASSOCIATED<br>WHOLESALE GROCERS, INC., WILSHIRE<br>BANK, BASHIR CHAUDRY and UNKNOWN<br>OWNERS and NON-RECORD CLAIMANTS.<br>    Defendants. | )<br>)<br>)<br>) CAUSE NO. 45D02-1712-MF-00218<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## PLAINTIFF'S FIRST REQUEST FOR PRODUCTION OF DOCUMENTS TO DEFENDANT ZAFAR SHEIKH

Pursuant to Indiana Trial Rules 26 and 34, Plaintiff Countryside Bank, requests that Defendant Zafar Sheikh, produce for inspection and copying the documents and/or tangible things described below at the offices of Burke Costanza & Carberry LLP, 9191 Broadway, Merrillville, IN 46410 within thirty (30) days from the date of service.

### INSTRUCTIONS AND DEFINITIONS

a.    As used herein, "Zafar Sheikh," "Defendant," "you," and "yours" refer to Zafar Sheikh, his attorneys, agents, and all other persons acting or purporting to act on behalf of Zafar Sheikh.

b.    As used herein, "Central Market of Indiana, Inc." means Central Market of Indiana, Inc., as well as its principals, its attorneys, agents, and other representatives, and its related, affiliated, predecessor, and successor entities.

c.    As used herein, "3232 Central Avenue, LLC" means 3232 Central Avenue, LLC, as well as its principals, attorneys, agents, and other representatives, and its related, affiliated, predecessor, and successor entities.

d.    The "Property" means the property located at 3232 Central Avenue, Lake Station, IN 46405.

e.    All terms defined in the Complaint shall have the same meaning herein.

f.    As used herein, "document" and "documents" mean all original writings of any nature and all non-identical copies thereof in the possession, custody, or under the control of Defendant regardless of where located. The terms include, but are not limited to, contracts, agreements,

records, tape recordings, correspondence (electronic and hard copy), communications, text messages, reports, studies, summaries, minutes, notes, diaries, calendars, appointment calendars, agenda, bulletins, notices, announcements, instructions, charts, manuals, brochures, schedules, telegrams, teletypes, memoranda, computer listings, interoffice and intra-office memoranda, and all other documents and tangible things as that term is used under Trial Rule 34. Any document bearing notations, markings, or writings of any kind different from the original shall be treated as an original document. In any case in which the original or a non-identical copy is not available, "document" and "documents" include an identical copy of an original or a copy of a non-identical copy.

g.      Each of the following requests for production of documents includes all documents within the permissible scope of discovery as defined by Indiana Trial Rule 26(B).

h.      Each of the following requests for production of documents is of a continuing nature. Defendant is to supplement his responses promptly in accordance with Trial Rule 26(E).

i.      Each document or thing produced in response to the following requests for production shall be marked and organized so as to relate the document or thing to the request or requests that seek the document or thing.

**Requests for Production**

**DOCUMENTS TO BE PRODUCED:**

1.      All documents related to the "Commercial Store Lease" of the Property dated 11/30/2017, including but not limited to:

a.      copies of checks, deposits, and withdrawals for all payments related to the Commercial Store Lease;

b.      copies of all bank statements after 11/30/2017 for any account into which funds related to the Commercial Store Lease or the proceeds thereof were deposited.

RESPONSE:

2.      All documents reflecting your relationship to or ownership interest in Central Market of Indiana, Inc. and 3232 Central Avenue, LLC.

RESPONSE:

3.      All documents reflecting the right of Central Market of Indiana, Inc. or 3232 Central Avenue, LLC to receive payments or property from any source.

RESPONSE:

Respectfully submitted,

Nancy J. Townsend (17178-45)
Burke Costanza & Carberry LLP
9191 Broadway
Merrillville, IN 46410
*townsend@bcclegal.com*
Attorneys for Plaintiff



*Exb. 1*

   

| Keep as New | Reply | Reply All | Forward | Delete | Spam | More ⌄ |
|---|---|---|---|---|---|---|

## (No subject)

 

🏳 **Hasan Musleh** hasanindianawholesale@gmail.com    Hide ⌄        Wed, Feb 28, 2018 10:25 am

To **zafar sheikh** zafarsheikh313@aol.com

Unfortunately I can't discuss the specific actions of our borrower but I can tell you that their actions make it impossible to negotiate in good faith. We appreciate your patience with this process and we share your disappointment that we can't continue our efforts to find a mutually beneficial avenue to you occupying the store. If things change in the future that allow us to re-open dialogue, we will reach out to you. Our goal is to have a receiver appointment and we will provide your contact information to the receiver upon the receivers appointment.

Best Regards,

Sent from my iPhone

 Reply     Reply All     Forward

Exb. U



UNITED STATES DEPARTMENT OF THE TREASURY

### Guidance

**FIN-2016-G003**
**Issued: July 19, 2016**
**Subject: Frequently Asked Questions Regarding Customer Due Diligence**
**Requirements for Financial Institutions**

---

The Financial Crimes Enforcement Network ("FinCEN") is issuing these FAQs to assist covered financial institutions in understanding the scope of the Customer Due Diligence Requirements for Financial Institutions," published on May 11, 2016 (the "CDD Rule"), available at https://www.gpo.gov/fdsys/pkg/FR-2016-05-11/pdf/2016-10567.pdf. These FAQs provide interpretive guidance with respect to the CDD rule. FinCEN intends to issue additional FAQs or guidance as appropriate.

## Frequently Asked Questions (FAQs)

*Question 1: Purpose of CDD Rule*

Q:      Why is FinCEN issuing the CDD Rule?

A.      FinCEN is issuing the CDD Rule to amend existing BSA regulations in order to clarify and strengthen customer due diligence requirements for certain financial institutions. The CDD Rule outlines explicit customer due diligence requirements and imposes a new requirement for these financial institutions to identify and verify the identity of beneficial owners of legal entity customers, subject to certain exclusions and exemptions. Within this construct, as stated in the preamble to the Rule, FinCEN intends that the legal entity customer identify its ultimate beneficial owner or owners and not "nominees" or "straw men."

*Question 2: Rule application*

Q:      Does the CDD Rule apply to all financial institutions?

A:      No. The CDD Rule applies to covered financial institutions.

*Question 3: Covered financial institutions*

Q:      Which financial institutions are covered under the CDD Rule?

A:      For purposes of the CDD Rule, covered financial institutions are federally regulated banks and federally insured credit unions, mutual funds, brokers or dealers in securities, futures commission merchants, and introducing brokers in commodities.[1]

*Question 4: CDD requirements for covered financial institutions with respect to beneficial ownership*

Q:      What are the requirements for covered financial institutions to collect beneficial ownership information?

A:      The CDD Rule requires covered financial institutions to establish and maintain written procedures that are reasonably designed to identify and verify the beneficial owners of legal entity customers. These procedures must enable the institution to identify the beneficial owners of each customer at the time a new account is opened, unless the customer is otherwise excluded or the account is exempted. Also, the procedures must establish risk-based practices for verifying the identity of each beneficial owner identified to the covered financial institution, to the extent reasonable and practicable. The procedures must contain the elements required for verifying the identity of customers that are individuals under applicable customer identification program ("CIP") requirements.[2]

In short, covered financial institutions are now required to obtain, verify, and record the identities of the beneficial owners of legal entity customers.

*Question 5: Amendments to the anti-money laundering ("AML") program requirements*

Q:      Are there any changes to the AML program requirements for covered financial institutions in the Rule?

A:      Yes. The CDD Rule amends the AML program requirements for each covered financial institution to explicitly require covered institutions to implement and maintain appropriate risk-based procedures for conducting ongoing customer due diligence, to include:

- understanding the nature and purpose of the customer relationships; and
- conducting ongoing monitoring to identify and report suspicious transactions and, on a risk basis, to maintain and update customer information.

A covered financial institution's AML program must include, at a minimum: (1) a system of internal controls; (2) independent testing; (3) designation of a compliance officer or individual(s) responsible for day-to-day compliance; (4) training for appropriate personnel; and (5) appropriate risk-based procedures for conducting ongoing CDD to understand the nature and

---

[1] "Covered financial institution" is defined at 31 CFR 1010.605(e)(1).
[2] See 31 CFR 1020.220(a)(2), 31 CFR 1023.220(a)(2), 31 CFR 1024.220, and 31 CFR 1026.220(a)(2) for applicable CIP requirements.

purpose of customer relationships and to conduct ongoing monitoring to identify and report suspicious transactions, and, on a risk basis, to maintain and update customer information.

### Question 6: Procedures for identification and verification of identity of beneficial owners

Q: Must a covered financial institution's procedures for identifying and verifying the identity of beneficial owners of legal entity customers be identical to its customer identification program?

A: No. However, the CDD Rule requires that the procedures, at a minimum, contain the same elements as required for verifying the identity of customers that are individuals under the applicable CIP rule. However, financial institutions may use photocopies or other reproductions of identification documents in the case of documentary verification.

### Question 7: Anti-money laundering procedures

Q: Are covered financial institutions required to include the procedures for identifying and verifying the identity of the beneficial owners of legal entity customers in the institution's AML compliance program?

A: Yes. The CDD procedures must be included in the covered financial institution's AML compliance program.

### Question 8: Collection of beneficial ownership information

Q: Are covered financial institutions required to collect any information about beneficial ownership from the legal entity customer?

A: Yes. Covered financial institutions must collect information on individuals who are beneficial owners of a legal entity customer in addition to the information they are required to collect on the customer under the CIP requirement.

### Question 9: Definition of beneficial owner

Q: Who is a beneficial owner?

A: The Rule defines beneficial owner as each of the following:

- each individual, if any, who, directly or indirectly, owns 25% or more of the equity interests of a legal entity customer (*i.e.*, the ownership prong); and
- a single individual with significant responsibility to control, manage, or direct a legal entity customer, including an executive officer or senior manager (*e.g.*, a Chief Executive Officer, Chief Financial Officer, Chief Operating Officer, Managing Member, General Partner, President, Vice President, or Treasurer); or any other individual who regularly performs similar functions (*i.e.*, the control prong). This list of positions is illustrative, not exclusive, as there is significant diversity in how legal entities are structured.

3

Under this definition, a legal entity will have a total of between one and five beneficial owners (*i.e.,* one person under the control prong *and* zero to four persons under the ownership prong).

### Question 10: Collection of information for beneficial owners

Q:      Are covered financial institutions required to obtain information directly from the beneficial owners of legal entity customers?

A:      No. The Rule requires financial institutions to obtain information about the beneficial owners of a legal entity from the individual seeking to open a new account at the covered financial institution on behalf of the legal entity customer. This individual could, but would not necessarily, be a beneficial owner.

### Question 11: Beneficial ownership information that must be collected for legal entity customers

Q:      What types of information are covered institutions required to collect on the beneficial owners of legal entity customers?

A:      As with CIP for individual customers, covered financial institutions must collect from the legal entity customer the name, date of birth, address, and social security number or other government identification number (passport number or other similar information in the case of foreign persons) for individuals who own 25% or more of the equity interest of the legal entity (if any), and an individual with significant responsibility to control/manage the legal entity at the time a new account is opened.

### Question 12: Nominee owners

Q:      May a legal entity provide the identification of a nominee owner in response to a financial institution's request for the identification of a beneficial owner?

A:      No. As stated in the preamble to the Rule, FinCEN intends that the legal entity customer identify its ultimate beneficial owner or owners and not "nominees" or "straw men." FinCEN reiterates that it is the responsibility of the legal entity customer to identify its ultimate beneficial owners and that the financial institution may rely upon the information provided, unless the institution has reason to question its accuracy.

### Question 13: The control prong of the beneficial ownership requirement

Q:      What types of individuals satisfy the definition of a person with "significant responsibility to control, manage, or direct a legal entity customer?"

A:      Under the Rule, a legal entity must provide information on a control person with "significant responsibility to control, manage, or direct the company." The rule also provides examples of the types of positions that could qualify, including "[a]n executive officer or senior manager (*e.g.*, a Chief Executive Officer, Chief Financial Officer, Chief Operating Officer, Managing Member, General Partner, President, Vice President, or Treasurer)." FinCEN's expectation is that the control person identified must be a high-level official in the legal entity, who is responsible for how the organization is run, and who will have access to a range of

information concerning the day-to-day operations of the company. The list of positions is illustrative, not exclusive.

### Question 14: Definition of account

Q:      How is "account" defined in the CDD Rule?

A:      In order to maintain consistency with CIP, FinCEN added to the CDD Rule the same definition of the term "account" that is in the CIP rules for banks, brokers or dealers in securities, mutual funds, and futures commission merchants and introducing brokers in commodities.

### Question 15: Definition of new account

Q:      What is a new account?

A:      The Rule defines a new account as each account opened at a covered financial institution by a legal entity customer on or after the May 11, 2018 applicability date.

### Question 16: Application to Existing Accounts

Q:      Does a covered financial institution have to obtain beneficial information on existing accounts?

A:      No. The rule does not cover existing accounts that were opened before the applicability date.

### Question 17: Exemptions and limitations on exemptions

Q:      Are there any other type of accounts that are not covered by the CDD Rule?

A:      Yes. Subject to certain limitations, covered financial institutions are also not required to identify and verify the identity of the beneficial owner(s) of a legal entity customer when the customer opens any of the following four categories of accounts:

- accounts established at the point-of-sale to provide credit products, solely for the purchase of retail goods and/or services at these retailers, up to a limit of $50,000;
- accounts established to finance the purchase of postage and for which payments are remitted directly by the financial institution to the provider of the postage products;
- accounts established to finance insurance premiums and for which payments are remitted directly by the financial institution to the insurance provider or broker; and
- accounts established to finance the purchase or lease of equipment and for which payments are remitted directly by the financial institution to the vendor or lessor of this equipment.

These exemptions will not apply under either of the following two circumstances:

5

- if the accounts are transaction accounts through which a legal entity customer can make payments to, or receive payments from, third parties.
- if there is the possibility of a cash refund for accounts opened to finance purchase of postage, insurance premium, or equipment leasing. If there's the possibility of a cash refund, the financial institution must identify and verify the identity of the beneficial owner(s) either at the initial remittance, or at the time such refund occurs.

### *Question 18: Collection of beneficial ownership information*

Q:    Must covered financial institutions collect beneficial ownership information on all of the beneficial owners of a legal entity customer?

A:    Covered financial institutions must collect and verify the beneficial ownership information of each person who meets the definition under the ownership prong, and of one person under the control prong. Under the ownership prong, covered financial institutions are required to collect the beneficial ownership information only for each individual who owns directly or indirectly 25% or more of the equity interest of a legal entity and under the control prong, for one individual with significant responsibility to control, manage, or direct the entity. However, the rule recognizes that there may be instances when no one individual owns 25% or more of the equity interest of the legal entity; in such instances, the financial institution is still required to collect the required information for one individual who controls, manages, or directs the legal entity customer.

### *Question 19: Certification Form*

Q:    Are covered financial institutions required to use the Certification Form that is in Appendix A of the final CDD Rule?

A:    No. The Certification Form is provided as an optional form that financial institutions may use to obtain the required beneficial ownership information. Financial institutions may choose to comply by using the sample Certification Form, using the institution's own forms, or any other means that complies with the substantive requirements of this obligation.

### *Question 20: Definition of legal entity customer*

Q:    Who is a legal entity customer?

A:    The Rule defines a legal entity customer as a corporation, limited liability company, other entity created by the filing of a public document with a Secretary of State or similar office, a general partnership, and any similar entity formed under the laws of a foreign jurisdiction that opens an account. The definition also includes limited partnerships, business trusts that are created by a filing with a state office, and any other entity created in this manner.

A legal entity customer does not include sole proprietorships, unincorporated associations, or natural persons opening accounts on their own behalf.

*Question 21: Exclusions from the definition of legal entity customer*

Q:      Are there any entities that are excluded from the definition of the legal entity customer and for which a covered financial institutions is not required to obtain beneficial ownership information?

A:      Yes. The CDD Rule excludes from the definition of legal entity customer certain entities that are subject to Federal or State regulation and for which information about their beneficial ownership and management is available from the Federal or State agencies, such as:

- Financial institutions regulated by a Federal functional regulator or a bank regulated by a State bank regulator;
- Certain exempt persons for purposes of the currency transactions reporting obligations:

    o A department or agency of the United States, of any State, or of any political subdivision of a State;
    o Any entity established under the laws of the United States, or any State, or of any political subdivision of any State, or under an interstate compact;
    o Any entity (other than a bank) whose common stock or analogous equity interests are listed on the New York, American, or NASDAQ stock exchange;
    o Any entity organized under the laws of the United States or of any State at least 51% of whose common stock or analogous equity interests are held by a listed entity;

- Issuers of securities registered under section 12 of the Securities Exchange Act of 1934 (SEA) or that is required to file reports under 15(d) of that Act;
- An investment company, as defined in section 3 of the Investment Company Act of 1940, registered with the U.S. Securities and Exchange Commission (SEC);
- An SEC-registered investment adviser, as defined in section 202(a)(11) of the Investment Advisers Act of 1940;
- An exchange or clearing agency, as defined in section 3 of the SEA, registered under section 6 or 17A of that Act;
- Any other entity registered with the SEC under the SEA;
- A registered entity, commodity pool operator, commodity trading advisor, retail foreign exchange dealer, swap dealer, or major swap participant, defined in section 1a of the Commodity Exchange Act, registered with the Commodity Futures Trading Commission;
- A public accounting firm registered under section 102 of the Sarbanes-Oxley Act.

Additional regulated entities:

- A bank holding company, as defined in section 2 of the Bank Holding Company Act of 1956 (12 USC 1841) or savings and loan holding company, as defined in section 10(n) of the Home Owners' Loan Act (12 USC 1467a(n));
- A pooled investment vehicle operated or advised by a financial institution excluded from the definition of legal entity customer under the final CDD rule;
- An insurance company regulated by a State;
- A financial market utility designated by the Financial Stability Oversight Council under Title VIII of the Dodd-Frank Wall Street Reform and Customer Protection Act of 2010;

Excluded Foreign Entities:

- A foreign financial institution established in a jurisdiction where the regulator of such institution maintains beneficial ownership information regarding such institution;
- A non-U.S. governmental department, agency or political subdivision that engages only in governmental rather than commercial activities; and
- Any legal entity only to the extent that it opens a private banking account subject to 31 CFR 1010.620.

### *Question 22: Trusts*

Q: Are trusts included in the definition of legal entity customer?

A: No. The definition of legal entity customers only includes statutory trusts created by a filing with the Secretary of State or similar office. Otherwise, it does not include trusts. This is because a trust is a contractual arrangement between the person who provides the funds or other assets and specifies the terms (*i.e.*, the grantor/settlor) and the person with control over the assets (*i.e.*, the trustee), for the benefit of those named in the trust deed (*i.e.*, the beneficiaries). Formation of a trust does not generally require any action by the state.

The CDD Rule does not supersede existing obligations and practices regarding trusts generally. The preamble to each of the CIP rules notes that, while financial institutions are not required to look through a trust to its beneficiaries, they "may need to take additional steps to verify the identity of a customer that is not an individual, such as obtaining information about persons with control over the account."[3] We understand that where trusts are direct customers of financial institutions, financial institutions generally also identify and verify the identity of trustees, because trustees will necessarily be signatories on trust accounts. Furthermore, under supervisory guidance for banks, "in certain circumstances involving revocable trusts, the bank may need to gather information about the settlor, grantor, trustee, or other persons with the

---

[3] *See, e.g.*, "Customer Identification Programs for Broker-Dealers," 68 FR at 25116 n.32. (May 9, 2003).

8

authority to direct the trustee, and who thus have authority or control over the account, in order to establish the true identity of the customer."[4]

### Question 23: Office of Foreign Assets Control (OFAC) Regulations

Q:      Are covered financial institutions required to comply with the OFAC regulations with respect to beneficial ownership information?

A:      Covered financial institutions should use beneficial ownership information as they use other information they gather regarding customers (e.g., through compliance with the CIP requirements), including for compliance with OFAC-administered sanctions.

### Question 24: Section 314(a) Requirements

Q:      Do covered financial institutions now have additional obligations under Section 314(a) for beneficial ownership information?

A:      FinCEN does not expect the information obtained under the CDD Rule to add additional 314(a) requirements for financial institutions. The regulation implementing section 314(a) does not require the reporting of beneficial ownership information associated with an account or transaction matching a named subject in a 314(a) request. Covered financial institutions are required to search their records for accounts or transactions matching a named subject and report whether a match exists using the identifying information provided in the request.

### Question 25: Effective Date of the final CDD Rule

Q:      What is the effective date of the CDD Rule?

A:      July 11, 2016, which is 60 days from the publication of the CDD Rule in the Federal Register.

### Question 26: Applicability Date of the final CDD Rule

Q:      When must covered financial institutions implement the final rule?

A:      Covered financial institutions will have until May 11, 2018, two years from the date the final CDD Rule was published in the Federal Register, to implement and comply with the CDD Rule.

---

[4] Federal Financial Institutions Examination Council, *Bank Secrecy Act/Anti-Money Laundering Examination Manual* 281 (2014) (FFIEC Manual).